**THE GILLAM LAW FIRM**
*A Professional Law Corporation*
Carol L. Gillam (SBN 102354)
11620 Wilshire Boulevard, Suite 900
Los Angeles, California 90025
Telephone: (310) 203-9977
Facsimile:  (310) 203-9922
carol@gillamlaw.com

Attorneys for Plaintiff Charles Matthew Erhart

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES MATTHEW ERHART, an individual,<br><br>                     Plaintiff,<br><br>   vs.<br><br>BOFI HOLDING INC., an entity, d/b/a BOFI FEDERAL BANK and BANK OF THE INTERNET,<br><br>                 Defendant. | Case No.: **'15CV2287 BAS NLS**<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>1. Whistleblower Retaliation in Violation of Sarbanes-Oxley Act<br>2. Whistleblower Retaliation in Violation of Dodd-Frank Act<br>3. Retaliation in Violation of Labor Code § 1102.5<br>4. Violation of California Medical Information Act<br>5. Wrongful Termination in Violation of Public Policy<br>6. Unfair Business Practices (Bus. & Prof. Code §§ 17200 et seq.)<br>7. Breach of Implied Covenant of Good Faith and Fair Dealing<br>8. Intentional Infliction of Emotional Distress<br>9. Defamation<br>10. Declaratory Relief<br><br>**JURY TRIAL DEMANDED** |

     Plaintiff CHARLES MATTHEW ("MATT") ERHART, demanding a jury

trial, alleges, on information and belief, the following in support of his complaint:

////

1

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

## JURISDICTION AND VENUE

1.     This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.* and the whistleblower protection provisions of the Dodd-Frank Act, 15 U.S.C. § 17u-6 *et seq*. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, as well as under 28 U.S.C. § 1343(a)(4), and 28 U.S.C. §§ 2201 and 2202. This suit is authorized and instituted pursuant to the above federal statutes. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by the Sarbanes-Oxley Act and the Dodd-Frank Act. This court has ancillary jurisdiction of the state law claims because they are sufficiently related to the federal claims.

2.     Venue is proper under 28 U.S.C. § 1391 because Defendant's principal place of business is in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

3.     Plaintiff CHARLES MATTHEW ("MATT") ERHART (hereinafter "Mr. Erhart" or "Plaintiff") resides in San Diego County, California. He was hired by Defendant to perform work as an internal auditor in San Diego, California, performing audits of a variety of aspects of BOFI's operations. For many reasons it is critical that Internal Audit be independent of management. Plaintiff performed his job competently at all relevant times. As the facts below will demonstrate, Plaintiff reasonably believed he uncovered numerous violations of federal and state law by BOFI, appropriately went up the chain of command to notify the Bank, and in all respects tried to get the Bank into compliance. Instead of being thanked by Bank management for his efforts, Plaintiff was repeatedly threatened, harassed and ultimately fired for trying to do the right thing.

4.     At all material times to this action, Defendant BOFI HOLDING INC., an entity, d/b/a BOFI FEDERAL BANK and BANK OF THE INTERNET

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

was a publicly traded company (NASDAQ symbol: BOFI) headquartered at 4350 La Jolla Village Drive, Suite 140, San Diego County, California 92122 (hereinafter "BOFI", Defendant, or "the Bank"). BOFI is the holding company for BOFI Federal Bank.

5.     BOFI boasts on its website (www.bofiholding.com) that its performance has it ranked #1 in the country among the largest public thrifts. Its assets exceed $5.8 billion. BOFI stock recently reached an all-time high of $143.92 per share. On information and belief, BOFI's valuation is based, at least in part, upon inaccurate information being supplied by the Bank to the public and the regulators.

6.     BOFI is regulated by, among others, the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), the Securities and Exchange Commission ("SEC), the Financial Industry Regulatory Authority ("FINRA") and the Consumer Financial Protection Bureau ("CFPB").

7.     BOFI is subject to a variety of statutory schemes including, without limitation, the Bank Secrecy Act of 1970 ("BSA"), the USA PATRIOT Act including the Know Your Customer Rule ("KYC"), the Dodd-Frank Act, Sarbanes-Oxley Act of 2002 ("SOX"), the Securities Act of 1933 and the Securities Exchange Act of 1934.

## EXHAUSTION OF REMEDIES

8.     Plaintiff timely filed complaints with federal agencies including the United States Department of Labor, Occupational Safety and Health Administration, and the SEC. More than 180 days have elapsed since filing those complaints. Plaintiff has therefore exhausted his administrative remedies.

////

////

////

////

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### The Structured Settlements and Lottery Audit

9.    On or about September 23, 2013, Mr. Erhart started his employment at BOFI as an internal auditor, following a stint at FINRA. He reported to Jonathan Ball, Vice President, Internal Audit.

10.    Higher than Mr. Ball in the Bank's management was John Tolla, Senior Vice President Audit and Compliance, to whom the Audit Department was to report for administrative purposes only. This is critically important because of the need for Internal Audit to have independence to do its function without undue pressure from senior management.

11.    On or about December 19, 2013, Plaintiff sent an Exit Meeting request for an audit he was completing, the Structured Settlements and Lottery internal audit. This is a standard procedure at the conclusion of an audit.

12.    One of BOFI's unusual sources of revenue derives from purchasing structured settlements from plaintiffs in litigation, and lottery payments from winners of lotteries. BOFI, through its subsidiary Anfed Bank, has a team of callers who cold-call prospects with the goal of purchasing the income streams from these individuals, offering them a lump sum in lieu of the periodic payments they are receiving. BOFI also solicits this target group through a website, https://www.anfedbank.com/lottery-payments.

13.    One of Plaintiff's major findings in the audit was that BOFI's callers were not notifying people they called that the calls were being recorded, in violation of California Penal Code § 632.

14.    Approximately 15 minutes after Plaintiff sent the request for the Exit Meeting, the Chief Executive Officer of BOFI, called Plaintiff on his work phone. This is highly unusual and grossly inappropriate.

15.    Approximately 30 minutes after Plaintiff sent the request, Senior Vice President John Tolla called Plaintiff into his office and instructed him to

4

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

never state in an audit report that the Bank violated a federal or state law.

16.    Approximately one hour after Plaintiff was called into Tolla's office and given that instruction, Plaintiff was summoned to a second meeting with Eshel Bar-Adon, the Bank's Chief Legal Officer, together with Plaintiff's manager Jonathan Ball. Mr. Bar-Adon instructed Plaintiff and Mr. Ball to remove evidence of the violation of California Penal Code § 632 from the Structured Settlements and Lottery Audit. Again, this was grossly inappropriate conduct on the part of a senior officer of the Bank. Mr. Ball informed the Chief Legal Officer that Internal Audit could not do that. Then Mr. Bar-Adon instructed Plaintiff to mark the entire report "Attorney Client Privileged," explaining that he was concerned the finding could be discoverable in class action litigation against the Bank, which would be expensive to defend. Plaintiff acceded to this order, but held fast in his refusal to remove the finding from the audit. Marking the report as "Attorney Client Privileged" could mean that the Bank would refuse to turn it over in litigation, hiding important evidence from litigants, counsel and courts. In addition, Mr. Bar-Adon instructed Plaintiff not to speak to an employee in the Structured Settlements and Lottery Department with whom he was friendly.

**Potentially Altered Financials**

17.    In or about January 2014, Thomas Constantine, the Bank's Chief Credit Officer, told Plaintiff, Jonathan Ball and others at a meeting that he is not responsible for any of the Bank's numbers after they are turned over to the Chief Financial Officer, Andrew Micheletti. He reiterated that he could and would not vouch for the accuracy of the numbers once the CFO had them.

Plaintiff reasonably understood this to mean that senior Bank management, at the CFO level and above, may be falsifying the Company's financials. If so, that is a serious criminal offense.

**Untimely Contributions of Employee 401k Elective Deferrals**

18.    In or about the middle of 2014 Plaintiff and a fellow employee in

5

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

Internal Audit did a Payroll Audit. They found that the Bank had not been making timely deposits to employees' 401k accounts for employee elective deferrals, contrary to law. Plaintiff found untimely deposits made (from 1-16 days late) for a total of 10 pay periods. When Plaintiff asked SVP Tolla about this, Tolla said it had to do with the H&R Block deal and moving around of assets. That deal had not even been approved yet and would not be for months. The answer made no sense. On information and belief an employee asked CFO Micheletti if the Bank would elect to self-report the problem to the Internal Revenue Service and Department of Labor to take corrective action. On information and belief no corrective action occurred.

### Fiscal 2015 Strategic Plan Not Properly Approved

19.    Plaintiff conducted the Fiscal 2014/2015 Business Plan Audit. During the October 30, 2014 Exit Meeting, CFO Micheletti and Chief Performance Officer Jan Durrans were present. Plaintiff had learned that the Strategic Plan had not been approved at any of the following Board of Directors meetings: May 1, 2014; July 2014; September 2014. Angela Lopez, Vice President of Corporate Governance and Corporate Secretary, wrote that the Board was dark in November and December, and that the revised budget might be submitted in January 2015.

20.    As of January 28, 2015, Derrick Walsh, Chief Accounting Officer, wrote that the strategic plan and budget for Fiscal 2015 were still not approved, due to an earnings call and other items "taking precedent, sorry."

21.    Then, magically, amazingly, on or about February 10, 2015 CPO Durrans presented Internal Audit's head Jonathan Ball with a document titled "Action by Unanimous Written Consent of the Board of Directors in Lieu of a Meeting" dated July 7, 2014, purporting to have approved the Fiscal 2015 strategic plan and budget seven months earlier. Each signature was copied and pasted, further proof that the Board did not actually approve the Fiscal 2015

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

Strategic Plan on July 7, 2014 or at any later date.

**Deposit Concentration Risk Findings**

22.     On or about November 21, 2014, Plaintiff sent an email to the Bank's Chief Risk Officer, Thomas Williams, in preparation for the upcoming Enterprise Risk Management ("ERM") audit. Plaintiff asked whether Mr. Williams thought the Bank had a deposit concentration risk. This is a serious concern for a bank. Where a large percentage of its deposits are derived from a few depositors, sudden withdrawals can pose a serious challenge to a Bank's ability to keep its doors open a well as maintain its compliance with regulators.

23.     Plaintiff was concerned and reported that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits. Plaintiff was aware that other banks had gotten into trouble with regulators for deposit concentration levels lower than this. Mr. Williams responded, but copied SVP John Tolla on the response.

24.     SVP Tolla then summoned Plaintiff to his office (again) and, commenting on Plaintiff's email to Mr. Williams, instructed Plaintiff not to put his concerns in writing: "Don't send that in an email, go have the conversation." Once again BOFI was instructing audit staff not to create written evidence of its non-compliance and illegal conduct. This inevitably compromises Internal Audit's independence and represents a gross conflict of interest.

**Plaintiff's Downgraded Performance Evaluation and Bonus**

25.     In or about December 2014, Plaintiff received his performance review from Jonathan Ball. His rating was downgraded by SVP John Tolla, specifically referencing Plaintiff's putting findings in writing. Furthermore, Mr. Tolla had complete discretion to determine bonuses, and Plaintiff's bonus was adversely affected by Tolla's rating and bonus decision. This is a direct conflict of interest to have someone in Tolla's position able to reward and punish Internal

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

Audit employees depending on how well they comply with upper management's desires to hide illegalities and non-compliance.

### SEC Subpoena

26.     On or about December 12, 2014, the SEC served a subpoena on BOFI, requesting account identifying information for a certain investment advisory firm with initials ETIA LLC ("ETIA"). On or about December 18, 2014 the Bank responded to the SEC that it did not have any information regarding ETIA.

27.     In or about early January 2015, Plaintiff became aware of the SEC subpoena, and knew that the Bank did indeed have a loan file containing information regarding ETIA. Plaintiff further learned that a file had been created in response to the SEC subpoena, containing the information located regarding ETIA. In the course of investigating why the file was not turned over to the SEC in response to its subpoena, Plaintiff learned from a Bank employee (name with initials CT) that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, *before* the Bank sent its response to the SEC denying the existence of any such files.

28.     Approximately three hours after interviewing Bank employee CT, Plaintiff was informed by Mr. Ball, his boss, that the Bank's Chief Lending Officer, Brian Swanson, was upset about the interview and said that Plaintiff should cease performing his duties to the extent they involved interviewing "his" employees.

29.     Shortly thereafter, Plaintiff placed a call to the SEC to be sure it was aware of the situation regarding the ETIA subpoena.

30.     A few days later, Plaintiff was called in (yet again) to SVP Tolla's office, and told that he had handled the ETIA investigation wrong, that he should not have interviewed employee CT, but should have gone instead to Mr. Swanson. SVP Tolla told Plaintiff that there was nothing "nefarious" going on with respect to the subpoena. Plaintiff was upset at this inappropriate interference

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

from upper management again, and asked his manager Mr. Ball whether he Plaintiff, in fact had done anything wrong. Mr. Ball reassured Plaintiff he had acted appropriately and that it was Mr. Tolla who was wrong.

31.     In or about February 2015, Plaintiff submitted two whistleblower tips to the SEC, one regarding the ETIA subpoena issue, and another regarding a suspicious loan customer, whom Plaintiff suspected of operating as an unregistered broker/investment advisor. He submitted them through his work computer, and BOFI had knowledge of his whistleblowing.

### Failure to Disclose Accounts with No Tax Identification Numbers

32.     On or about January 15, 2015, the Bank's principal regulator, the OCC (Office of the Comptroller of the Currency) requested information on Bank accounts with no Tax Identification Numbers ("TIN's"). The Bank responded to the OCC that there were no accounts without TIN's. This was knowingly false, as Plaintiff saw a spreadsheet in the BSA ("Bank Secrecy Act") folder disclosing approximately 150-200 accounts where the borrower does not have a TIN.

### Failure to Disclose Grand Jury and Other Subpoenas

33.     In or about February 2015, the OCC requested that the Bank disclose all correspondence with federal and state banking agencies and law enforcement, to include any and all subpoenas, criminal or otherwise. The Bank responded that it had not received any such documents for the review period in question. This was false, as Plaintiff saw a BSA spreadsheet that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of the Treasury, of which OCC is a part. Furthermore, Plaintiff sat next to the Bank employee who received and logged in subpoenas, and heard comments about how many there were and how frequently the Bank was served with subpoenas.

////

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

**Failure to Disclose Loans to Criminals, Politically Exposed Persons**

34.    In or about January 2015, Plaintiff conducted a Loan Origination Audit. He discovered that the Bank was making substantial loans to foreign nationals including Politically Exposed Persons ("PEP's") in potential violation of BSA/Know Your Customer rules. Plaintiff was able to readily uncover information that many of the borrowers were criminals, even notorious criminals, and other suspicious persons who put the bank at high risk for violating the Bank Secrecy Act's Anti-Money Laundering Rules ("AML Rules") as well as exposing the Bank to reputational risk. The purpose of the AML Rules is to help detect and report suspicious activity including the predicate acts to money laundering and terrorist financing. The  PEP's included very high level foreign officials from major oil-producing countries and war zones.

**SVP Tolla Materially Altered Bank Secrecy Act QC Findings**

35.    In or about early 2015 Plaintiff discovered that SVP Tolla had repeatedly changed the findings on numerous reports required under the Bank Secrecy Act's Quality Control ("QC") requirements.

**BOFI Improperly Accounts for Allowances for Loan and Lease Losses**

36.    In or about early 2015 Plaintiff discovered that the Bank recently calculated Allowances for Loan and Lease Losses ("ALLL") to exclude unfunded commitments for lines of credit. The size of the unfunded commitments excluded from ALLL meant the ALLL may have been materially miscalculated, which could materially impact the Bank's earnings.

**Material Omissions in Floor Disaster Protection Act Audit ("FDPA")**

37.    Plaintiff was reassigned the FDPA Audit after another employee resigned. A previous Compliance employee had found issues with 49 of the 51 samples she pulled. That employee told Plaintiff she was so disgusted with the Bank's nonexistent culture of compliance that she quit her job. Yet another

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

employee previously produced a Compliance Review identifying many issues, and then resigned. Plaintiff discovered that the Bank had buried and never issued the reviews.

38.    Plaintiff investigated and verified the negative findings made by his predecessors. He presented them to management, who caused most of the negative findings to be excluded from the Audit Report, leaving in only a small fraction of the findings.

39.    The FDPA Audit was a matter of considerable interest to OCC examiners, from whom material information was purposely withheld.

### Global Cash Card Reviews for High Risk Customers

40.    During the week of January 26, 2015, Plaintiff and a coworker met with the Bank's Deputy BSA Officer Third Parties to talk about Global Cash Card ("GCC") Customer Identification Program ("CIP") reviews for high-risk customers. On information and believe GCC is a vendor that provides cash cards that companies can issue to employees in lieu of traditional paychecks, or for other purposes.

41.    On or about February 12, 2015, Plaintiff and a coworker prepared an Internal Audit Memorandum with their findings from the GCC review. The OCC, then conducting its onsite examination at BOFI, asked that third party vendors like GCC rate their customers. When the GCC high-risk customer list was initially presented to SVP John Tolla, approximately 30% of the customers on the list were "bad" – i.e., the verification process produced alerts. The list included at least one social security number ("SSN") belonging to a deceased person, 30 SSN's that could not be found in public records, scores of SSN's that did not match the customer's name or were issued before the customer's date of birth was born, many had suspiciously high cash balances, even exceeding $70,000.

42.    SVP Tolla demanded that a new list be produced, and one was dutifully done that did not feature any "bad" Customer Identification Program

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

("CIP") data. The original list with the "bad" data was not turned over to the OCC; the new, sanitized list was. BOFI then terminated its relationship with GCC, and SVP Tolla repeatedly instructed staff not to inform the OCC about why the relationship was terminated. On information and belief CEO Gregory Garrabrants was party to the discussion when the "bad" CIP data was first discovered and GCC provided the initial high-risk customer list to the Bank.

43.     Plaintiff and a coworker located the original high-risk customer list the Bank received from GCC, including the "bad" data. They attached it as an exhibit to the February 12 Memorandum, which was intended to be presented to the Audit Committee until the events described below prevented that from occurring.

## Plaintiff Finds Improprieties in the CEO's Personal Accounts

44.     In early 2015 Plaintiff and others conducted a review of personal deposit accounts of senior management. In doing so Plaintiff discovered that CEO Gregory Garrabrants was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties. Plaintiff documented this in an internal audit memo to Jonathan Ball dated January 20, 2015. Plaintiff also learned that the issue of Mr. Garrabrants' depositing of third-party checks had previously been raised to the Audit Committee before he started working at the Bank, and that restrictions were imposed on him. Plaintiff was concerned as to whether or not the CEO was reporting the income to the IRS.

45.     In the course of reviewing employee deposit accounts at the Bank, Plaintiff also discovered that the largest consumer account at the Bank has the Tax Identification Number ("TIN") of the CEO's brother, Steven Garrabrants. The account had a balance of approximately $4 million, and the CEO was the signer on the account. As Steven Garrabrants was a minor league baseball player earning poverty wages, Plaintiff could find no evidence of how he had come legally into possession of the $4 million wired into the account. From the

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

foregoing, Plaintiff was concerned about whether CEO Garrabrants could be involved in tax evasion and/or money laundering. He saved the folder regarding this work in an Audit Department file on his work computer.

### Other Instances of Wrongdoing Uncovered by Plaintiff

46.    The foregoing instances described in Paragraphs 9-45 form an incomplete list of the instances of wrongdoing Plaintiff uncovered at the Bank. He documented these matters in files on BOFI's computers and in locked file cabinets in his work space. In fact, the Bank's Deputy BSA Officer stated, in front of others, that one problem with Plaintiff was that he was too good at his job. Plaintiff reported each of these matters to appropriate government agencies as a whistleblower in April 2015.

### SVP John Tolla's Threat to Plaintiff

47.    On or about January 27, 2015, SVP John Tolla walked by Plaintiff working at his computer. He stated, in the presence of others, "If Matt [Plaintiff] continues to turn over rocks, eventually he is going to find a snake and he's going to get bit." Plaintiff reasonably viewed this as a direct and serious threat, and became concerned for his personal safety as well as for his job.

48.    On or about February 4, 2015, Plaintiff informed his manager, Mr. Ball, about the threat he had received from SVP Tolla. Mr. Ball asked Plaintiff if he wanted to bring the matter to the Bank's Audit Committee. Plaintiff declined, because he was in the midst of conducting several investigations and audits, and feared that his work would come to an abrupt halt, without the Audit Committee or federal regulators being made aware of the Bank's wrongdoing.

### BOFI Refuses To Let Employees Communicate Via Outlook (Email)

49.    On or about February 12, 2015, Plaintiff emailed an OCC Examiner who was onsite working on the BOFI examination. He informed the examiner that SVP Tolla told all members of the Internal Audit Department that week that

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

they would no longer be permitted to use Microsoft Outlook to communicate. On information and belief SVP Tolla gave this directive did not want a paper trail regarding Bank improprieties.

### John Ball Abruptly Resigns After Refusing to Break the Law

50.    In or about late February 2015, during or after the OCC onsite examination, Plaintiff's manager Mr. Ball informed the Internal Audit department that a meeting would be held to discuss major findings that needed to be presented to the Bank's Audit Committee. This was a huge step. Mr. Ball felt that the level of wrongdoing at the Bank had become so egregious that the staff had no choice but to bring it up to the Audit Committee. The meeting was so sensitive that Mr. Ball turned up a radio so that the discussion could not be overheard outside his office. Mr. Ball said he planned to present memos from the Internal Audit staff, including Plaintiff, to the Audit Committee, documenting the wrongdoing.

51.    On or about March 5, 2015, Mr. Ball resigned abruptly after refusing an order from CEO Garrabrants to engage in what Mr. Ball reasonably viewed to be unlawful conduct to cover up the Bank's wrongdoing. Mr. Ball had spent five years at the Bank.

52.    Shortly thereafter SVP Tolla came into the Bank's offices and told the members of the Bank's Audit and Compliance Department *not* to inform the OCC that Mr. Ball had resigned. Plaintiff and a coworker had already told the OCC examiners, however. CEO Garrabrants also grilled Internal Audit employees about why Ball had resigned, but the employees refused to state why.

### Plaintiff Becomes Ill and Calls Off Work

53.    Plaintiff became even more concerned for his well being after Mr. Ball's sudden resignation. He felt very unwell and the following day, March 6, 2015, he called off sick. He informed a coworker in Internal Audit of his illness, and asked her to pass the word to SVP Tolla, since no one had yet taken Mr.

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

Ball's place as Plaintiff's manager.

54.     On or about Friday, March 6, 2015, at approximately 7:30 am, Plaintiff's coworker called Plaintiff and told him that SVP Tolla said Plaintiff was to attend a "non-optional" call with the OCC. The coworker confirmed she told Mr. Tolla he was off sick. She further informed him that SVP Tolla was going through Mr. Ball's email and found the Internal Audit Memo Plaintiff and the worker wrote regarding the Global Cash Card High Risk Customer Review, described in Paragraphs 40-43 above.

### Tolla Breaks Into Plaintiff's Locked Cabinets and Computer

55.     Plaintiff became extremely concerned that the Bank would try to destroy the records of wrongdoing that Plaintiff had placed on the Bank's computers. That same morning, March 6, 2015, he called the Denver Regional Office of the OCC and said he was seeking whistleblower protection. An appointment with the OCC was confirmed for Monday, March 9, 2015.

56.     Meantime, around 9:38 am that same Friday SVP Tolla was calling Plaintiff on his cell phone, instructing Plaintiff to call him. Later that same morning, Plaintiff heard from a coworker that "they opened up your computer" and a text stating: "Tolla is going crazy over here bro. Going through balls computer too. Fyi."

### Plaintiff Engages in Whistleblowing to the OCC

57.     At approximately 11:27 am that same day Plaintiff emailed the OCC a copy of the Internal Audit Memo regarding the Global Cash Card High Risk Customer Review, which SVP Tolla had discovered that morning. Plaintiff wanted to be sure the OCC did not think it was Mr. Ball who was hiding information from them. He further disclosed that both the CEO and SVP Tolla had discovered the memo, and that he feared upper management had accessed his work laptop remotely. He informed the OCC that he would not return to work

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

until he spoke with them at the appointed time the following Monday.

58.    Minutes later Plaintiff received a phone call from a coworker that SVP Tolla had a Bank employee open up the locked file cabinets at Plaintiff's desk and was going through all the documents. The coworker further informed him that Tolla had found the expanded scope Internal Audit review of personal accounts of the CEO, which Plaintiff believed showed potential tax evasion, described in Paragraphs 44-45 above.

59.    SVP Tolla continued to call Plaintiff's mobile phone repeatedly throughout that Friday, but did not leave any voicemails after the first one that morning.

60.    The following day, Saturday, March 7, 2015, Plaintiff received a text from a coworker telling Plaintiff that the CEO grilled her for nearly an hour about why Internal Audit was looking at his accounts. That coworker further stated, "We had an all hands yesterday where john [Tolla] and Greg [Garrabrants] spoke about you and Jon [Ball]. It was terrible."

## BOFI Prepares to Terminate Plaintiff

61.    Meanwhile, as Plaintiff learned later, the Bank had a termination letter prepared that Friday, March 6, firing Plaintiff, that it attempted to deliver to Plaintiff. The letter ended up not being delivered to Plaintiff. On information and belief, the Bank also intended to and may have informed local police authorities that day that it wanted Plaintiff's apartment searched and his computer seized and for him to be arrested. Plaintiff was extremely fearful. As it happened, the police did not arrive, at least not while Plaintiff was home, to his knowledge.

62.    However, on information and belief the Bank sent someone to Plaintiff's residence that day to attempt to deliver the termination letter and recover Plaintiff's work laptop.

63.    By early Monday morning, March 9, 2015, Plaintiff had learned that SVP Tolla was falsely claiming to Plaintiff's coworkers that the Bank had not

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

heard from him for 48 hours and that this was grounds for termination. Plaintiff sent an email at 6:25 am to SVP Tolla and several others reminding Tolla that he had called off sick Friday and said would do so today, and was seeking an appointment with his physician to discuss a medical leave of absence. He stated, "I am in no mental state to discuss anything on the phone."

### **Plaintiff Turns Over Records to the OCC**

64. That same morning Plaintiff also heard from an OCC Attorney confirming that his communications with the OCC would be covered under the applicable whistleblower protection statute.

65. That afternoon, March 9, Plaintiff had a lengthy phone call with the OCC, lasting nearly two hours. He was directed to bring any documents he had to their Carlsbad office the following morning.

66. Meanwhile Plaintiff received text messages from a Bank employee trying to arrange to deliver an envelope to Plaintiff as well as retrieve his work laptop. On information and belief, the envelope contained his termination letter.

67. On information and belief, it was highly unusual for the Bank to demand return of the work laptop of an employee who was out sick, even when the employee is on an extended medical leave under the Family Medical Leave Act ("FMLA) or the California Family Rights Act ("CFRA"), Rather, the Bank had decided to terminate Plaintiff and feared his disclosures to regulators, and wanted to seize the evidence before it could be turned over to regulators.

68. The following morning, Tuesday, March 10, Plaintiff went to the OCC office in Carlsbad, turned over evidence, and then that day and the following he continued to fax documents that the OCC was unable to download and encrypt during the Carlsbad meeting.

69. On Wednesday, March 11, an OCC attorney confirmed to Plaintiff that he had received the documentation. He also told Plaintiff that the Bank had informed the OCC that it was going to call the San Diego police to go to Plaintiff's residence and seize his computer. The Bank was obviously well aware

17

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

of Plaintiff's whistleblowing activities.

70.    On Thursday, March 12, Plaintiff went to BOFI to return the laptop. Mr. Bar-Adon, Chief Legal Officer, ordered him to come to a conference room to speak. Plaintiff reiterated he was in no mental state to speak to management. MR. Bar-Adon then claimed he was acting as General Counsel to the Audit Committee. Plaintiff continued to refuse to speak to him, but told him he would speak to the Audit Committee at a later time. That same day, a BOFI employee called Plaintiff and told him that an employee in Compliance had processed Plaintiff's termination paperwork the previous week (believed to have occurred the previous Friday, March 6, 2015).

### Tolla and Garrabrants Make False Accusations About Plaintiff

71.    On or about Saturday, March 14, 2015, a BOFI employee told Plaintiff that SVP Tolla was telling employees that Plaintiff was responsible for a negative article about BOFI on the Seeking Apha website published December 2, 2014. SVP Tolla had actually called Plaintiff "Seeking Alpha" to his face the previous month. Plaintiff was not responsible for the article.

72.    Plaintiff submitted paperwork to BOFI for a medical leave of absence. He remained out until he was officially fired June 9, 2015. On information and belief during Plaintiff's medical leave CEO Garrabrants grilled a coworker of Plaintiff's about the extent of Plaintiff's knowledge as compared with Ball's on matters that could hurt the Bank.

73.    On or about April 10, 2015, two coworkers informed Plaintiff that SVP Tolla stated, at an "All Hands Meeting" of members of Audit and Compliance that any information Plaintiff provided to the OCC could not be considered credible because of Plaintiff's "psychiatric medical leave." This was false.

74.    SVP Tolla and CEO Gregory Garrabrants told this same group of employees that Plaintiff's whistleblowing activities were "malicious." This was false. CEO Garrabrants also told Bank employees that he was going to "bury the

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

BOFI whistleblower." Plaintiff only hopes this is false.

75.    As a result of Defendant's actions, Plaintiff suffered substantial losses in earnings, medical and other employment benefits, severe physical and emotional distress, attorneys' fees and other items of damage.

## FIRST CAUSE OF ACTION

### (Retaliation In Violation of the Sarbanes-Oxley Act - 18 USC § 1514A)

76.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

77.    At all material times Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendant. It prohibits employers such as Defendant from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

78.    Plaintiff timely filed a whistleblower complaint with OSHA, and 180 days have elapsed since filing that complaint. No decision has been issued by

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

OSHA, and Plaintiff has not been the cause of any delay in the issuance of a decision. Accordingly Plaintiff is entitled to seek relief in district court by jury trial. Moreover, no predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section of SOX.

79.     Defendant harassed, threatened, discharged and retaliated against Plaintiff, and disclosed his entity as a whistleblower, after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to his employer, by and through its agents and employees, as well as to the SEC, the OCC and OSHA.

80.     Plaintiff is informed and believes, and thereon alleges that because of his making complaints regarding Defendant's illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was discharged from his employment and/or otherwise discriminated and retaliated against by Defendant after he had made the aforesaid complaints about illegal conduct.

81.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

82.     Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

83.     Defendant's actions constituted a willful violation of the above-mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

84.     The conduct of Defendant described hereinabove was outrageous

and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

85.    Defendant committed the acts alleged hereinabove by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies and damages allowable by law.

86.    As a proximate result of the actions and conduct described hereinabove, which constitute violations of Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks make-whole relief, civil penalties and attorneys fees against Defendant pursuant to SOX.

87.    Wherefore Plaintiff prays for relief as stated in pertinent part hereinafter.

## SECOND CAUSE OF ACTION

**(Retaliation In Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010- 15 USC § 78u-6(h))**

88.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

89.    At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendant. It permits individuals who allege discharge or other discrimination to bring an action in United States District Court for relief.

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

90.     Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

91.     Plaintiff is a whistleblower within the meaning of Dodd-Frank, as evidenced by his conduct described in Paragraphs 9-45 above.

92.     Defendant harassed, threatened, discharged and retaliated against Plaintiff, and took other adverse actions against Plaintiff, including disclosing his entity as a whistleblower, after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to his employer, by and through its agents and employees, as well as to the SEC, the OCC and OSHA.

93.     Plaintiff is informed and believes, and thereon alleges that because of his making complaints regarding Defendant's illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was discharged from his employment and/or otherwise discriminated and retaliated against by Defendant after he had made the aforesaid disclosures and complaints about illegal conduct.

94.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

95.     Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

96.     Defendant's actions constituted a willful violation of the above-

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

97.     The conduct of Defendant described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

98.     As a proximate result of the actions and conduct described hereinabove, which constitute violations of Dodd-Frank, Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks all relief allowable by law including without limitation double back pay, injunctive and declaratory relief, make-whole relief, civil penalties, litigation costs, expert witness fees and attorneys fees against Defendant pursuant to Dodd-Frank.

99.     Wherefore Plaintiff prays for relief as stated in pertinent part hereinafter.

### THIRD CAUSE OF ACTION

### (Retaliation in Violation of Labor Code § 1102.5)

100.     As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

101.     At all times material to this Complaint, California Labor Code § 1102.5 was in effect and binding on Defendant. This section requires Defendant to refrain from retaliating against an employee for refusing to participate in an activity that he reasonably believes would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

102.   Plaintiff had a reasonable belief that Defendant was violating state and federal laws, and reported those violations to Defendant's management as well as to law enforcement agencies and regulators, as Defendant well knew, and as alleged hereinabove.

103.   Defendant retaliated against Plaintiff for his whistleblowing, by harassing, threatening, and terminating him, among other things, all in violation of Labor Code § 1102.5.

104.   As a direct and proximate result of such retaliation, Plaintiff has been damaged in a sum according to proof.

105.   Plaintiff requests all available relief under Labor Code § 1102.5 including damages and the imposition of a civil penalty of $10,000.00 for each violation.

## **FOURTH CAUSE OF ACTION**

### **(Violation of California Medical Information Act - Civil Code § 56 *et seq.*)**

106.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

107.   At all times material hereto, the California Medical Information Act, California Civil Code § 56 *et seq.* ("CMIA") was in effect and binding on Defendant. The CMIA places obligations and restrictions on California employers with respect to requests for medical information from employees.

108.   By the conduct alleged hereinabove, Defendant violated the CMIA.

109.   As a proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer substantial losses of earnings and other employment benefits and has suffered and continues to duffer severe emotional distress, humiliation and mental anguish, all to his damage in an amount according to proof.

110.   Defendant's actions were willful, malicious, fraudulent and

24

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

oppressive, and committed with the wrongful intent to injury Plaintiff and in conscious disregard of Plaintiff's rights.

111.    Wherefore Plaintiff seeks relief as set forth below including attorneys' fees and costs pursuant to Civil Code § 56.35 and California Code of Civil Procedure § 1021.5.

## FIFTH CAUSE OF ACTION

### (Wrongful Termination In Violation of Public Policy)

112.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

113.    At all times material hereto, Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendant. This law prohibits employers such as Defendant from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders.

114.    At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

effect and binding on Defendant. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

115.    At all times mentioned in this complaint, California Labor Code Section 1102.5 was in full force and effect and was binding on Defendant. This law requires Defendant to refrain, among other things, from retaliating against employees who refuse to participate in or condone conduct they reasonably believe to violate state or federal law.

116.    At all times material hereto, the California Medical Information Act, California Civil Code § 56 *et seq.* ("CMIA") was in effect and binding on Defendant. The CMIA places obligations and restrictions on California employers with respect to requests for medical information from employees.

117.    Title 18 USC § 1343 defines the crime of wire fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…. by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

118.    Title 18 USC § 1341 defines the crime of mail fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…. for the

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, r deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

119.    Article 1, Section 1 of the California Constitution provides that all people have a right to privacy, among other inalienable rights. The disclosure of a person's private medical information without that person's consent constitutes a violation of this constitutional right to privacy.

120.    California Business & Professions Code § 17200 provides that unfair competition shall mean any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Section 17500, *et seq.*, of the Business & Professions Code. Section 17203 of the Business & Professions Code provides that a court of competent jurisdiction may enjoin any conduct constituting unfair competition under § 17200.

121.    Each of the aforesaid laws is a fundamental policy of the State of California.

122.    Plaintiff believes and thereon allege that his whistleblowing, refusing to condone illegal activity, and engaging in protected activity, was or were a motivating factor in Defendant's conduct as alleged hereinabove, including terminating Plaintiff.

123.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; and Plaintiff has suffered and continued to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

124.    Defendant's conduct as described above was willful, despicable,

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Unfair Business Practices - Bus. & Prof. Code § 17200 *et seq*.)

125.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

126.   Defendant's conduct as alleged above violates multiple state and federal laws and constitutes unlawful business practices within the meaning of California Business & Professions Code § 17200, *et seq.*

127.   Plaintiff is informed and believes and thereon alleges that Defendant continues to engage in some or all of the aforementioned unfair and unlawful business practices.

128.   Plaintiff seeks an injunction prohibiting Defendant from engaging in the unfair and unlawful conduct described herein. Plaintiff also seeks attorneys' fees pursuant to the private attorney general doctrine, as codified in California Civil Code § 1021.5.

## SEVENTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

129.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

130.   Plaintiff and Defendant had an agreement that Plaintiff would be able to perform the duties of an internal auditor in accordance with federal and state regulations and commonly understood business practices, without fear of

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

losing his job, being threatened physically and otherwise, and without having his performance evaluation downgraded and bonus reduced because he spoke up about unlawful and improper practices at the Bank. The agreement between Plaintiff and Defendant contained an implied covenant of good faith and fair dealing, which obligated Defendant to perform the terms and conditions of the agreement fairly and in good faith and to refrain from doing any act that would deprive Plaintiff of the benefits of the agreement.

131.    Plaintiff has performed all conditions, covenants and promises required on his part to be performed in accordance with the terms and conditions of the agreement.

132.    Plaintiff is informed and believes, and thereon alleges, that Defendant knew Plaintiff had fulfilled, and was ready, willing and able to continue to fulfill all of his duties and conditions under the agreement.

133.    Defendant breached the implied covenant of good faith and fair dealing under the agreement by terminating Plaintiff without good cause.

134.    As a direct, foreseeable and proximate result of Defendant's breach of the implied covenant, Plaintiff has suffered and sustained damages in an amount according to proof.

## EIGHTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

135.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

136.    Defendant engaged in outrageous conduct towards Plaintiff with the intention to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress, and with wanton and reckless disregard for the injurious result to Plaintiff, as set forth hereinabove. The

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

conduct set forth hereinabove was extreme and outrageous and an abuse of the authority and position of Defendant. The above-described conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress. This conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

137.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has sustained and continues to sustain pain and suffering, extreme and severe mental anguish and emotional distress; Plaintiff has incurred and will continue to incur medical expenses for treatment, and for incidental medical expenses; and Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

138.   Plaintiff is informed and believes and thereon alleges that Defendant and its managing agents, managers, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Plaintiff's rights.

## NINTH CAUSE OF ACTION
### (Defamation Per Se and Compelled Self-Defamation)

139.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

140.   On information and belief, Defendant through its agents needlessly made defamatory statements about Plaintiff to numerous persons including coworkers, supervisors and prospective employers of Plaintiff. Information as to

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

the specific identity of the persons publishing the relevant statements, and the recipients of the statements is in the hands of Defendant and other third parties, and will be subject to discovery.

141.    On information and belief, Plaintiff believes defamatory statements by Defendant and their agents were made orally. While defamatory statements may also have been made in writing, Plaintiff does not presently have information concerning written statements, which is in the hands of Defendant and of which Defendant have superior knowledge, as will be subject to discovery.

142.    Plaintiff does not presently have knowledge of the exact wording of the defamatory statements at issue, other than as alleged hereinabove, such information being in the hands of Defendant and third parties. On information and belief, the general substance of these defamatory statements includes false express and implied assertions also including insinuation and innuendo that Plaintiff's performance was deficient, that he failed to perform his duties in a professional manner, that he was incompetent, that he suffered from a psychiatric illness, that he was trying maliciously to harm Defendant, that he was a criminal, and that Plaintiff was lying to federal regulators.

143.    Such assertions were intended as statements of fact and not opinion.

144.    Plaintiff is informed and believes that Defendant, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally caused excessive and unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons and the community, and/or with a failure to investigate adequately or verify purported facts underlying the defamatory statements.

145.    The precise dates of these publications are not presently known to Plaintiff, as the information is in the hands of Defendant. However, Plaintiff is informed and believes the publications were published and foreseeably republished in or around November 2014, and after that date, to first cause, and then justify, Plaintiff's wrongful and illegal termination, and to cause Plaintiff to

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

be unable to secure new employment for a considerable period of time despite reasonable efforts to do so.

146.    These publications were outrageous, negligent, reckless, intentional, and maliciously published and republished by Defendant, and each of them. Plaintiff is informed and believes that the negligent, reckless, and intentional publications by Defendant, and each of them, were and continue to be, foreseeably published and republished by Defendant, their agents and employees, recipients, and in the community. Plaintiffs hereby seek damages for these publications and all foreseeable republications discovered up to the time of trial.

147.    During the above-described time-frame, Defendant, including through its agents as set forth above, conspired to, and in fact, did negligently, recklessly, and intentionally cause excessive and unsolicited publication of defamation, of and concerning Plaintiff, to third persons, who had no need or desire to know. Those third person(s) to whom these Defendant published this defamation are believed to include, but are not limited to, other agents and employees of Defendant, and each of them, federal regulators, the San Diego Police, and the community, all of whom are known to Defendant, and each of them, but unknown at this time to Plaintiff.

148.    Further, Defendant had knowledge and/or reason to believe that Plaintiff would be under a strong compulsion and pressure to disclose the contents of these defamatory false statements to third persons, namely potential employers, colleagues, friends, family and other individuals, as he in fact did.

149.    The defamatory publications set forth above consisted of knowingly false and unprivileged communications, tending directly to injure Plaintiff and Plaintiff's personal, business, and professional reputation.

150.    Plaintiff is informed, believes and fears that these false and defamatory per se statements, including statements regarding Plaintiff's occupational, business, professional, and personal reputation, will continue to be published by Defendant, and each of them, and will be foreseeably republished by

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

its recipients, all to the ongoing harm and injury to Plaintiff's occupational, business, professional, and personal reputation. Plaintiff also seeks redress in this action for all foreseeable re-publications, including his own compelled self-publication of these defamatory statements.

151.    The defamatory meaning of all of the above-described false and defamatory statements and their reference to Plaintiff, were understood by these above-referenced third person recipients and other members of the community who are known to Defendant, and each of them, but unknown to Plaintiff at this time.

152.    None of Defendant's defamatory publications and statements against Plaintiff referenced above is true. The above defamatory statements were understood as assertions of fact, and not as opinion. Plaintiff is informed and believes this defamation will continue to be negligently, recklessly, and intentionally published and foreseeably republished by Defendant, and each of them, and foreseeably republished by recipients of Defendant's publications, thereby causing additional injury and damages for which Plaintiff seeks redress by this action.

153.    Each of these false defamatory per se publications (as set forth above) were negligently, recklessly, and intentionally published in a manner equaling malice and abuse of any alleged conditional privilege (which Plaintiff denies existed), since the publications, and each of them, were made with hatred, ill will, and an intent to vex, harass, annoy, and injure Plaintiff in order to justify the illegal and cruel actions of Defendant, to cause further damage to Plaintiff's professional and personal reputation, to cause him to be fired, to justify his firing and to destroy his credibility in the federal and local law enforcement community.

154.    Each of these publications by Defendant, and each of them, was made with knowledge that no investigation supported the unsubstantiated and obviously false statements. Defendant published these statements knowing them to be false, unsubstantiated by any reasonable investigation and were the product

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

of hostile witnesses. These acts of publication were known by Defendant, to be negligent to such a degree as to be reckless. In fact, not only did Defendant have no reasonable basis to believe these statements, but it also had no belief in the truth of these statements, and in fact knew the statements to be false. Defendant excessively, negligently, and recklessly published these statements to individuals with no need to know, and who made no inquiry, and who had a mere general or idle curiosity of this information.

155.   The above complained-of publications by Defendant were made with hatred and ill will towards Plaintiff and the design and intent to injure Plaintiff, Plaintiff's good name, his reputation, employment and employability. Defendant published these statements, not with an intent to protect any interest intended to be protected by any privilege, but with negligence, recklessness and/or an intent to injure Plaintiff and destroy his reputation. Therefore, no privilege existed to protect Defendant from liability for any of these aforementioned publications or republications.

156.   As a proximate result of the publication and republication of these defamatory statements, and each of them, Plaintiff has suffered injury to his personal, business and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost wages and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount according to proof.

157.   Defendant committed the acts alleged herein recklessly, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, for an improper and evil motive amounting to malice (as described above), and which abused and/or prevented the existence of any conditional privilege, which in fact did not exist, and with a reckless and conscious disregard of Plaintiff's rights. All actions of Defendant, its agents and employees, herein alleged were known, ratified and approved by Defendant. Plaintiff thus is entitled to recover

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

punitive and exemplary damages from Defendant, for these wanton, obnoxious, and despicable acts in an amount according to proof at time of trial.

## TENTH CAUSE OF ACTION

### (Declaratory Relief)

158.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

159.   A dispute and an actual controversy has arisen between the parties regarding the enforceability of a document purporting to compel Plaintiff to arbitrate certain claims against Defendant.

160.   Plaintiff asserts that under *Armendariz v. Foundation HealthCare* (2000) 24 Cal.4th 83 and its progeny, as well as under SOX and Dodd-Frank, and the public policies of California and the United States, that the document is unenforceable for a number of reasons as set forth in statutes and the case law. On information and belief Defendant asserts that the document is enforceable and that Plaintiff must bring his claims in arbitration.

161.   Plaintiff desires a judicial determination of the parties' rights and obligations of the parties with respect to the document, and a declaration that the arbitration document is invalid because it lacks mutuality, is procedurally and substantively unconscionable, and violates public policy.

162.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties under the alleged arbitration agreement, and not be forced to forgo his constitutional right to a trial by jury.

163.   Plaintiff does not seek to avoid the alleged agreement to arbitrate unless the alleged arbitration agreement is declared invalid and/or unenforceable.

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

# **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.      For compensatory damages, including lost wages, medical benefits and other employment benefits, according to proof;

2.      For double back pay with interest;

3.      For general, mental and emotional distress damages according to proof;

4.      For punitive damages on each cause of action for which they are awardable;

5.      For all civil penalties awardable;

6.      For an award of interest, including prejudgment interest, at the legal rate;

7.      For an award of litigation costs and attorneys' fees as awardable on each cause of action pursuant to SOX, Dodd-Frank, CMIA, the private attorney general doctrine, as codified in California Civil Code Section 1021.5, and any other available bases;

8.      For an injunction ordering BOFI to cease and desist its unlawful practices;

7.      For costs of suit incurred;

8.      For a declaratory judgment that the alleged arbitration agreement is

////
////
////
////
////
////
////
////

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF

invalid because it lacks mutuality, is unconscionable, violates public policy and is prohibited under SOX and/or Dodd-Frank; and

9.    For such other and further relief as the court deems just and proper.

DATED: October 13, 2015    THE GILLAM LAW FIRM
                           *A Professional Law Corporation*


                                By:    /s/ Carol L. Gillam
                                       _____
                                       CAROL L. GILLAM
                                       Attorneys for Plaintiff Charles Matthew Erhart


## DEMAND FOR JURY TRIAL

Plaintiff Charles Matthew Erhart hereby demands a jury trial on all issues so triable.

DATED: October 13, 2015    THE GILLAM LAW FIRM
                           *A Professional Law Corporation*


                                By:    /s/ Carol L. Gillam
                                       _____
                                       CAROL L. GILLAM
                                       Attorneys for Plaintiff Charles Matthew Erhart

PLAINTIFF ERHART'S COMPLAINT FOR DAMAGES AND OTHER RELIEF