1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHARLES MATTHEW ERHART,<br><br>                              Plaintiff,<br><br>     v.<br><br>BOFI HOLDING, INC.,<br><br>                              Defendant. | Case No. 15-cv-02287-BAS(NLS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT BOFI HOLDING, INC.'S MOTION TO DISMISS AND MOTION TO STRIKE**<br><br>**[ECF No. 3]** |

## I.    INTRODUCTION

Plaintiff Charles Matthew Erhart commenced this whistleblower retaliation action against Defendant BofI Holding, Inc. alleging violations of the Sarbanes–Oxley Act of 2002, the Dodd–Frank Wall Street Reform and Consumer Protection Act, and California state law. (ECF No. 1.) BofI Holding, Inc. is the publicly-traded holding company for BofI Federal Bank, a federally-chartered savings and loan association that operates several brands of banks including Bank of Internet.[1] In a

---

[1] BofI Holding, Inc. and BofI Federal Bank are distinguishable. *See* 12 U.S.C. § 1813 (defining "savings and loan holding company" and "Federal savings association"). However, because this distinction is not relevant for this Order, the Court uses the term "BofI" to refer to either BofI Holding, Inc. or BofI Federal Bank.

countersuit, BofI claims Erhart violated California state law and the Computer Fraud and Abuse Act by disseminating its confidential information to *The New York Times*—causing BofI's stock price to plummet—and by deleting hundreds of files from his company-issued laptop. *See generally BofI Federal Bank v. Erhart*, No. 15-cv-02353-BAS(NLS) (S.D. Cal. filed Oct. 19, 2015) ("Countersuit").

BofI now moves to dismiss Erhart's federal whistleblower retaliation claims and several of his state law causes of action. (ECF No. 3.) In addition, BofI requests that the Court strike particular allegations from Erhart's Complaint. (*Id.*) Erhart opposes. (ECF No. 6.)

The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** BofI's motion.

## II.   BACKGROUND[2]

### A.   Internal Audit Department

In September 2013, Erhart began working as an internal auditor for BofI at its headquarters in San Diego, California. (Compl. ¶¶ 3–4, 9, ECF No. 1.) Erhart reported to Jonathan Ball, Vice President ("VP")–Internal Audit. (*Id.* ¶ 9.) One level above VP Ball on the corporate hierarchy was John Tolla, Senior Vice President ("SVP")–Audit and Compliance. (*Id.* ¶ 10.) VP Ball and the internal audit department were to report to SVP Tolla "for administrative purposes only" to allow the audit department "to have independence to do its function without undue pressure from senior management." (*Id.*) However, as detailed below, Erhart alleges SVP Tolla repeatedly interfered with the audit department's investigations and independence. (*See id.* ¶¶ 15, 24–25, 30, 42, 47, 49, 52, 56.)

---

[2] The following narrative is based on allegations in Erhart's Complaint. At the motion to dismiss phase, the Court assumes that Erhart's factual allegations are true. *See, e.g.*, *O'Brien v. Welty*, 818 F.3d 920, 924 (9th Cir. 2016).

**B.** **Alleged Wrongdoing**

**1.** **The Structured Settlements and Lottery Audit**

In late 2013, Erhart conducted an audit of BofI's division that purchases the income streams from lottery winnings and structured settlements. (Compl. ¶ 11.) BofI, through its AnFed Bank division, employs a "team of callers who cold-call prospects with the goal of purchasing the income streams from these individuals, offering them a lump sum in lieu of the periodic payments they are receiving." (*Id.* ¶ 12.) In his audit report, Erhart relayed his alleged discovery that BofI's "callers were not notifying people they called that the calls were being recorded" in violation of California's Invasion of Privacy Act, California Penal Code Section 632. (*Id.* ¶¶ 13, 15.)

Upon completing the audit, Erhart requested a routine audit exit meeting to discuss his findings. (Compl. ¶ 11.) Shortly thereafter, SVP Tolla summoned Erhart "into his office and instructed him to never state in an audit report that the Bank violated a federal or state law." (*Id.* ¶ 15.) Erhart was then summoned to a second meeting with SVP Tolla and Chief Legal Officer Eshel Bar-Adon. (*Id.* ¶ 16.) In this meeting, "Bar-Adon instructed [Erhart] to mark the entire report 'Attorney Client Privileged,' explaining that he was concerned the finding could be discoverable in class action litigation against the Bank, which would be expensive to defend. [Erhart] acceded to this order, but held fast in his refusal to remove the finding from the audit." (*Id.*)

**2.** **Potentially Altered Financial Statements**

In early 2014, Chief Credit Officer Thomas Constantine told Erhart, VP Ball, and others at a meeting that "he is not responsible for any of the Bank's numbers after they are turned over to the Chief Financial Officer, Andrew Micheletti. He reiterated that he could and would not vouch for the accuracy of the numbers once the CFO had them." (Compl. ¶ 17.) Erhart understood these statements "to mean that

1  senior Bank management, at the CFO level and above, may be falsifying the
2  Company's financials." (*Id.* ¶ 18.)

3

### 3.    Untimely Contributions to Employee 401k Accounts

In the middle of 2014, Erhart and a fellow employee in the audit department conducted a payroll audit. (Compl. ¶ 18.) "They found that the Bank had not been making timely deposits to employees' 401k accounts for employee elective deferrals, contrary to law." (*Id.*) When Erhart asked SVP Tolla about the delay, Tolla said it had to do with a business deal and the company moving around assets—a deal which had not yet even been approved. (*Id.*) Another employee allegedly asked CFO Micheletti if BofI "would elect to self-report the problem to the Internal Revenue Service and Department of Labor to take corrective action," but no action was taken. (*Id.*)

### 4.    Business Plan Audit

Erhart also conducted the "Fiscal 2014/2015 Business Plan Audit." (Compl. ¶ 19.) During the October 30, 2014, audit exit meeting, Erhart learned that BofI's Fiscal 2015 Strategic Plan had not been approved at several board of directors meetings between May and September 2014. (*Id.*) BofI's Chief Accounting Officer wrote that as of January 28, 2015, the company's strategic plan and budget for fiscal year 2015 had still not been approved. (*Id.* ¶ 20.) "Then, magically, amazingly, on or about February 10, 2015 [Chief Performance Officer] Durrans presented Internal Audit's head Jonathan Ball with a document titled 'Action by Unanimous Written Consent of the Board of Directors in Lieu of a Meeting' dated July 7, 2014, purporting to have approved the Fiscal 2015 strategic plan and budget seven months earlier." (*Id.* ¶ 21.) Erhart alleges that each signature on the document "was copied and pasted, further proof that the Board did not actually approve the Fiscal 2015 Strategic Plan on July 7, 2014 or at any other date." (*Id.*)

### 5.    Deposit Concentration Risk Findings and Negative Performance Review

In November 2014, Erhart sent an e-mail to Chief Risk Officer Thomas Williams regarding the bank's deposit concentration risk—the risk posed to a bank "when a large percentage of its deposits are derived from a few depositors" and these depositors may suddenly withdraw their funds. (Compl. ¶ 22.) Erhart allegedly reported to Williams "that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits." (*Id.* ¶ 23.) In doing so, Erhart "was aware that other banks had gotten into trouble with regulators for deposit concentration levels lower than this." (*Id.*) SVP Tolla later commented on Erhart's e-mail to Williams and instructed him "not to put his concerns in writing." (*Id.* ¶ 24.) About a month later, Erhart received his performance review from SVP Tolla. (*Id.* ¶ 25.) His rating was downgraded, with SVP Tolla specifically referencing Erhart's practice of putting findings into writing. (*Id.*) Erhart's bonus was also adversely affected. (*Id.*)

### 6.    SEC Subpoena

On December 12, 2014, the Securities and Exchange Commission ("SEC") "served a subpoena on BOFI, requesting account identifying information for a certain investment advisory firm with initials ETIA LLC ('ETIA')." (Compl. ¶ 26.) BofI "responded to the SEC that it did not have any information regarding ETIA." (*Id.*) In early January 2015, Erhart "became aware of the SEC subpoena, and knew that the Bank did indeed have a loan file containing information regarding ETIA." (*Id.* ¶ 27.) He also became aware "that a file had been created in response to the SEC subpoena, containing the information located regarding ETIA." (*Id.*) "In the course of investigating why the file was not turned over to the SEC in response to its subpoena, [Erhart] learned from a Bank employee . . . that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, before the

Bank sent its response to the SEC denying the existence of any such files." (*Id.*) Shortly thereafter, VP Ball informed Erhart that Chief Lending Officer Brian Swanson was upset that Erhart interviewed an employee about the issue and said that Erhart "should cease performing his duties to the extent they involved interviewing 'his' employees." (*Id.* ¶ 28.) Erhart then "placed a call to the SEC to be sure it was aware of the situation regarding the ETIA subpoena." (*Id.* ¶ 29.)

In February 2015, "Plaintiff submitted two whistleblower tips to the SEC, one regarding the ETIA subpoena issue, and another regarding a suspicious loan customer, whom Plaintiff suspected of operating as an unregistered broker/investment advisor. He submitted them through his work computer, and BOFI had knowledge of his whistleblowing." (Compl. ¶ 31.)

### 7.     Accounts Lacking Taxpayer Identification Numbers

Erhart further alleges that in early 2015, the United States Department of the Treasury's Office of the Comptroller of the Currency ("OCC"), BofI Federal Bank's principal regulator, requested information on bank accounts that lacked a taxpayer identification number ("TIN"). (Compl. ¶ 32.) BofI informed the OCC that no accounts lacked a TIN. (*Id.*) Erhart alleges this response was "knowingly false," as he "saw a spreadsheet in the BSA ('Bank Secrecy Act') folder disclosing approximately 150–200 accounts where the borrower does not have a TIN." (*Id.*)

Also in early 2015, the OCC requested that BofI "disclose all correspondence with federal and state banking agencies and law enforcement, to include any and all subpoenas, criminal or otherwise." (Compl. ¶ 33.) The bank responded that it had not received any of these items for the review period in question. (*Id.*) Erhart alleges this response was false, as he saw a spreadsheet that identified many subpoenas and sat next to the employee responsible for the intake of subpoenas. (*Id.*)

//

//

8.     **Loans Involving Criminals and Politically Exposed Persons**

Around the same time, Erhart conducted a "Loan Origination Audit." (Compl. ¶ 34.) During this audit, he discovered that BofI "was making substantial loans to foreign nationals including Politically Exposed Persons . . . in potential violation of BSA/Know Your Customer rules." (*Id.*) He allegedly was "able to readily uncover information that many of the borrowers were criminals, even notorious criminals, and other suspicious persons who put the bank at high risk for violating the Bank Secrecy Act's Anti-Money Laundering Rules . . . as well as exposing the Bank to reputational risk." (*Id.*) The "Politically Exposed Persons" included "very high level foreign officials from major oil-producing countries and war zones." (*Id.*) Erhart also discovered that SVP Tolla "had repeatedly changed the findings on numerous reports required under the Bank Secrecy Act's Quality Control ('QC') requirements." (*Id.* ¶ 35.)

9.     **Calculation of Allowances for Loan and Lease Losses**

Further, Erhart alleges he learned that BofI had calculated its accounting allowances for "loan and lease losses" to exclude "unfunded commitments for lines of credit." (Compl. ¶ 36.) He alleges the size of the commitments excluded from the allowances meant the allowances "may have been materially miscalculated, which could materially impact the Bank's earnings." (*Id.*)

10.     **Flood Disaster Protection Act Audit**

Erhart was assigned to the Flood Disaster Protection Act Audit after another employee resigned. (*See* Compl. ¶ 37.) A previous compliance employee "had found issues with 49 of the 51 samples she pulled" to conduct the audit. (*Id.*) "Yet another employee previously produced a Compliance Review identifying many issues, and then resigned." (*Id.*) Erhart "discovered that the Bank had buried and never issued the reviews." (*Id.*) After investigating, Erhart verified his predecessor's negative

1    findings and presented them to management. (*Id.* ¶ 38.) Management, however,

2    caused "most of the negative findings to be excluded from the Audit Report, leaving

3    in only a small fraction of the findings." (*Id.*) Erhart alleges this audit was "a matter

4    of considerable interest to OCC examiners, from whom material information was

5    purposely withheld." (*Id.* ¶ 39.)

6

7                  **11.    Global Cash Card Review for High Risk Customers**

8         Erhart also participated in reviewing "Global Cash Card" customers to

9    determine high-risk customers. (Compl. ¶ 40.) Global Cash Card is a "vendor that

10   provides cash cards that companies can issue to employees in lieu of traditional

11   paychecks, or for other purposes." (*Id.*) The OCC was conducting an onsite

12   examination at BofI and asked that third party vendors such as Global Cash Card rate

13   their customers. (*Id.* ¶ 41.) A list of "high-risk" Global Cash Card customers was

14   generated and presented to SVP Tolla. (*Id.*) Erhart alleges that the verification

15   process generated "alerts" for approximately thirty percent of the high-risk customers

16   on the list. (*Id.*) For example, the list included at least one instance where a

17   customer's social security number ("SSN") belonged to a deceased person, thirty

18   instances where customers' SSNs could not be found in public records, and scores of

19   instances where a SSN did not match a customer's name or was issued before the

20   customer's date of birth. (*Id.*) Further, many customers had suspiciously high cash

21   balances, even exceeding $70,000. (*Id.*)

22        However, Erhart alleges "SVP Tolla demanded that a new list be produced,

23   and one was dutifully done that did not feature any 'bad'" customer data. (Compl. ¶

24   42.) "The original list with the 'bad' data was not turned over to the OCC; the new,

25   sanitized list was. BOFI then terminated its relationship with [Global Cash Card],

26   and SVP Tolla repeatedly instructed staff not to inform the OCC about why the

27   relationship was terminated." (*Id.*)

28

**12.   Improprieties in BofI's CEO's Personal Accounts**

In early 2015, Erhart participated in a review of personal deposit accounts held by senior management. (Compl. ¶ 44.) Erhart allegedly discovered that Chief Executive Officer ("CEO") Gregory Garrabrants "was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties." (*Id.*) Erhart also learned that CEO Garrabrants's depositing of third-party checks "had previously been raised to the Audit Committee before [Erhart] started working at the Bank, and that restrictions were imposed on [CEO Garrabrants]." (*Id.*)

In addition, Erhart allegedly discovered the "largest consumer account at the Bank" had a taxpayer identification number belonging to CEO Garrabrants's brother. (Compl. ¶ 45.) "The account had a balance of approximately $4 million, and the CEO was the signer on the account." (*Id.*) Erhart alleges that because the CEO's brother "was a minor league baseball player earning poverty wages, [Erhart] could find no evidence of how he had come legally into possession of the $4 million wired into the account." (*Id.*) Based on the foregoing, Erhart was concerned about whether CEO Garrabrants "could be involved in tax evasion and/or money laundering." (*Id.*)

**C.   Turmoil in the Audit Department**

By early 2015, approximately sixteen months after he joined BofI, Erhart believed his job was in jeopardy. (*See* Compl. ¶ 47.) On or about January 27, 2015, SVP Tolla walked by Erhart's desk and stated, in the presence of others, "If [Erhart] continues to turn over rocks, eventually he is going to find a snake and he's going to get bit." (*Id.*) Erhart viewed this statement "as a direct and serious threat, and became concerned for his personal safety as well as for his job." (*Id.*)

Around this time, as mentioned, the OCC was examining BofI, with an examiner onsite in San Diego, California. (*See* Compl. ¶ 49.) During this examination, SVP Tolla told all of the members of the internal audit department "that

week that they would no longer be permitted to use Microsoft Outlook to communicate." (*Id.*) Erhart alleges SVP Tolla gave this directive because he "did not want a paper trail regarding Bank improprieties." (*Id.*) Erhart informed the OCC's examiner of this directive. (*Id.*)

Then, in late February 2015, VP Ball informed the internal audit department that a "meeting would be held to discuss major findings that needed to be presented to the Bank's Audit Committee." (Compl. ¶ 50.) This action was significant because VP "Ball felt that the level of wrongdoing at the Bank had become so egregious that the staff had no choice but to bring it up to the audit committee." (*Id.*) VP Ball planned to present memos documenting the wrongdoing from internal audit staff, including Erhart, to the committee. (*Id.*)

Yet, on March 5, 2015, VP Ball resigned abruptly "after refusing an order" from CEO Garrabrants to engage in what he "viewed to be unlawful conduct to cover up the Bank's wrongdoing." (Compl. ¶ 51.) SVP Tolla told members of the audit department not to inform the OCC that VP Ball had resigned. (*Id.*) Erhart and a coworker had already told the OCC examiners, however. (*Id.*)

### D.   Alleged Whistleblowing

Following VP Ball's sudden resignation, Erhart "felt very unwell and on the following day, March 6, 2015, he called off sick." (Compl. ¶ 53.) He asked a coworker to relay his illness to SVP Tolla—as no one had yet replaced VP Ball as Erhart's manager. (*Id.*) At 7:30 a.m. on that same day, Erhart's coworker informed him that VP Tolla said he was to attend a mandatory call with the OCC, despite Erhart's illness. (*Id.* ¶ 54.) She also informed Erhart that SVP Tolla had accessed VP Ball's e-mail account and found the internal audit memo Erhart had co-authored regarding the Global Cash Card High Risk Customer Review. (*Id.*) Erhart "became extremely concerned that the Bank would try to destroy the records of wrongdoing that [he] had placed on the Bank's Computers." (*Id.* ¶ 55.) He called the OCC's

1   Denver Regional Office and said he was seeking whistleblower protection, and an

2   appointment to speak with the OCC was confirmed for the next business day. (*Id.*)

3       Meanwhile, SVP Tolla was calling Erhart on his cell phone, and a coworker

4   informed Erhart that his work computer had been "opened up." (Compl. ¶ 56.) Erhart

5   also allegedly received a text message stating "Tolla is going crazy over here bro.

6   Going through balls computer too. Fyi." (*Id.*) Erhart then e-mailed the OCC a copy

7   of the Global Cash Card High Risk Customer Review audit memo and disclosed that

8   CEO Garrabrants and SVP Tolla had discovered the memo and that he feared upper

9   management had accessed his work laptop remotely. (*Id.* ¶ 57.)

10      Minutes later, Erhart received a phone call from a coworker that SVP Tolla

11  had arranged for the locked file cabinets at Erhart's desk to be opened up and "was

12  going through all the documents." (Compl. ¶ 58.) SVP Tolla located Erhart's review

13  of CEO Garrabrants's personal accounts. (*Id.*) He continued to call Erhart's mobile

14  phone repeatedly throughout that day. (*Id.*)

15      Erhart allegedly later learned that on the same day, Friday, March 6, 2015,

16  BofI had prepared a letter terminating him and had attempted to deliver it to him.

17  (Compl. ¶ 61.) Erhart claims BofI also "intended to and may have informed local

18  police authorities" that it wanted Erhart's "apartment searched and his computer

19  seized and for him to be arrested." (*Id.*) Erhart "was extremely fearful." (*Id.*) The

20  police did not arrive, but Erhart alleges BofI sent someone to his residence "on that

21  day to attempt to deliver the termination letter and recover [his] work laptop." (*Id.*)

22  On Saturday, Erhart was informed that CEO Garrabrants had "grilled" a coworker

23  "for nearly an hour" about the investigation into the his personal accounts and that

24  they "had an all hands yesterday where [SVP Tolla] and [CEO Garrabrants] spoke

25  about you and [VP Ball]. It was terrible." (*Id.* ¶ 60.)

26      By early Monday morning, March 9, 2015, Erhart alleges he learned SVP Tolla

27  was falsely claiming that BofI had not heard from Erhart for forty-eight hours—a

28  basis for termination. (Compl. ¶ 63.) Erhart sent an e-mail to SVP Tolla and several

others reminding them "that he had called off sick Friday," would remain out for the day, and "was seeking an appointment with his physician to discuss a medical leave of absence." (*Id.*) He also stated, "I am in no mental state to discuss anything on the phone." (*Id.*)

That same morning, an attorney with the OCC confirmed to Erhart "that his communications with the OCC would be covered under the applicable whistleblower statute." (Compl. ¶ 64.) Erhart had a lengthy phone call with the OCC that afternoon, and he was directed to bring any documents he had to the OCC's office in Carlsbad, California, the following morning. (*Id.* ¶ 65.) At the same time, a BofI employee was sending text messages to Erhart in an attempt to arrange the delivery of an envelope to Erhart—presumably containing his termination letter—and to recover his laptop. (*Id.*) Erhart alleges "it was highly unusual for the Bank to demand return of the work laptop of an employee who was out sick." (*Id.* ¶ 67.) "Rather, the Bank had decided to terminate [Erhart] and feared his disclosures to regulators, and wanted to seize the evidence before it could be turned over to regulators." (*Id.*)

The next morning, Erhart provided files to the OCC at its office in Carlsbad. (Compl. ¶ 68.) An OCC attorney confirmed receipt of these items the next day and told Erhart "that the Bank had informed the OCC that it was going to call the San Diego police to go to [Erhart]'s residence and seize his computer." (*Id.* ¶ 69.) Therefore, Erhart alleges BofI "was obviously well aware" of his whistleblowing activities. (*Id.*)

Erhart ultimately returned his laptop to BofI on March 12, 2015. (Compl. ¶ 70.) BofI's Chief Legal Officer "ordered him to come to a conference room to speak," but Erhart "reiterated he was in no mental state to speak to management." (*Id.*) That same day, a BofI employee called Erhart and told him that an employee had processed Erhart's termination paperwork the previous week—presumably on the Friday Erhart sought whistleblower protection. (*Id.*)

### E.   **Aftermath**

On March 14, 2015, a BofI employee told Erhart that SVP Tolla was informing employees that Erhart "was responsible for a negative article about BofI on the Seeking Alpha website published December 2, 2014." (Compl. ¶ 71.) SVP Tolla previously called Erhart "Seeking Alpha" "to his face." (*Id.*) Erhart was not responsible for the article. (*Id.*) Erhart also alleges that two coworkers informed Erhart that SVP Tolla stated at an "All Hands Meeting" of members of BofI's audit and compliance department that "any information [Erhart] provided to the OCC could not be considered credible because of [Erhart]'s psychiatric medical leave." (*Id.* ¶ 73.) SVP Tolla and CEO Garrabrants allegedly told this same group of employees that Erhart's "whistleblowing activities were 'malicious.'" (*Id.* ¶ 74.) CEO Garrabrants also told the employees he was going to "bury the BofI whistleblower." (*Id.*)

Based on the foregoing allegations, Erhart brings ten claims against BofI:

1.   Retaliation in Violation of the Sarbanes–Oxley Act of 2002, 18 U.S.C. § 1514A;

2.   Retaliation in Violation of the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h);

3.   Retaliation in Violation of California Labor Code Section 1102.5;

4.   Violation of California's Confidentiality of Medical Information Act, California Civil Code Section 56;

5.   Wrongful Termination in Violation of California Public Policy;

6.   Unfair Business Practices in Violation of California Business and Professions Code Section 17200;

7.   Breach of the Implied Covenant of Good Faith and Fair Dealing;

8.   Intentional Infliction of Emotional Distress;

9.   Defamation Per Se and Compelled Self-Defamation; and

10. Declaratory Relief.

1  (Compl. ¶¶ 76–163.) BofI moves to dismiss Erhart's first, second, fourth, seventh,

2  eighth, and ninth claims under Federal Rule of Civil Procedure 12(b)(6). (ECF No.

3  3.) BofI also moves to strike paragraphs 9–21, 26–45, 49–52, and 70 of Erhart's

4  Complaint under Federal Rule of Civil Procedure 12(f). (*Id.*)

6  ## III.  **LEGAL STANDARD**

7        A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

8  Procedure "tests the legal sufficiency" of the claims asserted in the complaint.

9  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all factual

10  allegations pleaded in the complaint as true and must construe them and draw all

11  reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty*

12  *Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6)

13  dismissal, a complaint need not contain detailed factual allegations; rather, it must

14  plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

15  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when

16  the plaintiff pleads factual content that allows the court to draw the reasonable

17  inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

18  556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint

19  pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

20  the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting

21  *Twombly*, 550 U.S. at 557).

22        "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

23  relief' requires more than labels and conclusions, and a formulaic recitation of the

24  elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in

25  original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court need not

26  accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. Despite the deference the

27  court must pay to the plaintiff's allegations, it is not proper for the court to assume

28  that "the [plaintiff] can prove facts that it has not alleged or that the defendants have

15cv2287

1  violated the . . . law[] in ways that have not been alleged." *Assoc. Gen. Contractors*
2  *of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

3      As a general rule, a court freely grants leave to amend a complaint that has
4  been dismissed. Fed. R. Civ. P. 15(a); *Schreiber Distrib. Co. v. Serv-Well Furniture*
5  *Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). However, leave to amend may be denied
6  when "the court determines that the allegation of other facts consistent with the
7  challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co.*,
8  806 F.2d at 1401 (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

9

10  **IV.   ANALYSIS**

11      **A.   Sarbanes–Oxley Whistleblower Retaliation**

12      BofI first moves to dismiss Erhart's whistleblower retaliation claim brought
13  under Sarbanes–Oxley. Congress enacted the Sarbanes–Oxley Act of 2002, Pub. L.
14  No. 107-204, 116 Stat. 745, to "safeguard investors in public companies and restore
15  trust in the financial markets following the collapse of Enron Corporation." *Lawson*
16  *v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (Ginsburg, J.) (citing S.Rep. No. 107-
17  146, at 2–11 (2002)). In seeking to prevent corporate fraud, Congress was particularly
18  concerned with the "abundant evidence that Enron had succeeded in perpetuating its
19  massive shareholder fraud in large part due to a 'corporate code of silence.'" *Id.* at
20  1162 (citing S.Rep. No. 107-146, at 2, 4–5 (2002)). This code of silence discouraged
21  employees from reporting fraudulent behavior, and employees who attempted to
22  report misconduct faced retaliation. *Id.* (citing S.Rep. No. 107-146, at 2, 5, 10
23  (2002)).

24      To address this issue, Section 806 of Sarbanes-Oxley added a new
25  whistleblower protection provision to Title 18 of the United States Code, 18 U.S.C.
26  § 1514A. *Lawson*, 134 S. Ct. at 1163. This provision, as amended, provides:
27  //
28  //

– 15 –

15cv2287

> No [publicly-traded] company . . . including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company . . . or any officer, employee, contractor, subcontractor, or agent of such company . . . may discharge . . . threaten, harass, or in other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> > (1) to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by
> >
> > > (A)   a Federal regulatory or law enforcement agency;
> > >
> > > (B)   any Member of Congress or any committee of Congress; or
> > >
> > > (C)   a person with supervisory authority over the employee . . . .

18 U.S.C. § 1514A.

Whistleblower retaliation claims under Sarbanes–Oxley "are governed by a burden-shifting procedure under which the plaintiff is first required to establish a prima facie case of retaliatory discrimination." *Tides v. Boeing Co.*, 644 F.3d 809, 813–14 (9th Cir. 2011) (citing 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121(b)(2)(B)(i)). To make a prima-facie showing, the plaintiff must show that (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer knew, actually or constructively, of the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the unfavorable action. *Id.* at 814 (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009)); *see also* 29 C.F.R. §

– 16 –

1980.104(b)(2)(i)–(iv). If the plaintiff makes this showing, then "the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." *Van Asdale*, 577 F.3d at 996. A plaintiff who prevails on a Sarbanes–Oxley claim is entitled to "all relief necessary to make the employee whole," including reinstatement, back pay with interest, and "compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees." 18 U.S.C. § 1514A(c).

In this case, BofI argues Erhart fails to allege a plausible whistleblower retaliation claim under Sarbanes-Oxley—particularly with respect to the requirement that he engaged in protected activity. (*See* Mot. 12:9–13:28.) For the following reasons, the Court ultimately agrees with BofI and dismisses Erhart's Sarbanes–Oxley claim with leave to amend.

### 1.    Protected Activity

First, Erhart must allege that he engaged in protected activity under Sarbanes–Oxley. *See, e.g.*, *Tides*, 644 F.3d at 814. As seen above, Sarbanes–Oxley protects from retaliation an employee who "provides[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C. § 1514A.

Here, the parties dispute what standard applies to determine whether Erhart has adequately alleged he engaged in protected activity. Thus, the Court first addresses this issue before assessing the sufficiency of Erhart's allegations.

//

//

### a.    Legal Standard for Protected Activity

The standard for determining whether an employee has engaged in protected activity under Sarbanes–Oxley has shifted over time. Initially, in *Platone v. FLYi, Inc.*, Docket No. 04-154, 25 IER Cases 278, 2006 WL 3246910, at *8 (U.S. Dept. of Labor Sept. 29, 2006), the Department of Labor's Administrative Review Board ("ARB") held that an employee's claimed whistleblower "communications must 'definitively and specifically' relate to any of the listed categories of fraud or securities violations under 18 U.S.C.A. § 1514A(a)(1)" to constitute protected activity. "Accordingly, *Platone* stands for two propositions: first, that a whistleblower's complaint must 'definitively and specifically' relate to an enumerated legal violation to qualify for protection; and second, that the complaint must 'approximate . . . the basic elements' of the kind of fraud or violation alleged." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 806 (6th Cir. 2015) (quoting *Platone*, 2006 WL at *8, 11). Thus, for example, if an employee is reporting conduct that the employee believes constitutes securities fraud, the complaint must approximate the elements of a securities fraud claim—(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Van Asdale*, 577 F.3d at 1001.

In *Van Asdale v. International Game Technology*, 577 F.3d 989, 996–97 (9th Cir. 2009), the Ninth Circuit first encountered *Platone*'s "definitively and specifically" standard for protected activity. The court noted that "[t]he three circuits that have addressed the issue have all agreed with the ARB's interpretation" of 8 U.S.C. § 1514A(a)(1). *Van Asdale*, 577 F.3d at 997. Thus, after deciding to "similarly defer to the ARB's reasonable interpretation of the statute," the Ninth Circuit applied *Platone*'s standard to the plaintiffs' claims. *Id.* at 997–98.

However, in 2011, the ARB's standard for protected activity shifted when it abrogated *Platone*. *Sylvester v. Parexel Int'l LLC*, Docket No. 07–123, 32 IER Cases

– 18 –

497, 2011 WL 2165854, at *14–15 (U.S. Dept. of Labor May 25, 2011) (en banc). In *Sylvester*, the ARB reconsidered the "definitively and specifically" *Platone* standard and noted that this standard was derived from cases arising under a separate statute—the Energy Reorganization Act, 42 U.S.C. § 5851. *Id.* at *15. The ARB therefore reasoned that this standard is "inapposite to the question of what constitutes protected activity under [Sarbanes–Oxley's] whistleblower protection provision." *Id.* at *16. It further reasoned that the "definitively and specifically" standard presented "a potential conflict with the express statutory authority of § 1514A, which prohibits a publicly traded company from discharging or in any other manner discriminating against an employee for providing information regarding conduct that the employee '**reasonably believes**' constitutes a [ ] violation" of one of the categories of laws listed in 18 U.S.C. § 1514A(a)(1). *See id.* (emphasis added). Consequently, the ARB abrogated *Platone* and held that a plaintiff "need only show that he or she 'reasonably believes' that the conduct complained of constitutes a violation of the laws listed at Section 1514." *Id.* at *11. To make this showing, the plaintiff must have a "subjective belief" that the challenged conduct violates a relevant law listed in 18 U.S.C. §1514(a)(1), and this belief must be "objectively reasonable." *Id.* at *12.

Accordingly, *Sylvester* also rejected the requirement that a whistleblower plaintiff's theory of wrongful conduct must closely imitate the elements of the relevant law listed in 18 U.S.C. § 1514A that the plaintiff believed was being violated. 2011 WL 2165854, at *19–21. The ARB reasoned that this requirement improperly "merged the elements required to prove a violation of" the fraud provision or other law listed in 18 U.S.C. § 1514A "with the requirements a whistleblower must allege or prove to engage in protected activity." *Id.* at *20. The ARB stressed that the purpose of Sarbanes–Oxley's anti-retaliation provision "is to protect and encourage greater disclosure. [Section 1514A] exists not only to expose existing fraud, i.e., conduct satisfying the elements of a fraud claim, but also to prevent potential fraud in its earliest stages." *Id.* at *21. The ARB believed this purpose "will be thwarted if

a complainant must, to engage in protected activity, allege, prove, or approximate" all of the substantive elements of one of the laws listed in 18 U.S.C. § 1514A. *Id.* Thus, 18 U.S.C. § 1514A does not require the plaintiff to "prove a violation of the substantive laws" listed in the statute, but merely to have "a reasonable belief of a violation of the enumerated statutes." *Id.* at *20.

Since the ARB's decision in *Sylvester*, no circuit court has rejected the "reasonable belief" standard for protected activity under Sarbanes–Oxley. The Second, Third, Sixth, and Eighth Circuits have all deferred to the *Sylvester* standard and have displaced *Platone*'s "definitively and specifically" standard. *See Beacom v. Oracle Am., Inc.*, 825 F.3d 376, 380 (8th Cir. 2016); *Rhinehimer*, 787 F.3d at 806; *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220–21 (2d Cir. 2014); *Wiest v. Lynch*, 710 F.3d 121, 131–32 (3d Cir. 2013). In addition, the "Fourth and Tenth Circuits have addressed *Sylvester*, but found the plaintiff satisfied the more rigorous 'definite and specific' standard from *Platone*." *Beacom*, 825 F.3d at 380 (citing *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 344 n.5 (4th Cir. 2014); *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1132 n.7 (10th Cir. 2013)).

The Ninth Circuit, however, has not yet had the opportunity to address the *Sylvester* standard and determine whether it would similarly defer to this standard. A few district courts in the Ninth Circuit have acknowledged the change in standards from *Platone* to *Sylvester*, but their decisions did not hinge on which standard applied. *See Nazif v. Comput. Scis. Corp.*, No. C-13-5498 EMC, 2015 WL 3776892, at *5 (N.D. Cal. June 17, 2015) (noting whether or not the *Sylvester* standard now applies in the Ninth Circuit "is irrelevant" because the plaintiff could not satisfy "even the lesser standard that requires that he had an objectively reasonable belief"); *McEuen v. Riverview Bancorp, Inc.*, No. C12-5997 RJB, 2013 WL 6729632, at *4 (W.D. Wash. Dec. 19, 2013) ("Regardless of whether the Ninth Circuit would adopt the rule enunciated in *Sylvester*, the Court finds that there are genuine issues of material fact as to whether [the plaintiff's] communications definitively and

1  specifically related to one of the listed categories of fraud or securities violations

2  under 18 U.S.C. § 1514A(a)(1), whether [the plaintiff] had a subjective, good faith

3  belief that her employer violated provisions listed in [Sarbanes–Oxley], and that her

4  belief was objectively reasonable.")

5    In this case, BofI claims Erhart must satisfy the "definitively and specifically"

6  standard for protected activity derived from *Platone* and incorporated by the Ninth

7  Circuit in *Van Asdale*, 577 F.3d at 997. (Mot. 1:23–2:4, 10:28–11:3, 12:11–14, 13–

8  20–23.) BofI conveniently does not mention *Sylvester*'s reasonable belief standard

9  or the fact that the ARB abrogated *Platone* in its moving papers. (*See id.*) In response,

10 Erhart argues this Court should apply the *Sylvester* standard because the Ninth

11 Circuit's decision in *Van Asdale* was dependent on a now-disavowed ruling of the

12 ARB. (Opp'n 1:6–8, 28, 2:1–3:7.) The Court agrees. In *Van Asdale*, the Ninth Circuit

13 gave deference to the *Platone* standard because it was the ARB's "reasonable

14 interpretation of the statute." 577 F.3d at 997. With *Platone* abrogated, *Sylvester* now

15 provides the ARB's interpretation of 18 U.S.C. § 1514A(a)(1). The Court believes

16 that the Ninth Circuit, consistent with its approach in *Van Asdale*, would "similarly

17 defer to the ARB's reasonable interpretation of the statute" that is now provided in

18 *Sylvester*. *See id.* In fact, on a later appeal in *Van Asdale* involving a different issue

19 of statutory interpretation, the Ninth Circuit again gave deference to the Department

20 of Labor's interpretation of 18 U.S.C. § 1514A. *See Van Asdale v. Int'l Game Tech.*,

21 763 F.3d 1089, 1093 (9th Cir. 2014) ("*Van Asdale III*") (affording *Skidmore*

22 deference to the Secretary of Labor's interpretation of 18 U.S.C. § 1514A(c)(1)

23

24

25

26

27

28

expressed in an *amicus curiae* brief).[3]

Accordingly, the Court will apply *Sylvester*'s reasonable belief standard for protected activity to Erhart's Sarbanes–Oxley claim.

### b.    Reasonable Belief

For Erhart "to sustain a complaint based on protected activity under § 1514A," he "need only show that he . . . 'reasonably believe[d]' that the conduct complained of constitute[d] a violation of the enumerated laws." *See Rhinehimer*, 787 F.3d at 811 (6th Cir. 2015) (citing *Nielsen*, 762 F.3d at 221). As the term "reasonably believes" indicates, "reasonable belief involves both a subjective component and an objective component." *Id.* "The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law." *Id.* Further, the objective component "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (quoting *Harp v. Charter Commc'ns,*

_____

[3] Although the Second, Third, and Sixth Circuits have all deferred to the *Sylvester* standard, they disagree over whether the ARB's interpretation of 18 U.S.C. § 1514A is entitled to *Chevron* deference, as opposed to only *Skidmore* deference. *Compare Wiest*, 710 F.3d at 131 (*Chevron* deference), *with Rhinehimer*, 787 F.3d at 811 (*Skidmore* deference), *and Nielsen*, 762 F.3d at 221 (*Skidmore* deference); *see also Beacom*, 825 F.3d at 380 (adopting *Sylvester* but without addressing the level of deference). Under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984), courts defer to an agency's permissible interpretation of the law "[i]f . . . the court determines Congress has not directly addressed the precise question at issue." However, even if an agency's interpretation is not entitled to *Chevron* deference, under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "non-binding agency opinions may be entitled to deference, with '[t]he weight of such a judgment in a particular case . . . depend[ent] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Fed. Trade Comm'n v. AT & T Mobility LLC*, --- F.3d ---, 2016 WL 4501685, at *8 (9th Cir. 2016) (alteration in original) (quoting *Skidmore*, 323 U.S. at 140). In *Sylvester*, the ARB thoroughly considered the standard for protected activity under 18 U.S.C. § 1514A and convincingly reasoned that the plain language of the statute and the policies underlying whistleblower protection better support a "reasonable belief" standard. *See* 2011 WL 2165854, at *1–19. The Court therefore believes the Ninth Circuit will adopt *Sylvester*'s interpretation of 18 U.S.C. § 1514A even if the ARB's decision is entitled to only *Skidmore* deference. *See Van Asdale III*, 763 F.3d at 1093; *see also Rhinehimer*, 787 F.3d at 811; *Nielsen*, 762 F.3d at 221.

*Inc.*, 558 F.3d 722, 723 (7th Cir.2009)); *see also Nielsen*, 762 F.3d at 221 ("That is to say, a plaintiff 'must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.'"). Thus, the reasonable person standard recognizes that "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers." *Nielson*, 762 F.3d at 221. Accordingly, "the inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case." *Rhinehimer*, 787 F.3d at 811.

The Second Circuit's decision in *Nielsen v. AECOM Technology Corp.*, 762 F.3d 214, 222 (2d Cir. 2014), demonstrates an application of this standard at the pleading phase. There, the plaintiff alleged that he "reasonably believed that defendants were committing fraud upon [their] shareholders and would likely continue violating the United States mail and wire fraud statutes by using telephone lines and emails in furtherance of the fraud." *Nielsen*, 762 F.3d at 222. However, the Second Circuit noted "this conclusory statement cannot sustain [the plaintiff's] § 1514A claim." *Id.* It reasoned that the plaintiff had not plausibly pled an objectively reasonable belief that the defendant had engaged "in mail or wire fraud, as both require a scheme to steal money or property—allegations that do not appear in the complaint." *Id.* The Second Circuit also held that the plaintiff could not show "that it was objectively reasonable to believe the conduct he complained of constituted shareholder fraud." *Id.* The court reasoned that the plaintiff's allegation that an employee failed to review fire safety designs was insufficient, reasoning it was a "trivial matter" in terms of the company's relationship to shareholder interests. *See id.* Thus, it ultimately held that the plaintiff's whistleblower retaliation claim was insufficient as a matter of law. *Id.* at 224.

Here, Erhart alleges he discovered and reported information regarding a torrent of conduct that runs the gamut from BofI allegedly recording phone calls without callers' consent to hiding information from the OCC. (*See* Compl. ¶¶ 9–46.) Erhart's

163 paragraph complaint is rife with detail and identifies over a dozen instances of claimed wrongdoing. Nevertheless, Erhart's Complaint does not adequately allege protected activity under Sarbanes–Oxley. Erhart relies on the assumption that a reasonable belief of *any* violation of law is sufficient to constitute protected activity under Sarbanes–Oxley. (*See, e.g.*, Opp'n 1:10–12.) But this assumption is incorrect. Sarbanes–Oxley does not protect an employee from harassment for reporting any believed violation of law. It protects employees who "provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). Thus, for example, Erhart's claim that he believed BofI was violating California state law by recording phone calls without callers' consent is not an allegation that he believed "the conduct complained of constitutes a violation of the laws listed at Section 1514." *See Sylvester*, 2011 WL 2517148, at *11; *see also Nielsen*, 762 F.3d at 221 n.6 ("We note that the statute does require plausible allegations that the whistleblower reported information based on a reasonable belief that the employer violated *one of the enumerated provisions* set out in the statute . . . . [T]o be reasonable, the purported whistleblower's belief cannot exist wholly untethered from these specific provisions."); *accord Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 110 (5th Cir. 2014) (concluding the petitioner had not demonstrated protected activity because "the conduct to which he objected" to "was the supposed orchestration of violations of Colombia tax law, not the violation of U.S. mail or wire laws to effectuate those purported Colombian law violations").

In fact, Erhart never alleges in his Complaint that he believed any of BofI's claimed wrongdoing constituted a violation of any of the categories of laws listed in 18 U.S.C. § 1514A(a)(1). (*See generally* Compl. ¶¶ 3–87.) He generally alleges that he "reasonably believed" BofI committed "conduct in violation of state and federal

statutes, rules, and regulations." (*Id.* ¶ 79.) But again, to satisfy the subjective component of the reasonable belief standard, Erhart must allege he "actually believed that the conduct complained of constituted a violation of **relevant law**." *See Rhinehimer*, 787 F.3d at 811 (emphasis added); *see also Nielsen*, 762 F.3d at 221 ("[R]elief pursuant to § 1514A turns on the reasonableness of the employee's *belief* that the conduct violated one of the enumerated provisions[.]"). To make disclosures protected by Sarbanes–Oxley, Erhart did not have to use legal terms of art or "cite a code section" he believed was being violated. *See Van Asdale*, 577 F.3d at 989 (quoting *Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008)). Yet, he must still have reasonably believed the information he was reporting constituted the type of conduct forbidden by provisions listed in Sarbanes–Oxley. *See Nielsen*, 762 F.3d at 221; *see also Portes v. Wyeth Pharm., Inc.*, No. 06–CV–2689, 2007 WL 2363356, at *5 (S.D.N.Y. Aug. 20, 2007) (dismissing claim where the plaintiff's "disclosures to personnel at [his] employer were concerned exclusively with violations of regulations governing the manufacture of pharmaceuticals," not that "the company was violating any federal rule or law *related to fraud against shareholders*"). Moreover, without knowing what particular conduct Erhart asserts he believed constituted a violation of any of the categories of laws enumerated in Section 1514(a)(1), the Court cannot meaningfully analyze whether he plausibly alleges a belief that is objectively reasonable.

Erhart provides little assistance to the Court in his Opposition. In response to BofI's arguments, he broadly cites to eleven segments of his Complaint and punts this issue to the Court. (Opp'n 4:12–5:23.) In other words, Erhart hands this Court a fifteen page fact pattern and asks it to specify what conduct could be believed to be "a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." *See* 18 U.S.C. § 1514A(a)(1). However, the test for protected activity

under *Sylvester* and Section 1514A(a)(1) is not what the Court, now reviewing Erhart's alleged discoveries at BofI, believes may violate one of Section 1514A(a)(1)'s categories. The standard instead focuses on Erhart's belief at the time he reported BofI's alleged misconduct—and whether a reasonable person *in his position*, not the Court's, would have believed that the conduct constituted a violation of the relevant laws. The Court cannot now articulate Erhart's beliefs for him after the fact. *See Assoc. Gen. Contractors of Cal., Inc.*, 459 U.S. at 526 (noting it is improper for the court to assume "the [plaintiff] can prove facts that it has not alleged"). Consequently, the Court concludes Erhart has not plausibly alleged he engaged in protected activity. Because he has not satisfied this requirement, Erhart's claim is subject to dismissal, and the Court does not reach the remaining three requirements for a prima facie case under Sarbanes–Oxley. *See, e.g.*, *Nielsen*, 762 F.3d at 222.

That said, the Court will grant Erhart leave to amend his claim. "[W]hen a viable case may be pled, a district court should freely grant leave to amend." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)). Here, a viable claim may be pled because it is possible that Erhart reasonably believed some of BofI's conduct violated one or more of the laws enumerated in 18 U.S.C. § 1514A(a)(1). To be clear, Erhart may plausibly allege a reasonable belief without alleging that that all of the substantive elements of any of these laws were satisfied. *See Sylvester*, 2011 WL 2165854, at *18–20. Further, even if Erhart had a "mistaken belief" that BofI's conduct violated relevant law, this belief may "still be objectively reasonable." *See Beacom* 825 F.3d at 380. But at the same time, his purported whistleblower "belief[s] cannot exist wholly untethered from these specific provisions." *See Nielsen*, 762 F.3d at 221 n.6. Thus, the Court will grant Erhart leave to amend.

//

– 26 –

In light of the foregoing, the Court dismisses Erhart's first claim for whistleblower retaliation under Sarbanes–Oxley with leave to amend.

**B.    Dodd-Frank Whistleblower Retaliation**

BofI also moves to dismiss Erhart's whistleblower retaliation claim brought under Dodd–Frank. Congress created a new whistleblower protection program when it enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). This act added Section 21F to the Securities Exchange Act of 1934, 15 U.S.C. § 78u-6. "Section 21F 'encourages individuals to provide information relating to a violation of U.S. securities laws' through 'two related provisions that: (1) require the SEC to pay significant monetary awards to individuals who provide information to the SEC which leads to a successful enforcement action; and (2) create a private cause of action for certain individuals against employers who retaliate against them for taking specified protected actions.'" *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1014–15 (N.D. Cal. 2015) (quoting *Somers v. Digital Realty Trust, Inc.*, 119 F. Supp. 3d 1088, 1094 (N.D. Cal. 2015)).

Dodd–Frank defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the Securities laws to the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6). To protect whistleblowers from retaliation, Dodd–Frank provides:

> No employer may discharge . . . or in any other manner discriminate against, a whistleblower in the terms and conditions of employment . . . because of any lawful act done by the whistleblower:
>
> (i) in providing information to the [SEC] in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the [SEC] based upon or related to such information; or

1
2
3
4

(iii)  in making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the [SEC].

5   *Id.* § 78u-6(h)(1)(A). Further, the statute provides that the SEC "shall have the

6   authority to issue such rules and regulations as may be necessary or appropriate to

7   implement the provisions of this section consistent with the purposes of this section."

8   *Id.* § 78u–6(j). The SEC's regulation interpreting the anti-retaliation provision

9   provides:

10          (c) Prohibition against retaliation.

11
12
13

        (1) For purposes of the anti-retaliation protections afforded by Section 21F(h)(1) of the Exchange Act (15 U.S.C. 78u–6(h)(1)), you are a whistleblower if:

14
15
16
17
18

            (i)  You possess a **reasonable belief** that the information you are providing relates to a **possible securities law violation** (or, where applicable, to a **possible violation of the provisions set forth in 18 U.S.C. [§] 1514A(a)**) that has occurred, is ongoing, or is about to occur, and;

19
20

            (ii) You provide that information in a manner described in Section 21F(h)(1)(A) of the Exchange Act (15 U.S.C. [§] 78u–6(h)(1)(A)).

21  17 C.F.R. § 240.21F-2 (emphasis added). This test incorporates the violations of law

22  listed in Sarbanes–Oxley's anti-retaliation provision because, as seen above, one of

23  the manners of providing information under Dodd–Frank's provision is "making

24  disclosures that are required or protected under the Sarbanes–Oxley Act of 2002[.]"

25  15 U.S.C. § 78u-6(h)(1)(A). Despite that Dodd–Frank incorporates Sarbanes–Oxley

26  disclosures, there is a split of authority as to whether Dodd–Frank protects Sarbanes–

27  Oxley disclosures that are not made directly to the SEC. *Compare Somers*, 119 F.

28  Supp. 3d at 1094–1106 (concluding the SEC's interpretation that Dodd–Frank also

protects Sarbanes–Oxley disclosures that are not made directly to the SEC is entitled to *Chevron* deference), *and Wadler*, 141 F. Supp. 3d at 1027 (same), *with Asadi v. G.E. Energy (USA), LLC*, 720 F.3d 620 (5th Cir. 2013) (holding Dodd–Frank is unambiguous and "requires individuals to provide information . . . *to the SEC* to qualify for protection from retaliation"). BofI does not argue for the more restrictive interpretation of Dodd–Frank here, however.[4]

In this case, Erhart does not plead a plausible claim under Dodd–Frank. To qualify for whistleblower protection, Erhart must sufficiently allege that he had a "reasonable belief that the information [he was] providing relate[d] to a possible securities law violation . . . or . . . a possible violation of the provisions" enumerated in Sarbanes–Oxley's anti-retaliation provision. *See* 17 C.F.R. § 240.21F-2. For largely the same reasons that Erhart fails to allege protected activity under Sarbanes–Oxley, he does not satisfy this requirement. In his Complaint, Erhart alleges he "is a whistleblower within the meaning of Dodd–Frank, as evidenced by [the] conduct described in" his lengthy factual narrative. (Compl. ¶ 91.) But he does not allege anywhere in his Complaint that he believed any of the information related to a possible securities law violation or the violations covered by Sarbanes–Oxley. (*See generally id.* ¶¶ 3–99.) A general allegation that he believed BofI committed "illegal conduct and/or conduct Plaintiff reasonably believed to be illegal" does not suffice. (*See id.* ¶ 93.) For instance, to use the same example as above, Erhart's allegation that he believed he was providing information to regulators relating to a violation of California's Invasion of Privacy Act does not allege "a reasonable belief that the information [Erhart] [was] providing relate[d] to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. 1514A(a)) . . . ." *See* 17 C.F.R. § 240.21F-2.

//

---

[4] BofI initially argued Erhart's disclosures must have been made to the SEC to implicate Dodd–Frank, but BofI withdrew this argument after filing its motion. (*See* ECF No. 5.)

15cv2287

Further, like he does with his Sarbanes–Oxley claim, Erhart punts this issue to the Court in his Opposition. (*See* Opp'n 4:12–5:23.) But it is not the Court's role to review Erhart's narrative of his discoveries at BofI and identify for him what information he believed at the time "relate[d] to a possible securities law violation . . . or . . . a possible violation of the provisions" enumerated in Sarbanes–Oxley.[5] *See* 17 C.F.R. § 240.21F-2. Thus, Erhart has not plausibly stated a claim under Dodd–Frank, and the Court will dismiss his second claim.

However, the Court will grant Erhart leave to amend his claim. Allowing Erhart to amend his Dodd–Frank claim is appropriate for the same reasons that are discussed above in connection with his Sarbanes–Oxley claim. Consequently, the Court dismisses Erhart's second claim for whistleblower retaliation under Dodd–Frank with leave to amend.

\* \* \*

The Court has dismissed all of Erhart's claims that provide a basis for original jurisdiction.[6] Under 28 U.S.C. § 1367, the Court may "decline to exercise

---

[5] Perhaps the closest Erhart comes to alleging he reasonably believed he provided information relating to a securities law violation is his claim that he submitted a "tip" regarding "a suspicious loan customer, whom [Erhart] suspected of operating as an unregistered broker/investment advisor." (*See* Compl. ¶ 31.) Erhart does not specify what information was contained in the tip, why he believed the loan customer was suspicious, why he believed the customer was operating as an unregistered broker/investment advisor, whether he believed this conduct violated securities laws, or any other factual detail. (*See id.*) Even if the Court were to draw the inference that he subjectively believed this information related to a securities law violation, without more detail, Erhart has not plausibly pled a belief that could be found to be objectively reasonable based on a reasonable person in his circumstances.

[6] The Court lacks diversity jurisdiction over Erhart's state law claims because both parties are citizens of California. Although BofI Holding, Inc. is a Delaware corporation, the entity is a citizen of California because its principal place of business—or "nerve center"—is located in San Diego, California. *See* 28 U.S.C. § 1332(c)(1); *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010) (discussing "nerve center" test for corporate citizenship). Further, because the Court has dismissed Erhart's federal claims, the Court finds Erhart's tenth claim for declaratory relief that concerns an arbitrability issue does not independently confer original jurisdiction. *See Valley View Health Care, Inc. v. Chapman*, 992 F. Supp. 2d 1016, 1031 (E.D. Cal. 2014) ("Although the [Federal Arbitration Act] 'creates federal substantive law requiring the parties to honor arbitration agreements, it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 or otherwise.'") (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 16, n.9 (1984)).

1  supplemental jurisdiction" over Erhart's remaining claims if it "has dismissed all

2  claims over which it has original jurisdiction." Having dismissed Erhart's federal

3  claims, the Court—at this time—declines to exercise supplemental jurisdiction over

4  Erhart's remaining state law claims. *See* 28 U.S.C. § 1367(c). Accordingly, the Court

5  dismisses these claims without prejudice.

6      In addition, the Court denies BofI's motion to strike allegations from Erhart's

7  Complaint. Given that the Court has effectively dismissed Erhart's Complaint, the

8  Court discerns little value in determining whether particular allegations should be

9  stricken from this pleading. *See, e.g.*, *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d

10 1101, 1152 (C.D. Cal. 2003) ("Motions to strike are generally regarded with

11 disfavor[.]").

12

13      **C.    Consolidation**

14      Although the Court has resolved BofI's motion, the Court raises the issue of

15 consolidation *sua sponte*. Federal Rule of Civil Procedure 42(a)(2) provides that

16 when "actions before the court involve a common question of law or fact, the court

17 may . . . consolidate the actions." The purpose of consolidation is to enhance court

18 efficiency and to avoid substantial danger of inconsistent adjudications. *E.g.*,

19 *E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998); *Bank of Montreal v.*

20 *Eagle Assocs.*, 117 F.R.D. 530, 533 (S.D.N.Y. 1987).

21      Further, district courts are vested with inherent powers to "manage their own

22 affairs so as to achieve the orderly and expeditious disposition of cases." *Link v.*

23 *Wabash R.R.*, 370 U.S. 626, 630–31 (1962). These powers are substantial. *See, e.g.*,

24 *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) ("Indeed,

25 the inherent powers permit a district court to go as far as to dismiss entire actions to

26 rein in abusive conduct."). Thus, district courts may consolidate cases on their own

27 accord. *E.g.*, *In re Adams Apple, Inc.*, 829 F.2d 1484, 1487 (9th Cir. 1987) ("Because

28 consolidation is within the broad discretion of the district court, . . . trial courts may

1  consolidate cases *sua sponte*[.]")

2       Here, the Court finds consolidating BofI's Countersuit with this case is
3  appropriate. The cases involve numerous common questions of law or fact that are
4  related to Erhart's alleged whistleblowing and his tenure at BofI. Moreover, the
5  Court finds consolidation will promote efficiency and avoid substantial danger of
6  inconsistent adjudications. The Court will therefore consolidate these two actions.
7  *See* Fed. R. Civ. P. 42(a)(2); *In re Adams Apple, Inc.*, 829 F.2d at 1487.

8

9  **V.   <u>CONCLUSION</u>**

10      Erhart's Complaint presents a compelling account of his tenure as an internal
11 auditor in a turbulent corporate environment. Time and time again, Erhart battles
12 against pressure from senior management as he discovers conduct he believes is
13 wrongful. But the federal statutes Erhart now seeks to invoke are not general
14 compliance statutes. They do not police all employee grievances and suspicions of
15 wrongdoing. Erhart's alleged beliefs must be at least tethered to the conduct
16 Sarbanes–Oxley and Dodd–Frank seek to uncover and prevent—fraud against
17 shareholders, wire fraud, bank fraud, and the other violations of law these statutes
18 encompass. He need not prove these laws were being violated, but he must plausibly
19 allege a reasonable belief that they were being violated or that he was providing
20 information relating to a possible securities law violation.

21      Accordingly, the Court **GRANTS IN PART AND DENIES IN PART**
22 BofI's motion to dismiss and motion to strike (ECF No. 3). Specifically, the Court
23 grants BofI's motion to dismiss Erhart's first and second claims and dismisses these
24 claims with leave to amend. The Court declines to exercise supplemental jurisdiction
25 over Erhart's remaining claims and therefore dismisses these claims without
26 prejudice. In addition, the Court denies BofI's motion to strike. If Erhart chooses to
27 file a First Amended Complaint, he must do so no later than **<u>October 17, 2016</u>**.

28 *//*

15cv2287

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Further, the Court **ORDERS** consolidation of BofI's Countersuit—*BofI Federal Bank v. Erhart*, No. 15-cv-02353-BAS(NLS) (S.D. Cal. filed Oct. 19, 2015)—with this whistleblower retaliation action. <u>This action is designated as the lead case, and all further filings shall be in this action</u>. The Clerk of the Court shall file a copy of this Order in BofI's Countersuit.

**IT IS SO ORDERED.**

**DATED:  September 26, 2016**

Hon. Cynthia Bashant
United States District Judge