1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14

CHARLES MATTHEW ERHART,

                Plaintiff,

15      v.

16  BOFI HOLDING, INC.,

17                  Defendant.

18
19
20
21
22

BOFI FEDERAL BANK,

                Plaintiff,

23
24      v.

25  CHARLES MATTHEW ERHART,

26                  Defendant.

27
28

Case No. 15-cv-02287-BAS-NLS
*consolidated with*
15-cv-02353-BAS-NLS

**ORDER GRANTING IN PART AND DENYING IN PART BOFI FEDERAL BANK'S MOTION FOR SUMMARY ADJUDICATION OF CHARLES MATTHEW ERHART'S TWELFTH THROUGH TWENTY-FOURTH AFFIRMATIVE DEFENSES**

**[ECF No. 45 (in 15-cv-02353)]**

15cv2287

## I.   **INTRODUCTION**

These consolidated actions revolve around whistleblower protections under federal and state law. BofI Federal Bank employed Charles Matthew Erhart as an internal auditor at its headquarters in San Diego, California. After Erhart discovered conduct he believed to be wrongful, he reported it to the United States Department of the Treasury's Office of the Comptroller of the Currency—BofI's principal regulator. He later filed an action against BofI under federal and state law whistleblower protection provisions alleging BofI retaliated against him for reporting unlawful conduct to the government.

The next day, *The New York Times* published an article titled *Ex-Auditor Sues Bank of Internet*. The share price of BofI's publicly-traded holding company plummeted thirty percent. A few days later, BofI brought a countersuit against Erhart alleging he violated California state law and the Computer Fraud and Abuse Act by publishing BofI's confidential information and deleting hundreds of files from his company-issued laptop. The Court consolidated BofI's countersuit with Erhart's whistleblower retaliation action.

BofI now moves in its countersuit for summary adjudication of thirteen of Erhart's affirmative defenses, all of which relate to whistleblower protections. (ECF No. 45.)[1] Erhart opposes. (ECF No. 67.) After hearing oral argument, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion for the following reasons.

## II.   **BACKGROUND**

### A.   **Confidentiality Clause**

BofI is a financial services company headquartered in San Diego, California. (Tolla Decl. ¶ 3, ECF No. 7-4.) On September 23, 2013, Erhart started working for

---

[1] The parties briefed BofI's motion before the Court consolidated BofI's countersuit with Erhart's whistleblower retaliation action. Therefore, unless otherwise noted, the Court's Electronic Case Filing citations are to documents filed in BofI's countersuit—Case No. 15-cv-02353.

BofI as an internal auditor. (Durrans Decl. ¶ 5, ECF No. 7-5; Erhart Decl. ¶ 5, ECF No. 67-5.) As an internal auditor, Erhart had access to information BofI treated as proprietary and confidential. (Tolla Decl. ¶ 6, ECF No. 7-4.) This information included consumer banking information, nonpublic communications between BofI and its regulators, communications between BofI's attorneys and its agents, internal audit findings, and BofI's employees' personal information. (*Id.*)

To safeguard this information, BofI required Erhart to execute an Employee Confidentiality, Non-Disclosure, and Non-Recruitment Agreement ("Confidentiality Agreement") as a condition of his employment. (Joint Statement of Undisputed Facts ("JSUF") ¶ 15; Confidentiality Agreement, BofI's App. Exs., Ex. 6, ECF No. 7-14.) This agreement forbids the unauthorized disclosure of BofI's "Trade Secrets" and "Confidential Information." (Confidentiality Agreement § 2.) The Confidentiality Agreement defines "Trade Secrets" by incorporating California law,[2] whereas "Confidential Information" is defined as information that is "proprietary and confidential in nature." (*Id.*) For these two types of information, Erhart agreed that:

> [A]t any time during [his] term of employment or following the termination of [his] employment with BofI, whether voluntary or involuntary, [he] shall not, except as required in the conduct of BofI's business or as authorized in writing by BofI, use, publish or disclose any of BofI's Trade Secrets and/or Confidential Information in any manner whatsoever.

(*Id.* § 2.E.)

Further, Erhart agreed that if his employment with BofI was terminated for any reason, he would promptly:

//

//

---

[2] California, which has adopted the Uniform Trade Secrets Act, defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

> Inform BofI of and deliver to BofI all records, files, electronic data . . . and the like in [his] possession, custody or control that contain any of BofI's Trade Secrets or Confidential Information which [Erhart] prepared, used, or came in contact with while employed by BofI . . . .

(*Id.* § 7.A.)

### B.    Erhart's Use of BofI's Information

In the course of performing his work as an internal auditor, Erhart claims he repeatedly encountered conduct he believed to be wrongful. (*See generally* Erhart Decl. ¶¶ 9–75, ECF No. 67-5.) One instance of believed wrongdoing involved a subpoena BofI received from the Securities and Exchange Commission ("SEC"). (*Id.* ¶ 26.) Erhart believed the bank failed to disclose information to the SEC when it responded to the subpoena. (*Id.* ¶ 27.) On January 14, 2015, Erhart contacted the SEC regarding the subpoena. (JSUF ¶ 1.) He did so "to be sure it was aware of the situation." (Erhart Decl. ¶ 29, ECF No. 67-5.) Further, on February 20, 2015, Erhart contacted the SEC regarding a BofI loan customer. (JSUF ¶ 2; *see also* Erhart E-mail, Towill Reply Decl. ¶ 2, Ex. A, ECF No. 72-2.) Erhart contacted the SEC because he believed the "suspicious" loan customer was operating as an unregistered investment advisor. (Erhart Decl. ¶ 31, ECF No. 67-5.) In doing so, he disclosed confidential information about the customer to the SEC. (*See* Erhart E-mail, Towill Reply Decl. ¶ 2, Ex. A, ECF No. 72-2.)

Further, during his employment as an internal auditor, "Erhart used his personal g-mail account to e-mail files containing confidential BofI information that was stored on BofI electronic media to his personal g-mail address." (JSUF ¶ 3.) He also "printed copies of BofI documents, including customer bank account information and internal audit reports." (*Id.* ¶ 4.) In addition, Erhart "downloaded to his personal computer BofI files, including [supervisory communications from BofI's principal regulator], audit communications, audit reports and backup information, law enforcement and SEC inquiries regarding a BofI customer, account

– 4 –

1    information, wire transfer details, account lists, and portions of loan files." (*Id.* ¶ 5.)

2        Approximately sixteen months after he joined BofI, Erhart believed his job

3    was in jeopardy. (Erhart Decl. ¶ 47, ECF No. 67-5.) In a recent performance

4    evaluation, Erhart's rating had been downgraded, with his bonus adversely affected.

5    (*Id.* ¶ 25.) BofI identified Erhart's practice of preserving audit findings in writing as

6    a performance issue. (*Id.*) Erhart states BofI had repeatedly directed internal audit

7    staff to not create written evidence of believed non-compliance and illegal conduct.

8    (*Id.* ¶¶ 15, 24.) One of BofI's senior vice presidents walked by Erhart's workstation

9    and stated, in the presence of others, "If [Erhart] continues to turn over rocks,

10   eventually he is going to find a snake and he's going to get bit." (*Id.* ¶ 47.)

11       Then, on March 5, 2015, BofI's Vice President-Internal Audit—Erhart's

12   supervisor—resigned abruptly. (Ball Decl. ¶ 8, ECF No. 22; Erhart Decl. ¶ 51, ECF

13   No. 67-5.) The next day, Erhart "felt very unwell" and "called off sick." (Erhart Decl.

14   ¶ 53, ECF No. 67-5.) Erhart requested, and was granted by BofI, an unpaid leave of

15   absence pursuant to the Family Medical Leave Act and the California Family Rights

16   Act beginning on March 6, 2015. (Durrans Decl. ¶ 15, ECF No. 7-5.)

17       At this time, Erhart "became extremely concerned that the Bank would try to

18   destroy the records of wrongdoing that [he] had placed on the Bank's computers."

19   (Erhart Decl. ¶ 55, ECF No. 67-5.) On March 6, 2015, Erhart sent an e-mail to his

20   mother that included "a spreadsheet that contained BofI customer social security

21   numbers." (JSUF ¶ 6.) He states he sent the information to her for safekeeping.

22   (Erhart Decl. ¶ 77, ECF No. 67-5.) Erhart's mother briefly accessed the e-mail, but

23   she did not forward it or otherwise share it with anyone. (Pamela Erhart Dep. 36:8–

24   24, 58:2–15, ECF No. 67-7.)

25       Erhart also contacted the Denver Regional Office of the United States

26   Department of the Treasury's Office of the Comptroller of the Currency ("OCC")—

27   BofI Federal Bank's principal regulator. (Erhart Decl. ¶ 55, ECF No. 67-5.) After

28   Erhart spoke with the OCC by phone, (*id.* ¶ 65), he later "provided documentary

evidence to the OCC that he claims supports his allegations of wrongdoing by BofI," (JSUF ¶ 7). Further, on March 12, 2015, "Erhart downloaded to a personal USB drive BofI files, including OCC supervisory information, audit findings, draft audit committee meeting minutes, wire transfer details, and bank account information." (*Id.* ¶ 8.) Erhart also used his live-in girlfriend's computer to "access some BofI documents." (Erhart Decl. ¶ 3, ECF No. 67-3.) He used her computer because it had software that he did not have installed on his computer. (*Id.*) Erhart's girlfriend never viewed any of the BofI information placed on her computer, and she did not forward the information to anyone. (Cornell Decl. ¶ 2, ECF No. 67-2.)

### C.   Procedural History

On April 14, 2015, Erhart filed a whistleblower protection complaint with the Occupational Safety and Health Administration. (JSUF ¶ 9.) Several months later, Erhart commenced his whistleblower retaliation action in this Court. (ECF No. 1 in Case No. 15-cv-02287.) In his Complaint, Erhart alleges BofI retaliated against him for reporting conduct he believed to be wrongful to the government. (*Id.*) Several days later, BofI filed its countersuit against Erhart. (ECF No. 1.) In its First Amended Complaint, BofI brings claims against Erhart for: (1) breach of contract; (2) conversion; (3) breach of the duty of loyalty; (4) negligence; (5) fraud; (6) violation of California Penal Code Section 502; (7) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5); and (8) unfair business practices in violation of California Business & Professions Code Section 17220. (ECF No. 12.) On January 4, 2016, Erhart answered BofI's amended complaint, raising fifty-two affirmative defenses. (ECF No. 23.) The present motion concerns thirteen of these fifty-two affirmative defenses. (ECF No. 45.)

//

//

//

### III.   <u>LEGAL STANDARD</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by . . . the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at

324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## IV.  **ANALYSIS**

BofI seeks to extinguish thirteen of Erhart's affirmative defenses—all of which relate to whistleblower protections. (Mot. 1:1–13, ECF No. 45-1.) These defenses invoke a variety of statutes, including the Sarbanes–Oxley Act of 2002, the Fair Credit Reporting Act, and California Labor Code Section 1102.5. (Answer ¶¶ 111–123, ECF No. 23.) For each defense, Erhart alleges he cannot be held liable on BofI's claims because he was engaged in protected activity as a whistleblower under the identified statute. (*Id.*) Several of these defenses, however, are based on statutes that do not contain whistleblower protections. Further, two of Erhart's defenses are redundant of his other defenses. The Court addresses these sets of defenses first. The Court then turns to Erhart's remaining whistleblower defenses.

### A.  **Nonexistent Defenses**

Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses allege his actions "constituted protected activity as a whistleblower" under the following authority: (1) laws and regulations administered by the OCC, (2) laws and regulations administered by the Internal Revenue Service, (3) the Gramm–Leach–Billey Act, and (4) the Fair Credit Reporting Act. (Answer ¶¶ 113–114, 120–121.) BofI argues these defenses fail as a matter of law because the identified authorities do not contain express whistleblower protections. (Mot. 19:5–21:13.) At

oral argument, Erhart agreed. Accordingly, the Court will grant BofI's request for summary adjudication of Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses.

### B.   Redundant Defenses

Erhart's Thirteenth Affirmative Defense alleges his conduct "constituted protected activity as a whistleblower under the Dodd–Frank Act." (Answer ¶ 112.) The Dodd–Frank Wall Street Reform and Consumer Protection Act created a whistleblower protection and reward program that the SEC is responsible for administering. 15 U.S.C. §78u-6. A separate defense, Erhart's Eighteenth Affirmative Defense, seeks protection under the same authority by referencing laws and regulations administered by the SEC. (Answer ¶ 117.) Thus, Erhart's Eighteenth Affirmative Defense is redundant.

In addition, in his Sixteenth Affirmative Defense, Erhart alleges his conduct "constituted protected activity as a whistleblower" under laws and regulations administered by the Consumer Financial Protection Bureau. (Answer ¶ 115.) His Seventeenth Affirmative Defense invokes the same authority. (*Id.* ¶ 116.) Therefore, Erhart's Seventeenth Affirmative Defense is also redundant.

BofI recognizes these defenses are redundant, but it does not seek to dispose of them on that basis. (*See* Mot. 14:24–27, 15:25–27.) That said, this Court may "act on its own" to "strike from a pleading . . . any redundant . . . matter." *See* Fed. R. Civ. P. 12(f)(1). Because Erhart's Seventeenth and Eighteenth Affirmative Defenses are redundant, the Court concludes it is appropriate to strike them from his Answer. *See id.*

//

//

//

//

## C.    Whistleblower Protection Defenses

The remaining defenses BofI challenges share a common characteristic: each defense invokes a law that contains or incorporates protections for whistleblowers.[3]

---

[3] The Court construes Erhart's defenses as invoking the following laws and anti-retaliation provisions:

| Defense No. | Identified Law | Anti-Retaliation Provision | General Description |
|---|---|---|---|
| 12 | Sarbanes–Oxley Act of 2002 | 18 U.S.C. § 1514A | Prohibits retaliation against a covered person who reports conduct reasonably believed to be, *inter alia*, mail fraud, wire fraud, bank fraud, or securities fraud |
| 13 | Dodd–Frank Wall Street Reform and Consumer Protection Act | 15 U.S.C. § 78u-6 | Prohibits retaliation against a covered person who reports conduct reasonably believed to be a possible securities law violation or makes disclosures under Sarbanes–Oxley's provision |
| 16 | Consumer Financial Protection Bureau Administered Laws and Regulations (Consumer Financial Protection Act) | 12 U.S.C. § 5567 | Prohibits retaliation against a covered person who reports violations of laws subject to the Consumer Financial Protection Bureau's jurisdiction or violations of its regulations |
| 19 | Bank Secrecy Act | 31 U.S.C. § 5328 | Prohibits retaliation against a covered person who reports violations of bank recordkeeping and reporting requirements and anti-money laundering provisions |
| 20 | Federal Deposit Insurance Corporation Administered Laws and Regulations (Financial Institutions Reform, Recovery, and Enforcement Act) | 12 U.S.C. § 1831j | Prohibits retaliation against a covered person who reports a possible violation of law, "gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety" |
| 23 | California Labor Code Section 1102.5 | Cal. Labor Code § 1102.5(b) | Prohibits retaliation against a covered person who reports violations of state or federal law |
| 24 | Common Law | Not Applicable | May prohibit imposing tort or contract liability on a whistleblower where doing so would be against public policy |

BofI argues all of these defenses fail because at least some of Erhart's conduct cannot be considered protected whistleblower activity as a matter of law.

Whether Erhart's defenses fail necessarily depends on the claims they are being asserted against. Although BofI asserts a variety of tort, contract, and statutory claims against him, Erhart mainly focuses on demonstrating that his defenses may defeat BofI's first claim for breach of contract in his opposition. (*See* Opp'n 1:18–27, 4:2–5:8, 8:17–22.) The Court will primarily analyze Erhart's defenses in the context of this claim because it provides a framework for addressing the public policy issues raised by Erhart.

### 1.    Breach of the Confidentiality Agreement

BofI's first claim for breach of contract is based on the Confidentiality Agreement executed by Erhart at the start of his employment. (First Am. Compl. ¶¶ 47–53.) It is undisputed that California state law governs this agreement. (Confidentiality Agreement § 12.) To prevail on a claim for breach of contract under California law, "the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).

Erhart's whistleblower defenses allege Erhart cannot be held liable on BofI's claim because the law protects Erhart's conduct. Stated differently, these defenses allege enforcing the Confidentiality Agreement in these circumstances would be illegal. If "the illegality of a contract does not appear from the face of the complaint it becomes a matter of affirmative defense . . . . And in such case the burden of proof is on the defendant." *Fellom v. Adams*, 274 Cal. App. 2d 855, 863 (1969) (quoting *Eaton v. Brock*, 124 Cal. App. 2d 10, 13 (1954)); *see also Sweeney v. KANS, Inc.*, 247 Cal. App. 2d 475, 480 (1966) ("Defendant's contention of illegality is, of course, an affirmative defense. The burden of establishing this defense was, therefore, on

the defendant."). Here, the illegality of the Confidentiality Agreement does not appear on the face of BofI's First Amended Complaint. (*See* First Am. Compl. ¶¶ 7–46.) For instance, BofI does not allege that it is seeking to enforce the agreement despite that Erhart was using BofI's confidential information to support his reports of believed wrongdoing to the government. (*See id.*) Thus, the Court construes Erhart's whistleblower defenses as each raising a variation of the affirmative defense of illegality—the position that enforcing the Confidentiality Agreement would be against public policy.

"The law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy." *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 540 (2004) (alteration omitted) (quoting 15-79 Corbin on Contracts § 79.1 (2003)); *see also Lee On v. Long*, 37 Cal. 2d 499, 502 (1951) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out[.]"). To determine whether a contract is unenforceable based on public policy, California courts "essentially engage in a weighing process, balancing the interests of enforcing the contract with those interests against enforcement." *Rosen v. State Farm Gen. Ins. Co.*, 30 Cal. 4th 1070, 1082 (2003). Accordingly, "the question of whether a contract provision is illegal or contrary to public policy 'is a question of law to be determined from the circumstances of each particular case.'" *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1256–57 (2013) (quoting *Jackson v. Rogers & Wells*, 210 Cal. App. 3d 336, 349–350 (1989)). However, California courts have cautioned that the "power to void a contract should be exercised only where the case is free from doubt." *Kaufman v. Goldman*, 195 Cal. App. 4th 734, 746 (2011) (citing *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 777 n.53 (2007)).

//

In making this determination under California law, courts have often relied on Section 178 of the Restatement (Second) of Contracts. *See, e.g.*, *Kashani*, 118 Cal. App. 4th at 551; *Cariveau v. Halferty*, 83 Cal. App. 4th 126, 131–32 (2000); *Bovard v. Am. Horse Enters., Inc.*, 201 Cal. App. 3d 832, 840 (1988). This section states: "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Restatement (Second) of Contracts § 178 (1981). The Restatement lists a series of factors to be considered when making this determination, including "any special public interest in the enforcement of the particular term" and the strength of the public policy against enforcement of the term "as manifested by legislation or judicial decisions." *Id.*

The public policy advanced to prevent the enforcement of a contract term may be based on a variety of sources. *E.g.*, *Kashani*, 118 Cal. App. 4th at 542 ("For purposes of illegality, the 'law' is a broad term."). It may be based on the "policy expressed in a statute" or "may be implied from the language of such statute[.]" *Cariveau*, 83 Cal. App. 4th at 132. A public policy may also "be enunciated in administrative regulations that serve the statutory objective." *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 80 (1998). In addition, "California law includes federal law." *Kashani*, 118 Cal. App. 4th at 543 (citing *People v. Sischo*, 23 Cal. 2d 478, 491 (1943)). Thus, California courts have refused to enforce contract terms in light of public policies that are based on federal statutes, regulations, and rules. *See generally*, *Green*, 19 Cal. 4th 66 (Federal Aviation Administration regulations); *Cariveau*, 83 Cal. App. 4th 126 (federal securities law and rules); *Kashani*, 118 Cal. App. 4th 531 (executive orders promulgated under the International Emergency Economy Powers Act, 50 U.S.C. § 1701).

//

//

For example, a settlement agreement's confidentiality clause that prohibits a securities customer "from discussing the selling agent's misconduct with regulatory authorities" is unenforceable on grounds of federal public policy. *Cariveau*, 83 Cal. App. 4th at 128. In *Cariveau*, a securities agent subject to the rules of the National Association of Securities Dealers, Inc. ("NASD") recommended inappropriate investments to an investor. *Id.* at 128. As a condition to returning the investor's money, the agent required the investor to enter into a settlement agreement providing that "the underlying events resulting in the negotiation of this Agreement shall remain . . . confidential . . . and shall not be disclosed . . . to any public or private person or entity, or to any administrative, law enforcement or regulatory agency." *Id.* at 129. The investor later wrote a letter to the agent's employer, which led to the agent's termination, an NASD investigation, and NASD sanctions against the agent. *Id.* at 130. The agent responded by suing the investor for breach of contract based on the investor's disclosure of information in violation of the settlement agreement's confidentiality clause. *Id.*

"The trial court refused to enforce the clause on grounds of public policy," and the California Court of Appeal affirmed. *Cariveau*, 83 Cal. App. 4th at 128. In doing so, the court looked to the former NASD Rules of Fair Practice, which "are derived from, and carry out the purposes of, the Securities Exchange Act of 1934." *Id.* at 133. These rules "require[d] reporting outside business activities to a member's employer so that the employer can maintain effective oversight of the activities. The rules also encourage[d] aggrieved investors to report wrongdoing so that the integrity of the system is preserved." *Id.* Because these rules served statutory objectives, they were "a valid source of public policy." *Id.* at 134. In weighing the interest in enforcing the settlement agreement against the public policy, the court noted "[t]he only interest appellant identifies in support of the contract term is the general policy in favor of promoting the settlement of disputes." *Id.* at 136. Balancing against this interest was "the policy of maintaining an honest and fair

national marketplace in securities," which "has been declared as a 'national public interest' in the Securities Exchange Act of 1934." *Id.* (citing 15 U.S.C. § 78b). After applying the factors in Section 178 of the Restatement (Second) of Contracts and reasoning that the "inclusion of a restrictive confidentiality clause in the [Settlement] Agreement . . . is an instance of misconduct in itself," the court concluded the agreement was unenforceable on grounds of public policy. *Id.* at 137–38.

Here, as mentioned above, Erhart argues his affirmative defenses should survive summary adjudication because the Confidentiality Agreement is unenforceable on public policy grounds. (Opp'n 4:1–5:28.) Accordingly, the Court considers the interest in enforcing the Confidentiality Agreement, the public policy against enforcement, and whether the public policy clearly outweighs the interest in favor of enforcement.

### a.      Interest in the Enforcement of the Confidentiality Agreement

The Court starts by weighing "the interest in the enforcement" of the Confidentiality Agreement. *See* Restatement (Second) of Contracts § 178 (1981). The Court finds there is a strong interest in enforcing the Confidentiality Agreement because it serves several legitimate interests. First, enforcing the Confidentiality Agreement supports the "longstanding established public policy in California which respects and promotes the freedom of private parties to contract." *Brisbane Lodging*, 216 Cal. App. 4th at 1262; *see also Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 363 (1992) (citing *In re Garcelon's Estate*, 104 Cal. 570, 591 (1894)) ("[I]f there is one thing which more than another public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contract, and that their contracts when entered into freely and voluntarily shall be held sacred, and shall be enforced by courts of justice.").

//

15cv2287

Second, enforcing the Confidentiality Agreement furthers the "significant government interests" promoted by legal protection of trade secrets. *See DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal. 4th 864, 885 (2003). These interests include promoting the sharing of knowledge, incentivizing innovation, and maintaining commercial ethics. *Id.* at 880–81. Although trade secret and contract law provide separate remedies, *see* Cal. Civ. Code § 3426.7(b), the two are often intertwined. To obtain trade secret protection, information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). One reasonable step to ensure secrecy is to require "employees to sign confidentiality agreements" because they can be used to prevent the disclosure of trade secret information. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) (citing *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.1993)); *see also* Alan J. Tracey, *The Contract in the Trade Secret Ballroom- A Forgotten Dance Partner?*, 16 Tex. Intell. Prop. L.J. 47, 48–51 (2007) (summarizing the value of non-disclosure agreements in connection with the Uniform Trade Secrets Act). Here, at least some of BofI's files taken by Erhart, such as BofI's Fiscal 2015 Strategic Plan, contain information likely entitled to trade secret protection. *See, e.g.*, *Whyte*, 101 Cal. App. 4th at 1456 (holding company's strategic plan documents are trade secrets under California law). Thus, allowing BofI to enforce the Confidentiality Agreement where Erhart has appropriated documents with trade secret information furthers the interests promoted by legal protection of trade secrets.

Third, enforcing the Confidentiality Agreement serves the government interest in protecting nonpublic personal information possessed by BofI. Under 15 U.S.C. § 6801, "[i]t is the policy of Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." It is undisputed that Erhart appropriated files containing customers'

nonpublic personal information. He sent an e-mail from his personal e-mail account to a third party, his mother, containing a spreadsheet with BofI customers' social security numbers. (JSUF ¶ 6.) Thus, enforcing the Confidentiality Agreement furthers this interest.

Fourth, BofI has an interest in protecting other confidential business information that may not qualify for trade secret protection. *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (recognizing an employer's "strong interest" in discouraging an employee from taking sensitive personnel documents, "copying those documents and showing them to a co-worker" in the context of a retaliation claim under the Age Discrimination in Employment Act); *see also Winston Research Corp. v. Minn. Mining & Mfg. Co.*, 350 F.2d 134, 138 (9th Cir. 1965) ("Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized [and] employers will be compelled to limit communication among employees with a consequent loss in efficiency . . . ."). Enforcing the Confidentiality Agreement furthers this interest as well.

Based on the foregoing, the Court concludes there is a significant interest in the enforcement of the Confidentiality Agreement.

### b.    Public Policy against Enforcement of the Confidentiality Agreement

Next, the Court weighs the "public policy against enforcement" of the Confidentiality Agreement. *See* Restatement (Second) of Contracts § 178 (1981). Both California state and federal law, including those laws specifically identified by Erhart's defenses, reflect the strong public policy in favor of protecting whistleblowers. California Labor Code Section 1102.5(b), invoked by Erhart's Twenty-Third Affirmative Defense, is "California's general whistleblower statute." *Carter v. Escondido Union High Sch. Dist.*, 148 Cal. App. 4th 922, 933 (2007). It

forbids retaliation against an employee who discloses "information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Labor Code § 1102.5(b). "This provision reflects the broad public policy interest in encouraging workplace whistle blowers to report unlawful acts without fearing retaliation." *Green*, 19 Cal. 4th at 77.

This policy is similarly reflected in federal law invoked by Erhart's other whistleblower defenses. Under Sarbanes–Oxley's anti-retaliation provision, raised by Erhart's Twelfth Affirmative Defense, no covered company may retaliate against an employee who provides certain information to "a Federal regulatory or law enforcement agency" or "a person with supervisory authority over the employee . . . ." 18 U.S.C. § 1514A; s*ee also Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (discussing the public purpose underlying Sarbanes–Oxley and its anti-retaliation provision). This provision demonstrates the "public policy in favor of whistleblowers in securities cases." *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1136 (N.D. Cal. 2002). Dodd–Frank's whistleblower protection program, 15 U.S.C. § 78u–6, which contains an "anti-retaliation provision [that] appears to sweep more broadly" than Sarbanes–Oxley's provision and is identified in Erhart's Thirteenth Affirmative Defense, also reflects the strong public policy in favor of protecting whistleblowers. *See Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1014 (N.D. Cal. 2015). Regulations promulgated under Dodd–Frank expressly preclude parties, including employers, from interfering with Dodd–Frank's whistleblower program. Specifically, Rule 21F-17(a) states:

> No person may take any action to impede an individual from communicating directly with the [SEC] staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications.

17 C.F.R. § 240.21F-17; *see also* Richard Moberly et al., *De Facto Gag Clauses:*

*The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 87–92 (2014) (discussing Dodd–Frank's whistleblower program and SEC Rule 21F-17).

Accordingly, both federal and state law reflect a strong public policy in favor of whistleblowing and protecting whistleblowers from retaliation.

### c.   Balancing the Enforcement Interest and Public Policy

Last, the Court considers whether the interest in the enforcement of the Confidentiality Agreement is "clearly outweighed in the circumstances by a public policy against the enforcement" of the agreement. *See* Restatement (Second) of Contracts § 178 (1981). In these circumstances, Erhart engaged in a variety of conduct where he used information that he gained access to during his employment. Hence, the Court considers separately below whether the public policy in favor of whistleblower protection clearly outweighs the interest in the enforcement of the Confidentiality Agreement as to Erhart's conduct in (1) providing information to the government, (2) appropriating BofI's files, (3) sending BofI's information to his mother and placing BofI's information on his live-in girlfriend's computer, (4) purportedly providing information to the press, and (5) disclosing information in his publicly-filed whistleblower retaliation complaint.

### (1)   Erhart's Communications with the Government

The Court first considers Erhart's conduct in providing information to the government—the SEC and the OCC. (*See* JSUF ¶¶ 1, 2, 7.) Erhart disclosed BofI's information to the government in reporting believed wrongdoing at the bank. (*See id.* ¶¶ 1, 2.) Viewing the evidence in the light most favorable to Erhart, this conduct qualifies for protection under one or more of the whistleblower protection provisions relied upon by the Court as sources of public policy. *See, e.g.*, Cal. Lab. Code § 1102.5(b). In addition, any attempt to enforce the agreement as to this conduct would

violate the SEC's rule prohibiting BofI from "enforcing, or threatening to enforce, a confidentiality agreement" to impede Erhart from communicating with the SEC. *See* 17 C.F.R. § 240.21F-17. Consequently, as to these actions, the public policy in favor of whistleblower protection clearly outweighs the interest in the enforcement of the agreement, and the agreement is unenforceable. *See Cariveau*, 83 Cal. App. 4th at 138; *see also Green*, 19 Cal. 4th at 77.

### (2)    Erhart's Appropriation of BofI's Files

Next, the Court considers Erhart's conduct in appropriating various files from BofI. (*See* JSUF ¶¶ 3–5, 7.) In light of the strong interests in favor of enforcing confidentiality agreements and the public policy of whistleblower protection, courts are split on whether confidentiality agreements should be enforced in contexts involving comparable conduct.[4] For example, in *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007), the court applied California law and enforced a confidentiality agreement despite the employee's counterclaim for whistleblower retaliation under Sarbanes–Oxley. The court reasoned that the public policy in favor of whistleblowing cannot "fairly be said to authorize disgruntled employees to pilfer a wheelbarrow full of an employer's proprietary documents in violation of their contract merely because it might help them blow the whistle on an employer's violations of law, real or imagined." *Id.* In the court's view:

> Endorsing such theft or conversion would effectively invalidate most confidentiality agreements, as employees would feel free to haul away proprietary documents, computers, or hard drives, in contravention of their confidentiality agreements, knowing they could later argue they needed the documents to pursue suits against employers under a variety

---

[4] *Compare Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011); *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 915 (4th Cir. 1997); and *JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 697, 702 (E.D. Va. 2007); *with Shmushkovich v. Home Bound Healthcare, Inc.*, No. 12 C 2924, 2015 WL 3896947, at *1 (N.D. Ill. June 23, 2015); *Siebert v. Gene Sec. Network, Inc.*, No. 11-CV-01987-JST, 2013 WL 5645309, at *8 (N.D. Cal. Oct. 16, 2013); and *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012).

> of statutes protecting employees from retaliation for publicly reporting wrongdoing, such as Sarbanes–Oxley (18 U.S.C. § 1514A), the False Claims Act (31 U.S.C. § 3730), . . . or other statutes prohibiting retaliation for activity in opposition to discrimination.

*Id.*

Other courts, particularly in the context of actions brought under the False Claims Act, have refused to enforce a confidentiality agreement on public policy grounds. In *Ruhe*, the district court declined to strike exhibits appended to the relators' complaint that the defendant argued were taken and disclosed in violation of non-disclosure agreements. *Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1038–39 (C.D. Cal. 2012). The court explained that:

> Relators sought to expose a fraud against the government and limited their taking to documents relevant to the alleged fraud. Thus, this taking and publication was not wrongful, even in light of nondisclosure agreements, given "the strong public policy in favor of protecting whistleblowers who report fraud against the government." Obviously, the strong public policy would be thwarted if [the defendant] could silence whistleblowers and compel them to be complicit in potentially fraudulent conduct.

*Id.* at 1039 (citation omitted) (quoting *United States v. Cancer Treatment Ctrs. of Am.*, 350 F. Supp. 2d 765, 773 (N.D. Ill. 2004)); *see also Siebert v. Gene Sec. Network, Inc.*, No. 11-CV-01987-JST, 2013 WL 5645309, at *8 (N.D. Cal. Oct. 16, 2013) ("The Court agrees that any alleged obligation by [the relator] not to retain or disclose the confidential documents that form the basis of this action is unenforceable as a matter of public policy because it would frustrate Congress' purpose in enacting the False Claims Act.").

In *Cafasso, United States ex rel. v. General Dynamics C4 Systems Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011), the Ninth Circuit stated there is "some merit" in a public policy exception to a confidentiality agreement. There, the relator Cafasso executed a confidentiality agreement at the start of her employment that contained a confidentiality provision similar to that agreed to by Erhart. *See id.* at 1061. After

Cafasso copied various documents and instituted a False Claims Act ("FCA") case against her former employer after her termination, the employer counterclaimed that Cafasso's "appropriation of electronic documents and files" violated the confidentiality agreement. *Id.* The district court granted summary judgment in favor of the employer. *Id.*

On appeal, Cafasso, like Erhart, admitted to appropriating files covered by the confidentiality agreement but, also like Erhart, argued for a public policy exception to the enforcement of the contract. *Cafasso*, 637 F.3d at 1061–62. The Ninth Circuit declined to decide whether to adopt an exception, but, in recognizing that a public policy exception had "some merit," the Ninth Circuit forecasted that "[e]ven were we to adopt such an exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation" of files. *Id.* at 1062. The court noted that "Cafasso copied nearly eleven gigabytes of data—tens of thousands of pages," and "she scanned only file names and 'did not look at any individual documents at all.'" *Id.* "An exception broad enough to protect the scope of Cafasso's massive document gather in this case would make all confidentiality agreements unenforceable as long as the employee later files a qui tam action." *Id.* (citing *JDS Uniphase Corp*, 473 F. Supp. 2d at 702). In affirming the district court, the Ninth Circuit provided the following guidance:

> Were we to adopt a public policy exception to confidentiality agreements to protect relators—a matter we reserve for another day—those asserting its protection would need to justify why removal of the documents was reasonably necessary to pursue an FCA claim . . . . The need to facilitate valid claims does not justify the wholesale stripping of a company's confidential documents. Although courts perhaps should consider in particular instances for particular documents whether confidentiality policies must give way to the needs of FCA litigation for the public's interest, Cafasso's grabbing of tens of thousands of documents here is overbroad and unreasonable, and cannot be sustained by reference to a public policy exception.

*Id.*; *see also* Richard Moberly et al., *De Facto Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions,*

30 ABA J. Lab. & Emp. L. 87, 113 (2014) (citing *In re JDS Uniphase Corp. Secs. Litig.*, 238 F. Supp. 2d 1127, 1136 (N.D. Cal. 2002)) (noting courts "recognize that the federal interest in whistleblowing can trump employers' otherwise legitimate desire to protect confidential documents when there is a reasonable connection between the documents and the alleged securities violation").

Here, the Court concludes there is merit to a public policy exception to confidentiality agreements to protect whistleblowers who appropriate company documents. As discussed above, the Court recognizes the strong interest in the enforcement of confidentiality agreements like the one signed by Erhart. But at the same time, whistleblowers often need documentary evidence to substantiate their allegations. As several commentators have noted in the context of whistleblower tips submitted to the SEC:

> Relevant documents taken from an employer not only can provide potentially valuable evidence of a possible securities violation, but also can help the SEC confirm the veracity of the whistleblower's information and better distinguish between tips that warrant significant attention and those that do not. This is a critical function because the SEC received over 3,200 tips through the SEC Whistleblower Program in fiscal year 2013 alone, and receives tens of thousands of other tips and referrals through other means, such as investor complaints.

Richard Moberly et al., *De Facto Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 115 (2014). Allowing a whistleblower to appropriate documents supporting believed wrongdoing also mitigates the possibility that evidence of the wrongdoing will be destroyed before an investigation can be conducted. *Cf. United States v. Arthur Andersen, LLP*, 374 F.3d 281, 286 (5th Cir. 2004) (discussing accounting firm Arthur Andersen's shredding of two tons of documents on the eve of the SEC's investigation into Enron), *reversed on other grounds at* 544 U.S. 696. //

1  Further, the qualified approach forecasted by the Ninth Circuit strikes an
2  appropriate balance between these interests. This type of "more nuanced approach"
3  focuses on "the nexus between the confidential documents in question and the
4  misconduct alleged by the whistleblower." *See* Richard Moberly et al., *De Facto*
5  *Gag Clauses: The Legality of Employment Agreements That Undermine Dodd-*
6  *Frank's Whistleblower Provisions*, 30 ABA J. Lab. & Emp. L. 87, 110 (2014). Under
7  this approach, the burden is on the party seeking to invoke the public policy
8  exception "to justify why removal of the documents was reasonably necessary" to
9  support the allegations of wrongdoing. *See Cafasso*, 637 F.3d at 1062. In this Court's
10 view, this determination is a question of fact, but one that can be made as a matter
11 of law when a reasonable jury could only reach one conclusion. *See id.* ("Even were
12 we to adopt such an exception, it would not cover Cafasso's conduct given her vast
13 and indiscriminate appropriation of [company] files.").

14 In this case, Erhart states he "was very careful in [selecting] the information
15 [he] accessed and turned over. Each document was specifically related to one of the
16 allegations of wrongdoing [he] had discussed with [his supervisor] and then reported
17 to federal law enforcement." (Erhart Decl. ¶ 79, ECF No. 67-5.) Further, Erhart
18 states "every document" he used was one he "had properly accessed in the course of
19 performing [his] work as an internal auditor," as directed by his immediate
20 supervisor. (*Id.*) The Court, having previously reviewed lists of files taken by Erhart,
21 notes many do appear to be related to his allegations of believed wrongdoing. (*See*
22 ECF No. 21.)

23 Viewing the evidence in the light most favorable to Erhart, summary
24 adjudication of his defenses based on this conduct is not warranted. BofI has not
25 demonstrated Erhart engaged in a "wholesale stripping of [BofI]'s confidential
26 documents"—or that his appropriation of its files was "vast and indiscriminate." *See*
27 *Cafasso*, 637 F.3d at 1062. Thus, it is possible that a public policy exception may
28 cover Erhart's conduct, and there is a genuine issue for trial as to whether Erhart's

15cv2287

removal of documents was "reasonably necessary" to support his allegations of wrongdoing. *See Cafasso*, 637 F.3d at 1062. This issue may also be inextricably intertwined with whether a jury concludes Erhart's beliefs of wrongdoing were reasonable. In sum, to the extent BofI's claim is predicated on Erhart's appropriation of files to support his allegations of believed wrongdoing, his whistleblower defenses survive BofI's request for summary adjudication.

### (3) Erhart's Transmission of Confidential Information to His Mother and Use of Live-in Girlfriend's Computer

The Court turns to Erhart's conduct in e-mailing confidential information to his mother and using his live-in girlfriend's computer to access BofI documents. (JSUF ¶¶ 6, 13–14.) In a different procedural context, the Fourth Circuit discussed analogous conduct in *Deltek, Inc. v. Department of Labor, Administrative Review Board*, 649 F. App'x 320, 324 (4th Cir. 2016). There, the plaintiff alleged she was terminated in violation of Sarbanes–Oxley's whistleblower protection provision, 18 U.S.C. § 1514A. *Id.* at 322. The defendant employer discovered that the plaintiff had e-mailed company documents to her home e-mail account, which was shared by her husband, in violation of her employment contract and company policies. *Id.* at 332. Thus, the company argued the after-acquired evidence doctrine applied. *Id.* at 331. This doctrine allows an employer in a retaliation case to limit its liability if evidence discovered after termination would have led to the termination had the company known of the evidence earlier. *Id.*; *see also McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361–62 (1995). The Administrative Law Judge ("ALJ") rejected the defendant's argument, however, and the Department of Labor's Administrative Review Board affirmed. *Deltek*, 649 Fed. App'x at 332.

Under the deferential substantial evidence standard, the Fourth Circuit affirmed. *Deltek*, 649 Fed. App'x at 331–33. The court noted that the ALJ made

"specific findings, affirmed by the Board, that [the plaintiff] forwarded to her home account only documents that were relevant to her whistleblowing reports; that when she did so, she had a reasonable concern that the documents might be shredded by [company] employees or otherwise destroyed; and that [the plaintiff's] motivation for forwarding the documents was 'to support her [Sarbanes–Oxley] allegations.'" *Id.* at 332 (third alteration in original). The court also noted the plaintiff, after complaining of retaliation to the company's general counsel, had been directed to gather information to support her internal complaint. *Id.* "[I]n light of the specific factual findings of the ALJ and the Board," the Fourth Circuit agreed that the plaintiff's "effort to protect select relevant documents" would not have justified her termination, and it affirmed. *Id.*

The Ninth Circuit's decision in *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996), discussed contrasting circumstances in another context. In that case, the plaintiff brought suit alleging employment discrimination under the Age Discrimination in Employment Act ("ADEA"). *Id.* at 765. He "was convinced he had been denied [a] promotion and laid off because of his age." *Id.* at 758. "The evening after he was denied the promotion," the plaintiff "searched his supervisor's office. Ostensibly, he was looking for his own personnel file (to which access was restricted), but while he was rummaging through his supervisor's desk, [the plaintiff] came across other documents he found interesting, including his supervisor's promotion recommendations and a handwritten list ranking employees for layoff (a so-called 'totem' list)." *Id.* The plaintiff "photocopied the handwritten 'totem' list along with several other documents, and later showed them to another employee who had been slated for layoff." *Id.*

After the defendant discovered these actions in discovery, the company, similar to the defendant in *Deltek*, argued the plaintiff's later-discovered misconduct "absolved the company of all liability for its alleged discrimination." *O'Day*, 79 F.3d at 758. In response, the plaintiff claimed he was engaged in protected activity under

the ADEA's opposition clause, which "protects reasonable attempts to contest an employer's discriminatory practices." *Id.* at 763. In applying a balancing test, the court concluded the plaintiff's conduct was not protected activity. *Id.* It reasoned the plaintiff "committed a serious breach of trust, not only in rummaging through his supervisor's office for confidential documents, but also in copying those documents and showing them to a co-worker." *Id.* Further, although the plaintiff had an interest in preserving evidence of the defendant's unlawful employment practices, that interest did not "explain why he showed the purloined documents to a co-worker who had been slated for lay-off, or why he felt compelled to preserve evidence of [the defendant's] lay-off decisions," given that he had not yet been laid off. *Id.* Thus, the court rejected the plaintiff's protected activity argument. *Id.* at 764.

Here, it is undisputed that Erhart sent an e-mail to his mother that included a spreadsheet containing BofI customers' social security numbers. (JSUF ¶ 6.) Although this e-mail was briefly accessed by his mother, she did not print it, forward it, or otherwise provide it to anyone. (Pamela Erhart Dep. 36:8–24, 58:2–15, ECF No. 67-7.) In his declaration, Erhart states he was "fearful that the Bank would delete or alter material information, based on what [he'd] seen management do in the past." (Erhart Decl. ¶ 76, ECF No. 67-5.) In addition, Erhart states he was informed that the bank was breaking into the locked cabinets and computer at his workstation, where he had documented instances of believed wrongdoing. (*Id.* ¶¶ 46, 55–56.) Further, around this time, Erhart states he "feared upper management had accessed [his] work laptop remotely." (*Id.* ¶ 57.) Thus, Erhart states he sent his mother "a copy of some information to hold for safekeeping because [he] was fearful, in case something happened to [him] or that information." (*Id.* ¶ 77.) Viewing the evidence in the light most favorable to Erhart, the Court concludes a factfinder could determine that the information transmitted by Erhart was relevant to his whistleblower reports, that this information was transmitted because he had a reasonable concern the information might be destroyed, and that Erhart's motivation

1    for forwarding the information was to support his allegations of wrongdoing. *See*

2    *Deltek*, 649 Fed. App'x at 331–32. Moreover, unlike the circumstances in *O'Day*,

3    where the plaintiff showed a confidential layoff list to an employee who was slated

4    to be laid off, there is no evidence of a competing motive for Erhart's transmission

5    of confidential bank information to his mother—she had no reason to personally

6    benefit from receiving this information.

7         If the jury concludes Erhart's conduct was to protect relevant information

8    from what he reasonably perceived was a risk of destruction, then the public policy

9    in favor of whistleblowing clearly outweighs the interest in enforcement of the

10   Confidentiality Agreement in these specific circumstances—rendering the

11   agreement unenforceable. If, however, the opposite determination is reached, the

12   calculus shifts in favor of enforcement, and BofI may recover for breach of the

13   Confidentiality Agreement.

14        Further, it is undisputed that Erhart used his live-in girlfriend's computer to

15   access BofI documents. (JSUF ¶ 13.) Erhart used the computer, which was in his

16   home, "to access some BofI documents." (Erhart Decl. ¶ 3, ECF No. 67-3.) His

17   girlfriend never looked at any BofI information Erhart "may have placed on [her]

18   computer for his viewing purposes." (Cornell ¶ 2.) She did not share the information

19   with anyone. (*Id.*) The Court similarly concludes Erhart has made a sufficient

20   showing that his use of the computer to access BofI documents as part of his

21   reporting of believed wrongdoing may be found to be protected activity.

22        Accordingly, because Erhart has made a sufficient showing that this conduct

23   may be protected, the Court will not summarily adjudicate Erhart's whistleblower

24   defenses on this basis.

25   //

26   //

27   //

28   //

**(4)   Erhart's and His Counsel's Purported**

**Disclosures to the Press**

BofI also argues Erhart disclosed confidential information to *The New York Times* prior to his counsel transmitting a copy of his whistleblower retaliation complaint. (*See* Mot. 9:8–17.) In *Tides v. Boeing Co.*, 644 F.3d 809, 811 (9th Cir. 2011), the Ninth Circuit held "[l]eaks to the media" are not protected by Sarbanes–Oxley's anti-retaliation provision—the statute invoked in Erhart's Twelfth Affirmative Defense. The putative-whistleblower plaintiffs in *Tides* argued that their disclosures to the *Post-Intelligencer* were protected by Sarbanes–Oxley "because reports to the media may eventually 'cause information to be provided' to members of Congress or federal law enforcement or regulatory agencies." *Id.* at 815. The court "decline[d] to adopt such a boundless interpretation of the statute." *Id.* It reasoned that Sarbanes–Oxley's anti-retaliation provision "protects employees of public companies from retaliation only when they" provide information to "one of three individuals or entities: (1) a federal regulatory or law enforcement agency, (2) a member or committee of Congress, or (3) a supervisor or other individual who has the authority to investigate, discover or terminate such misconduct." *Id.* (citing 18 U.S.C. § 1514A(a)(1)). "Members of the media are not included. If Congress wanted to protect reports to the media under § 1514A(a)(1), it could have listed the media as one of the entities to which protected reports may be made. Or, it could have protected 'any disclosure' of specified information[.]" *Id.* This conclusion is in contrast to a government whistleblower statute that was not implicated in *Tides*, the Whistleblower Protection Act, 5 U.S.C. § 2302, which protects any disclosure of specified information. *Id.* Thus, "[w]hen Congress wants to protect the disclosure of any information to any entity, it knows how to do so." *Id.*

Although the plain meaning of the statute was dispositive, the Ninth Circuit also noted "we can sleep well knowing" that the legislative history of Sarbanes–Oxley's anti-retaliation provision reinforces the conclusion that disclosures to the

media are not protected. *Tides*, 644 F.3d at 816. The Senate Judiciary Committee "explained that the whistleblower provision was intended to protect 'employees . . . who report acts of fraud to federal officials *with the authority to remedy the wrongdoing* or to supervisors or appropriate individuals within their company." *Id.* (quoting S. Rep. No. 107–146, at 5 (2002)). The provision "protects employees 'when they take lawful acts to disclose information or otherwise assist . . . federal regulators, Congress, or their supervisors . . . .'" *Id.* (quoting S. Rep. No. 107–146, at 18–19 (2002)). Thus, disclosures to the media are not protected. *Id.*

The plain meaning reasoning in *Tides* is equally applicable to all of the other whistleblower protection provisions invoked by Erhart. Consequently, none of these provisions protects disclosures to the press.

Here, however, BofI has not established that it is undisputed that Erhart or his counsel provided confidential information to the press. BofI only submits evidence demonstrating Erhart and his counsel communicated with a reporter—not that they disclosed confidential information to the reporter. Further, Erhart and his counsel dispute BofI's claim. (Gillam Decl. ¶ 9, ECF No. 67-1, Erhart Decl. ¶ 13, ECF No. 67-6.) Thus, at this point, Erhart is not relying on his whistleblower protection defenses to protect any alleged disclosures to the press. That said, if BofI establishes Erhart disclosed confidential information to the press, Erhart will not be able to raise these whistleblower defenses as to this conduct because leaks to the media are not protected. *See Tides*, 644 F.3d at 810–11.

### (5)    Erhart's Disclosure of BofI's Information in His Whistleblower Retaliation Complaint

Last, BofI argues Erhart disclosed its confidential information in his publicly-filed whistleblower retaliation complaint. (Mot. 7:13–8:23.) After hearing oral argument on this point, the Court concludes this issue turns on whether it was reasonably necessary for Erhart to disclose this information in his complaint to

1    pursue his whistleblower retaliation claims.

2        Erhart's whistleblower retaliation action relies upon, among others, Sarbanes–

3    Oxley's and Dodd–Frank's provisions that authorize a private right of action against

4    employers that retaliate against whistleblowers. *See* 15 U.S.C. § 78u-6(h)(1)(B); 18

5    U.S.C. § 1514A(b). To proceed under these provisions, Erhart must plausibly allege

6    that he engaged in protected activity under the respective statutes. *See, e.g.*, *Tides*,

7    644 F.3d at 814; 17 C.F.R. § 240.21F-2. Meaning, for Sarbanes–Oxley's provision,

8    Erhart must allege that he "provide[d] information . . . regarding any conduct which

9    [he] reasonably believe[d] constitutes a violation of section 1341 [mail fraud], 1343

10   [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule

11   or regulation of the Securities and Exchange Commission, or any provision of

12   Federal law relating to fraud against shareholders . . . ." *See* 18 U.S.C. § 1514A.

13   Similarly, for Dodd–Frank's provision, Erhart must allege that he had a "reasonable

14   belief that the information [he was] providing relate[d] to a possible securities law

15   violation . . . or . . . a possible violation of the provisions" enumerated in Sarbanes–

16   Oxley's anti-retaliation provision. *See* 17 C.F.R. § 240.21F-2.

17       Accordingly, Erhart must include factual allegations regarding his believed

18   wrongdoing in his complaint to state a claim for whistleblower retaliation under

19   Sarbanes–Oxley and Dodd–Frank. Yet, the broad provisions in the Confidentiality

20   Agreement appear to apply to much of the information Erhart relies upon for his

21   allegations. In the Court's view, these confidentiality obligations must give way to

22   allow Erhart enough leeway to allege and pursue his whistleblower retaliation

23   claims. At the same time, Erhart should not be able to disclose any of BofI's

24   information in his complaint simply because he is pursuing a whistleblower

25   retaliation claim. Rather, like the approach taken by the Court with Erhart's

26   appropriation of BofI's documents, Erhart should be permitted to disclose BofI's

27   information in his complaint if doing so was "reasonably necessary" to pursue his

28   retaliation claim. *See Cafasso*, 637 F.3d at 1062; *see also Ruhe*, 929 F. Supp. 2d

1033, 1039 (citing *Cancer Treatment Ctrs. of Am.*, 350 F.Supp.2d at 773) (noting in a False Claims Act case that the publication of confidential documents in the relator's complaint "was not wrongful, even in light of nondisclosure agreements, given 'the strong public policy in favor of protecting whistleblowers who report fraud against the government'"); *cf. Wadler v. Bio–Rad Labs., Inc.*, --- F. Supp. 3d ---, 2016 WL 7369246, at \*14 (N.D. Cal. 2016) (concluding former general counsel was permitted to rely on privileged communications and confidential information that was "reasonably necessary" to his claims and defenses in his whistleblower retaliation action).

Ultimately, this determination, like Erhart's appropriation of files, turns on issues of fact. BofI argues Erhart disclosed confidential information to inflict maximum damage on the company and "benefit short sellers at the Bank's expense," not simply to pursue his whistleblower retaliation claims. (*See* Reply 3:6–8.) However, BofI has not met its initial burden of demonstrating there is no genuine issue of material fact as to this conduct. Therefore, summary adjudication of Erhart's whistleblower defenses on this basis is not appropriate.

### 2.    Remaining Claims

Thus far, the Court's analysis has focused on considering Erhart's public policy arguments in the context of BofI's breach of contract claim. Summarily adjudicating Erhart's defenses in the context of this claim is not appropriate, and the Court reaches the same conclusion for BofI's remaining claims. For example, BofI asserts various tort claims against Erhart, including conversion and breach of the duty of loyalty. For these claims, the Court construes Erhart's defenses as raising a defense of justification or privilege. "A privileged act is by definition one for which the actor is absolved of any tort liability, whether premised on the theory of negligence or of intent." *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 421 (1991); *see also* Restatement (Second) of Torts § 890 (1979) (defining "privilege"

as denoting "the fact that conduct that under ordinary circumstances would subject the actor to liability, under particular circumstances does not subject him to the liability"). "When the correlation between justifiability and privilege is acknowledged, it inevitably follows that [a] plaintiff's cause of action cannot be sustained." *Id.* at 420. A privilege or justification may arise by statute. *See, e.g.*, 2 Cal. Affirmative Def. § 41:1 (2d ed.).

It is implicit in the various whistleblower protection provisions that if an employee is permitted to provide information regarding believed wrongdoing to the government, including documents, the employer cannot then seek to impose tort liability on the employee for the same conduct. The public policy considerations underpinning the Court's contract analysis would similarly influence its analysis under tort law.[5] Consequently, for the same reasons discussed above, the Court concludes summary adjudication of Erhart's defenses in the context of BofI's remaining claims is not warranted.

## V.    **CONCLUSION**

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion for summary adjudication of thirteen of Erhart's affirmative defenses. (ECF No. 45 in Case No. 15-cv-02287.) Erhart's Fourteenth, Fifteenth, Twenty-First, and Twenty-Second Affirmative Defenses fail as a matter of law. These defenses invoke protections for whistleblowers, but Erhart concedes these protections do not exist. Therefore, the Court summarily adjudicates these defenses in BofI's favor. In addition, the Court strikes Erhart's Seventeenth and Eighteenth

---

[5] BofI also brings a claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. (First Am. Compl. ¶¶ 89–95). Because neither party substantively addresses this claim, the Court does not wade into the potential issues arising from the intersection of this claim and Erhart's whistleblower defenses. *See, e.g.*, *United States v. Nosal*, 844 F.3d 1024, 1032 (9th Cir. 2016) (discussing CFAA generally); *see also* Connor C. Turpan, *Whistleblower? More Like Cybercriminal: The Computer Fraud and Abuse Act As Applied to Sarbanes-Oxley Whistleblowers*, 42 Rutgers Computer & Tech. L.J. 120, 121–23 (2016) (discussing employers' use of the CFAA to deter whistleblower retaliation claims).

Affirmative Defenses from his Answer because these defenses are redundant of Erhart's other defenses. Further, the Court denies BofI's request for summary adjudication of Erhart's Twelfth, Thirteenth, Sixteenth, Nineteenth, Twentieth, Twenty-Third, and Twenty-Fourth Affirmative Defenses.

**IT IS SO ORDERED.**

**DATED:  February 14, 2017**

**Hon. Cynthia Bashant**
**United States District Judge**

15cv2287