1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   CHARLES MATTHEW ERHART,                Case No. 15-cv-02287-BAS-NLS
                                             *Consolidated with*
                          Plaintiff,        15-cv-02353-BAS-NLS
12
                                             **ORDER GRANTING IN PART**
13        v.                                 **AND DENYING IN PART**
                                             **MOTION TO DISMISS AND**
14   BOFI HOLDING, INC.,                     **STRIKE ALLEGATIONS FROM**
                                             **FIRST AMENDED COMPLAINT**
15                        Defendant.
                                             **[ECF No. 35]**
16   BOFI FEDERAL BANK,

17                        Plaintiff,

18
          v.
19
     CHARLES MATTHEW ERHART,
20
                          Defendant.
21

22          Plaintiff Charles Matthew Erhart commenced this whistleblower retaliation

23   action against Defendant BofI Holding, Inc. alleging violations of the Sarbanes–

24   Oxley Act of 2002, the Dodd–Frank Wall Street Reform and Consumer Protection

25   Act, and California state law.[1] In a consolidated countersuit, BofI claims Erhart, a

26

27   ───────────────
          [1] BofI Holding, Inc. is the publicly-traded holding company for BofI Federal Bank, a
28   federally-chartered savings and loan association that operates several brands of banks including
     Bank of Internet. The Court uses the term "BofI" to refer to either BofI Holding, Inc. or BofI
     Federal Bank.

                              – 1 –                                    15cv2287

former internal auditor, violated California state law and the Computer Fraud and Abuse Act by disseminating BofI's confidential information to *The New York Times*—causing its stock price to plummet—and by deleting hundreds of files from his company-issued laptop.

Previously, the Court dismissed Erhart's federal whistleblower retaliation claims with leave to amend. (ECF No. 31.) Erhart filed a First Amended Complaint, and BofI now moves to again dismiss Erhart's federal whistleblower retaliation claims, as well as several of his state law causes of action. (ECF No. 35.) In addition, BofI seeks to strike numerous allegations from the First Amended Complaint. (*Id.*) Erhart opposes. (ECF No. 36.)

The Court finds BofI's motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion to dismiss and strike allegations from Erhart's First Amended Complaint.

# I. BACKGROUND[2]

## A. BofI's Internal Audit Department

In September 2013, Erhart began working as an internal auditor for BofI at its headquarters in San Diego, California. (First Amended Complaint ("FAC") ¶¶ 3–4, 9, ECF No. 32.) Erhart reported to Jonathan Ball, Vice President ("VP")– Internal Audit. (*Id.* ¶ 9.) One level above VP Ball on the corporate hierarchy was John Tolla, Senior Vice President ("SVP")–Audit and Compliance. (*Id.* ¶ 10.) VP Ball and the internal audit department were to report to SVP Tolla "for administrative purposes only" to allow the audit department "to have independence to do its function without undue pressure from senior management." (*Id.*) However, as detailed below, Erhart alleges SVP Tolla repeatedly interfered with the audit

---

[2] The following narrative is based on the allegations in Erhart's First Amended Complaint. At the motion to dismiss phase, the Court assumes that Erhart's factual allegations are true. *See, e.g.*, *O'Brien v. Welty*, 818 F.3d 920, 924 (9th Cir. 2016).

department's investigations and independence. (*See id.* ¶¶ 15, 24–25, 30, 42, 47, 49, 52, 56.)

### B. Alleged Wrongdoing

From late 2013 to early 2015, Erhart claims he repeatedly encountered conduct at BofI that he believed to be wrongful, and he provides over a dozen examples of this conduct. (*See* FAC ¶¶ 11–45.) The conduct he describes runs the gamut from BofI allegedly miscalculating an accounting entry to making loans to notorious criminals. (*See id.*) The Court will highlight several of Erhart's examples.

#### 1. Deposit Concentration Risk Findings and Negative Performance Review

In November 2014, Erhart sent an e-mail to Chief Risk Officer Thomas Williams regarding the Bank's deposit concentration risk—the risk posed to a bank "when a large percentage of its deposits are derived from a few depositors" and these depositors may suddenly withdraw their funds. (FAC ¶ 22.) Erhart allegedly reported to Williams "that a mere four customers accounted for approximately 25% of total deposits, and nine customers accounted for approximately 40% of total deposits" at the Bank. (*Id.* ¶ 23.) In doing so, Erhart "was aware that other banks had gotten into trouble with regulators for deposit concentration levels lower than this." (*Id.*) SVP Tolla, however, later commented on Erhart's e-mail to Williams and instructed Erhart "not to put his concerns in writing." (*Id.* ¶ 24.) Management had previously chastised Erhart for stating in an internal audit report that he believed BofI was violating the law. (*Id.* ¶¶ 13–16.)

About a month later, Erhart received his performance review from SVP Tolla. (FAC ¶ 25.) His rating was downgraded, with SVP Tolla specifically referencing Erhart's practice of putting findings into writing. (*Id.*) Erhart's bonus was also adversely affected. (*Id.*)

## 2. SEC Subpoena

On December 12, 2014, the Securities and Exchange Commission ("SEC") "served a subpoena on BofI, requesting account identifying information for a certain investment advisory firm with initials ETIA LLC." (FAC ¶ 26.) BofI "responded to the SEC that it did not have any information regarding ETIA." (*Id.*) In early January 2015, Erhart "became aware of the SEC subpoena, and knew that the Bank did indeed have a loan file containing information regarding ETIA." (*Id.* ¶ 27.) He also became aware "that a file had been created in response to the SEC subpoena, containing the information located regarding ETIA." (*Id.*) "In the course of investigating why the file was not turned over to the SEC in response to its subpoena, [Erhart] learned from a Bank employee . . . that she had informed the Bank's legal department of the existence of the file on or about December 17, 2014, before the Bank sent its response to the SEC denying the existence of any such files." (*Id.*) Shortly thereafter, VP Ball informed Erhart that Chief Lending Officer Brian Swanson was upset that Erhart interviewed an employee about the issue and said that Erhart "should cease performing his duties to the extent they involved interviewing 'his' employees." (*Id.* ¶ 28.) Erhart then "placed a call to the SEC to be sure it was aware of the situation regarding the ETIA subpoena." (*Id.* ¶ 29.)

In February 2015, Erhart "submitted two whistleblower tips to the SEC, one regarding the ETIA subpoena issue, and another regarding a suspicious loan customer, whom [Erhart] suspected of operating as an unregistered broker/investment advisor. He submitted them through his work computer, and BofI had knowledge of his whistleblowing." (FAC ¶ 31.) Later, in 2016, federal law enforcement officials would arrest "the Founder and Chief Operating Officer of Florida-based Elm Tree Investment Advisors LLC (ETIA) on charges that they engaged in a scheme to defraud investors out of more than $17 million." (*Id.* ¶ 31A.)

### 3. BofI's CEO's Personal Accounts

In early 2015, Erhart participated in a review of personal deposit accounts held by senior management. (FAC ¶ 44.) Erhart allegedly discovered that Chief Executive Officer ("CEO") Gregory Garrabrants "was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties." (*Id.*) Erhart also learned that CEO Garrabrants's depositing of third-party checks "had previously been raised to the Audit Committee before [Erhart] started working at the Bank, and that restrictions were imposed on [CEO Garrabrants]." (*Id.*)

In addition, Erhart allegedly discovered the "largest consumer account at the Bank" had a taxpayer identification number belonging to CEO Garrabrants's brother. (FAC ¶ 45.) "The account had a balance of approximately $4 million, and the CEO was the signer on the account." (*Id.*) Erhart alleges that because the CEO's brother "was a minor league baseball player earning poverty wages, [Erhart] could find no evidence of how he had come legally into possession of the $4 million wired into the account." (*Id.*) Based on the foregoing, Erhart was concerned about whether CEO Garrabrants "could be involved in tax evasion and/or money laundering." (*Id.*)

Erhart alleges he believed this conduct and the other actions described in his allegations violated various federal laws, including the Dodd–Frank Act, fraud statutes, and "rules and regulations promulgated by the Securities and Exchange Commission." (FAC ¶ 74A.) He also claims he believed that "because BofI was regulated by so many different federal agencies, and because its stock was publicly traded, that additional federal statutes, rules, and regulations were likely being violated, including without limitation, Rule 10b-5." (*Id.*) These beliefs were based on the circumstances, including "guidance and instruction he received from" his manager, VP Ball. (*Id.*)

## C.    Turmoil in the Internal Audit Department

By early 2015, approximately sixteen months after he joined BofI, Erhart believed his job was in jeopardy. (*See* FAC ¶ 47.) On or about January 27, 2015, SVP Tolla walked by Erhart's desk and stated, in the presence of others, "If [Erhart] continues to turn over rocks, eventually he is going to find a snake and he's going to get bit." (*Id.*) Erhart viewed this statement "as a direct and serious threat, and became concerned for his personal safety as well as for his job." (*Id.*)

Around this time, the United States Department of the Treasury's Office of the Comptroller of the Currency ("OCC"), BofI Federal Bank's principal regulator, was examining BofI on-site at its headquarters in San Diego. (FAC ¶ 49.) During this examination, SVP Tolla told all of the members of the internal audit department "that they would no longer be permitted to use Microsoft Outlook to communicate." (*Id.*) Erhart alleges SVP Tolla gave this directive because he "did not want a paper trail regarding Bank improprieties." (*Id.*) Erhart informed the OCC's examiner of this directive. (*Id.*)

Then, in late February 2015, VP Ball informed the internal audit department that a "meeting would be held to discuss major findings that needed to be presented to the Bank's Audit Committee." (FAC ¶ 50.) This action was significant because VP Ball "felt that the level of wrongdoing at the Bank had become so egregious that the staff had no choice but to bring it up to the Audit Committee." (*Id.*) VP Ball allegedly planned to present memos documenting the wrongdoing from internal audit staff, including Erhart, to the Audit Committee. (*Id.*)

Yet, on March 5, 2015, VP Ball resigned abruptly "after refusing an order" from CEO Garrabrants to engage in what he "viewed to be unlawful conduct to cover up the Bank's wrongdoing." (FAC ¶ 51.) SVP Tolla told members of the audit department not to inform the OCC that VP Ball had resigned. (*Id.*) Erhart and a coworker had already informed the OCC, however. (*Id.*)

**D.** **Alleged Whistleblowing to the OCC**

After VP Ball's sudden resignation, Erhart "felt very unwell and on the following day, March 6, 2015, he called off sick." (FAC ¶ 53.) He asked a coworker to relay his illness to SVP Tolla—as no one had yet replaced VP Ball as Erhart's direct manager. (*Id.*) At 7:30 a.m. on that same day, Erhart's coworker informed him that SVP Tolla said he was to attend a mandatory call with the OCC, despite his illness. (*Id.* ¶ 54.) She also informed Erhart that SVP Tolla had accessed VP Ball's e-mail account and found an internal audit memo Erhart had co-authored regarding believed wrongdoing involving a vendor that distributed cash cards to customers. (*Id.*) Erhart "became extremely concerned that the Bank would try to destroy the records of wrongdoing that [he] had placed on the Bank's computers." (*Id.* ¶ 55.) He called the OCC's Denver Regional Office and said he was seeking whistleblower protection, and an appointment to speak with the OCC was confirmed for the next business day. (*Id.*)

Meanwhile, SVP Tolla was calling Erhart on his cell phone, and a coworker informed Erhart that his work computer had been "opened up." (FAC ¶ 56.) Erhart also allegedly received a text message stating: "Tolla is going crazy over here bro. Going through balls computer too. Fyi." (*Id.*) Erhart then e-mailed the OCC a copy of the internal audit memo regarding cash card customers and disclosed that CEO Garrabrants and SVP Tolla had discovered the memo and that he feared upper management had accessed his work laptop remotely. (*Id.* ¶ 57.)

Minutes later, Erhart received a phone call from a coworker that SVP Tolla had arranged for the locked file cabinets at Erhart's desk to be opened up and "was going through all the documents." (FAC ¶ 58.) SVP Tolla located Erhart's review of CEO Garrabrants's personal accounts. (*Id.*) He continued to call Erhart's mobile phone repeatedly throughout that day. (*Id.*)

Erhart allegedly later learned that on the same day, Friday, March 6, 2015, BofI had prepared a letter terminating him and had attempted to deliver it to him.

(FAC ¶ 61.) Erhart claims BofI also "intended to and may have informed local police authorities" that it wanted Erhart's "apartment searched and his computer seized and for him to be arrested." (*Id.*) Erhart "was extremely fearful." (*Id.*) The police did not arrive, but Erhart alleges BofI sent someone to his residence "on that day to attempt to deliver the termination letter and recover [his] work laptop." (*Id.*) On Saturday, Erhart was informed that CEO Garrabrants had "grilled" a coworker "for nearly an hour" about the investigation into his personal accounts and that they "had an all hands yesterday where [SVP Tolla] and [CEO Garrabrants] spoke about [Erhart] and [VP Ball]. It was terrible." (*Id.* ¶ 60.)

By early Monday morning, March 9, 2015, Erhart alleges he learned SVP Tolla was falsely claiming that BofI had not heard from Erhart for forty-eight hours—a basis for termination. (FAC ¶ 63.) Erhart sent an e-mail to SVP Tolla and several others reminding them "that he had called off sick Friday," would remain out for the day, and "was seeking an appointment with his physician to discuss a medical leave of absence." (*Id.*) He also stated, "I am in no mental state to discuss anything on the phone." (*Id.*)

That same morning, an attorney with the OCC confirmed to Erhart "that his communications with the OCC would be covered under the applicable whistleblower statute." (FAC ¶ 64.) Erhart had a lengthy phone call with the OCC that afternoon, and he was directed to bring any documents he had to the OCC's office in Carlsbad, California, the following morning. (*Id.* ¶ 65.) At the same time, a BofI employee was sending text messages to Erhart in an attempt to arrange the delivery of an envelope to Erhart—presumably containing his termination letter— and to recover his laptop. (*Id.*) Erhart alleges "it was highly unusual for the Bank to demand return of the work laptop of an employee who was out sick." (*Id.* ¶ 67.) "Rather, the Bank had decided to terminate [Erhart] and feared his disclosures to regulators, and wanted to seize the evidence before it could be turned over to regulators." (*Id.*)

The next morning, Erhart provided files to the OCC at its office in Carlsbad. (FAC ¶ 68.) An OCC attorney confirmed receipt of these items the next day and told Erhart "that the Bank had informed the OCC that it was going to call the San Diego police to go to [Erhart]'s residence and seize his computer." (*Id.* ¶ 69.) Therefore, Erhart alleges BofI "was obviously well aware" of his whistleblowing activities. (*Id.*)

Erhart ultimately returned his laptop to BofI on March 12, 2015. (FAC ¶ 70.) BofI's Chief Legal Officer "ordered him to come to a conference room to speak," but Erhart "reiterated he was in no mental state to speak to management." (*Id.*) That same day, a BofI employee called Erhart and told him that an employee had processed Erhart's termination paperwork the previous week—presumably on the Friday Erhart sought whistleblower protection. (*Id.*)

## E. <u>Aftermath</u>

On March 14, 2015, a BofI employee told Erhart that SVP Tolla was informing employees that Erhart "was responsible for a negative article about BofI on the Seeking Alpha website published December 2, 2014." (FAC ¶ 71.) SVP Tolla previously called Erhart "Seeking Alpha" "to his face." (*Id.*) Erhart, however, was not responsible for the article. (*Id.*) Erhart also alleges that two coworkers informed him that SVP Tolla stated at an "All Hands Meeting" of members of BofI's audit and compliance department that "any information [Erhart] provided to the OCC could not be considered credible because of [Erhart]'s psychiatric medical leave." (*Id.* ¶ 73.) SVP Tolla and CEO Garrabrants allegedly told this same group of employees that Erhart's "whistleblowing activities were 'malicious.'" (*Id.* ¶ 74.) CEO Garrabrants also told the employees he was going to "bury the BofI whistleblower." (*Id.*)

Further, Erhart alleges that in the past year, BofI, "through SVP Tolla, CEO Garrabrants, and others, has continued to widely publish false and defamatory statements about [Erhart], claiming that he has colluded and/or collaborated with

'short sellers' of BofI's stock, and that he was a dishonest and incompetent employee." (FAC ¶ 74B.) Because of this conduct and "the notoriety of this case," Erhart claims he has "been unable to retain employment." (*Id.*)

Based on the foregoing allegations, Erhart brings various claims against BofI, including two claims for whistleblower retaliation under federal law. (FAC ¶¶ 76–163.) BofI moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss Erhart's federal retaliation claims and four of his state law causes of action. (ECF No. 35.) BofI also requests the Court strike numerous allegations from Erhart's First Amended Complaint under Federal Rule of Civil Procedure 12(f). (*Id.*)

## II.   MOTION TO DISMISS

### A.   Legal Standard

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure "tests the legal sufficiency" of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. Despite the deference the court must pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . law[] in ways that have not been alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

As a general rule, a court freely grants leave to amend a complaint that has been dismissed. Fed. R. Civ. P. 15(a); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co.*, 806 F.2d at 1401 (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

### B.  <u>Analysis</u>

#### 1.  **Sarbanes–Oxley Whistleblower Retaliation**

BofI seeks to dismiss Erhart's first claim for whistleblower retaliation under Sarbanes–Oxley. Congress enacted the Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745, to "safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Lawson v. FMR LLC*, 134 S. Ct. 1158, 1161 (2014) (citing S.Rep. No. 107-146, at 2–11 (2002)). In seeking to prevent corporate fraud, Congress was particularly concerned with the "abundant evidence that Enron had succeeded in perpetuating its massive shareholder fraud in large part due to a 'corporate code of silence.'" *Id.* at 1162 (citing S.Rep. No. 107-146, at 2, 4–5 (2002)). This code of silence discouraged employees from reporting fraudulent behavior, and employees who attempted to report misconduct faced retaliation. *Id.* (citing S.Rep. No. 107-146, at 2, 5, 10 (2002)).

To address this issue, Section 806 of Sarbanes–Oxley added a new whistleblower protection provision to Title 18 of the United States Code, 18 U.S.C. § 1514A. *Lawson*, 134 S. Ct. at 1163. This provision, as amended, provides:

> No [publicly-traded] company . . . may discharge . . . or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—
>
> (1) to provide information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by
>
> > (A)   a Federal regulatory or law enforcement agency;
> >
> > (B)   any Member of Congress or any committee of Congress; or
> >
> > (C)   a person with supervisory authority over the employee . . . .

18 U.S.C. § 1514A.

Whistleblower retaliation claims under Sarbanes–Oxley "are governed by a burden-shifting procedure under which the plaintiff is first required to establish a prima facie case of retaliatory discrimination." *Tides v. Boeing Co.*, 644 F.3d 809, 813–14 (9th Cir. 2011) (citing 18 U.S.C. § 1514A(b)(2)(A); 49 U.S.C. § 42121(b)(2)(B)(i)). To make a prima-facie showing, the plaintiff must show that (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer knew, actually or constructively, of the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the circumstances raise an inference that the protected activity was a contributing factor in the unfavorable action. *Id.* at 814

– 12 –

(citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009)); *see also* 29 C.F.R. § 1980.104(e)(2)(i)–(iv). If the plaintiff makes this showing, then "the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." *Van Asdale*, 577 F.3d at 996.

### i. Protected Activity

First, Erhart must allege that he engaged in protected activity under Sarbanes–Oxley. *See, e.g.*, *Tides*, 644 F.3d at 814; 29 C.F.R. § 1980.104(e)(2)(i). As seen above, the anti-retaliation statute protects an employee who "provides[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . ." 18 U.S.C. § 1514A.

In the Court's order on BofI's first motion to dismiss, the Court considered at length which standard to apply to determine whether Erhart alleges he engaged in protected activity. (ECF No. 22 at 17:15–22:3.) The Court ultimately adopted the Department of Labor's Administrative Review Board's "reasonable belief" standard from *Sylvester v. Parexel International LLC*, ARB Case No. 07-123, 2011 WL 2165854 (ARB May 25, 2011) (en banc). (*Id.* at 22:2–3.)[3]

To allege protected activity under this standard, an employee "need only show that he or she 'reasonably believes' that the conduct complained of" is a violation of the laws enumerated in 18 U.S.C. § 1514A. *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 811 (6th Cir. 2015) (quoting *Nielsen v. AECOM*

---

[3] The Ninth Circuit has since recognized in an unpublished opinion that the Administrative Review Board's standard for protected activity has shifted to the "reasonable belief" standard used by this Court in its prior order. *See Rocheleau v. Microsemi Corp., Inc.*, 680 F. App'x 533, 535 n.2 (9th Cir. 2017). The Ninth Circuit, however, declined to address whether it would adopt this standard in lieu of the old standard because the plaintiff's claim failed "under either standard." *Id.*

*Tech. Corp.*, 762 F.3d 214, 220–21 (2d Cir. 2014)). As the term "reasonably believes" indicates, this standard "involves both a subjective component and an objective component." *Id.* "The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law." *Id.* As for the objective component, it "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Id.* (quoting *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009)); *see also Nielsen*, 762 F.3d at 221 ("That is to say, a plaintiff 'must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.'"). This reasonable person standard recognizes that "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers." *Nielsen*, 762 F.3d at 221. Accordingly, "the inquiry into whether an employee had a reasonable belief is necessarily fact-dependent, varying with the circumstances of the case." *Rhinehimer*, 787 F.3d at 811.

It also follows from this standard that a plaintiff "need not prove a violation of the substantive laws listed in [18 U.S.C. § 1514A]" to engage in protected activity. *See Sylvester*, 2011 WL 2165854, at *18. The plaintiff, therefore, "can have an objectively reasonable belief of a violation" even if the plaintiff "fails to allege, prove, or approximate specific elements of fraud, which would be required under a fraud claim against the defrauder directly." *Id.*; *see also Van Asdale*, 577 F.3d at 1001 ("To encourage disclosure, Congress chose statutory language which ensures that 'an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected.'" (quoting *Allen v. Admin. Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008))).

The Court previously dismissed Erhart's Sarbanes–Oxley claim because it determined the subjective component of the reasonable belief standard was not satisfied. (ECF No. 22 at 23:26–26:13.) This conclusion was based on Erhart's failure to allege anywhere in his initial Complaint that he believed the alleged wrongdoing violated the laws enumerated in § 1514A. (*Id.* at 25:6–11 ("But again, to satisfy the subjective component of the reasonable belief standard, Erhart must allege he 'actually believed that the conduct complained of constituted a violation of relevant law.'" (quoting *Rhinehimer*, 787 F.3d at 811)). Erhart corrects this deficiency in his First Amended Complaint. He alleges he believed, at the time, that the wrongdoing he discovered "constituted a violation of federal fraud statutes and regulations, including without limitation, the mail fraud, wire fraud, bank fraud, and securities fraud statutes." (*See* FAC ¶ 91A; *see also id.* ¶ 74A.)

BofI argues that Erhart still fails to allege protected activity under Sarbanes–Oxley. (Mot. 11:6–16:10.) Although Erhart's lengthy pleading is imperfect, and at times imprecise, the Court disagrees. Erhart sufficiently pleads he reported at least some conduct that could constitute a reasonable belief of a violation of the laws enumerated in Sarbanes–Oxley's anti-retaliation provision.

For instance, BofI is a federally-insured bank, and one of the laws enumerated in Sarbanes–Oxley's whistleblower retaliation provision, 18 U.S.C. § 1514A, is bank fraud, 18 U.S.C. § 1344. "The essential elements of bank fraud under 18 U.S.C. § 1344(1) are: '(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC [Federal Deposit Insurance Corporation].'" *United States v. Rizk*, 660 F.3d 1125, 1135 (9th Cir. 2011) (alteration in original) (quoting *United States v. Warshak*, 631 F.3d 266, 312 (6th Cir. 2010)). An "[i]ntent to defraud may be established by circumstantial evidence." *Id.* (citing *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008)).

– 15 –

The district court's decision at the summary judgment phase in *Guitron v. Wells Fargo Bank, N.A.* demonstrates an application of Sarbanes–Oxley's whistleblower provision in the context of potential bank fraud. No. C 10-3461 CW, 2012 WL 2708517 (N.D. Cal. July 6, 2012). There, one of the plaintiffs, Guitron, was a teller at a branch of Wells Fargo Bank. *Id.* at *1. She "repeatedly complained to branch management about certain activities of other bankers within [her] branch." *Id.* at *2. These activities involved, among other things, bankers allegedly opening and closing accounts "without the customer's permission or knowledge" and misleading customers about the terms of accounts. *Id.* She knew these activities were against the bank's sales practices, but she was not sure if they were illegal. *See id.* ("[S]omebody is getting financial gain for committing these activities. So it could be; it could not be. It just depends on the specifics." (quoting Guitron's deposition)). The court found Guitron established a genuine issue of material fact as to whether her complaints related to bank fraud. *Id.* at *14. It reasoned that Guitron "reported that her colleagues were engaging in practices such as opening and closing accounts without customer permission . . . , which would allow them to obtain otherwise unearned bonuses from Wells Fargo, thereby defrauding it." *Id.* Thus, "[f]rom the evidence presented, a jury could conclude that Guitron's beliefs were objectively reasonable." *Id.* The court also found an issue of fact existed as to whether the subjective belief component was satisfied, making summary judgment based on a failure to engage in protected activity inappropriate. *See id.* at *14.

In this case, Erhart alleges BofI—through its AnFed Bank division—operates a business that purchases the income streams from lottery winnings and structured settlements. (FAC ¶ 11.) The Bank employs a "team of callers who cold-call prospects with the goal of purchasing the income streams from these individuals, offering them a lump sum in lieu of the periodic payments they are receiving." (*Id.* ¶ 12.) Relatedly, as described above, Erhart claims he conducted an audit of BofI's senior management's personal deposit accounts at the Bank. (*Id.* ¶ 44.)

– 16 –

Erhart "discovered that CEO Gregory Garrabrants was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties." (*Id.*) Erhart documented "this work in an Audit Department file on his work computer." (*Id.* ¶ 45.) When CEO Garrabrants later discovered Erhart's work, he "grilled" one of Erhart's coworkers "for nearly an hour about why Internal Audit was looking at his accounts." (*Id.* ¶ 60.)

Erhart claims he reported this conduct—as well as the other instances of believed wrongdoing he describes—"to appropriate government agencies as a whistleblower in April 2015." (FAC ¶ 46.) Erhart also "had a lengthy phone call with the OCC, lasting nearly two hours," on March 10, 2015, and he turned over documents to the OCC on March 11, 2015, to support his whistleblower allegations. (*Id.* ¶¶ 65, 68–69.)

When all inferences are drawn in his favor, Erhart sufficiently alleges that he engaged in protected activity under Sarbanes–Oxley. From Erhart's perspective in early 2015—or from anyone else's for that matter—it is challenging to discern what proper purpose a CEO would have for depositing "nearly $100,000 in checks made payable to third parties" into his personal deposit account. (FAC ¶ 44.) Upon discovering this conduct, a reasonable person in Erhart's position could believe that CEO Garrabrants was engaged in a scheme where he deposited checks made payable from BofI to third-parties into his personal account for his own benefit— thereby possibly defrauding the Bank. (*See id.* ¶¶ 12, 44, 72A.) *See Guitron*, 2012 WL 2708517, at *2, 4; *see also Rizk*, 660 F.3d at 1135 (providing an "[i]ntent to defraud may be established by circumstantial evidence"). Erhart also alleges that he subjectively believed this conduct was a violation of the laws enumerated in 18 U.S.C. § 1514A. Accordingly, when the Court accepts Erhart's allegations as true and construes and draws all reasonable inferences from the allegations in his favor,

the Court finds Erhart alleges he engaged in protected activity under Sarbanes–Oxley.

### ii. Knowledge of Protected Activity

Second, Erhart must allege that BofI "knew or suspected that [he] engaged in the protected activity." 29 CFR § 1980.104(e)(2)(ii); *see also Tides*, 644 F.3d at 814. This requirement is satisfied. Erhart alleges he reported much of the conduct he discovered to members of BofI's management team—particularly VP Ball. Some of Erhart's discoveries also made their way directly to SVP Tolla. As for Erhart's "two whistleblower tips to the SEC," he alleges that "BofI had knowledge of his whistleblowing." (*Id.* ¶ 31.)

Further, the events that allegedly transpired around the time Erhart called off sick from work indicate BofI, at the minimum, "suspected that [he] engaged in the protected activity." *See* 29 CFR § 1980.104(e)(2)(ii). These circumstances include BofI accessing Erhart's work computer, BofI "going through all the documents" in Erhart's locked file cabinets, SVP Tolla locating Erhart's review of CEO Garrabrants's personal accounts, BofI preparing a letter terminating Erhart, BofI's alleged statements to the OCC about Erhart, and BofI's general counsel demanding that Erhart "come to a conference room to speak" when he returned his work laptop. (*See* FAC ¶¶ 56–74.) If these allegations are true, a factfinder could draw the inference that BofI suspected or knew Erhart engaged in protected activity. Accordingly, Erhart's pleading meets the second element of a prima facie case for whistleblower retaliation under Sarbanes–Oxley.

### iii. Adverse Action

Third, Erhart's pleading must demonstrate that he suffered "an adverse action." *See* 29 C.F.R. § 1980.104(e)(2)(iii); *see also Tides*, 644 F.3d at 814 (noting "the plaintiff must show that: . . . (3) he suffered an unfavorable personnel action"). Sarbanes–Oxley broadly defines what constitutes prohibited discrimination in 18 U.S.C. § 1514A. It provides that the employer may not "discharge, demote,

suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment" because of the employee's protected activity. 18 U.S.C. § 1514A; *see also* 29 C.F.R. § 1980.104 (defining retaliatory acts to also include "intimidating . . . , restraining, coercing, blacklisting or disciplining" the employee).

Consistent with § 1514A's text, the Administrative Review Board has adopted an expansive view of "adverse action." *E.g.*, *Menendez v. Haliburton, Inc.*, ARB Case Nos. 09-002, 09-003, 2011 WL 4915750 (ARB Sept. 13, 2011). The Board has reasoned that in "explicitly proscribing non-tangible activity," § 1514A "bespeaks a clear congressional intent to prohibit a very broad spectrum of adverse action against [Sarbanes–Oxley] whistleblowers." *Id.* at *9. Thus, the Board has defined "adverse actions" as referring to "unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged." *Id.*

The Administrative Review Board has also used the Supreme Court's standard for Title VII discrimination from *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), as a "helpful interpretive tool." *Menendez*, 2011 WL 4915750, at *9. Under this standard, adverse action means actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Thus, actions "that would deter a reasonable employee from engaging in protected activity would be actionable under Section [1514A] as well." *Menendez*, 2011 WL 4915750, at *13.

Erhart's allegations satisfy the adverse action requirement. He alleges BofI officially discharged him on June 9, 2015. (FAC ¶ 72.) In addition, setting aside Erhart's discharge, Erhart's pleading contains various other allegations of discriminatory conduct. Viewing these allegations in the light most favorable to Erhart, they show his performance rating was downgraded and his was bonus was

adversely affected, (*id.* ¶ 25), he was threatened, (*id.* ¶ 47), and he was harassed, (*see id.* ¶¶ 54, 56, 59, 63, 66, 70–71). Upon learning Erhart was communicating with the OCC, BofI also allegedly engaged in conduct that may be viewed as the Bank attempting to intimidate Erhart or discourage him from sharing any more information with the government. (*See id.* ¶ 73 ("SVP Tolla stated, at an 'All Hands Meeting' of members of Audit and Compliance that any information [Erhart] provided to the OCC could not be considered credible because of [Erhart]'s 'psychiatric medical leave.'"); *id.* ¶ 74 ("SVP Tolla and CEO Gregory Garrabrants told this same group of employees that [Erhart]'s whistleblowing activities were 'malicious' . . . . Garrabrants also told Bank employees that he was going to 'bury the BofI whistleblower.'"). A factfinder could draw the reasonable inference that management expected that the threats and derogatory statements they made at an "All Hands Meeting" of Erhart's coworkers would be shared with him. And they were. These are actions that could have a chilling effect on protected activity, are unfavorable, and are more than trivial. *Cf. Thomas v. Union Pac. R.R. Co.*, 203 F. Supp. 3d 1111, 1120–22 (D. Or. 2016) (interpreting similar anti-retaliation language under the Federal Rail Safety Act and concluding a genuine issue of fact existed as to whether employee suffered an adverse action before termination where she was subjected to intimidating and harassing interviews, surveillance by other employees, increased testing for job-compliance, and discipline for absenteeism). Thus, Erhart sufficiently pleads he suffered an adverse action.

### iv.    Contributing Factor in the Adverse Action

Last, Erhart must plead facts demonstrating "the circumstances raise an inference that the protected activity was a contributing factor in the unfavorable action." *See, e.g.*, *Tides*, 644 F.3d at 814; *see also* 29 C.F.R. § 1980.104(e)(2)(iv). The Ninth Circuit has "held that 'causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.'" *Van Asdale*, 577 F.3d at 1003 (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

1054, 1065 (9th Cir. 2002)). It also has "made clear that 'a specified time period cannot be a mechanically applied criterion,' and . . . cautioned against analyzing temporal proximity 'without regard to its factual setting.'" *Id.* (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 977–78 (9th Cir. 2003)).

For example, in *Van Asdale*, after the two plaintiffs disclosed believed wrongdoing, the employer terminated one of the plaintiffs two and a half months later and the other plaintiff several weeks thereafter. 577 F.3d at 1003. The Ninth Circuit held "a reasonable fact finder could find that the [plaintiffs'] alleged disclosures were a contributing factor in their terminations where, among other things, both [plaintiffs] were removed from their positions within weeks of their alleged protected conduct." *Id.*; *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding for a Title VII retaliation claim that causation could be inferred where the first adverse employment action occurred less than three months after the plaintiff's protected activity).

Erhart's allegations fulfill this final requirement. BofI's alleged retaliatory conduct occurred within close temporal proximity to Erhart's purported whistleblowing activities. Causation, therefore, can be inferred from the timing alone. *See Van Asdale*, 577 F.3d at 1003. In addition, accepting Erhart's allegations as true, there is a litany of circumstantial evidence to support this final requirement, including poorly-veiled threats to Erhart and an attempt to abruptly terminate him after he called in sick. Consequently, the alleged circumstances "raise an inference that the protected activity was a contributing factor in the unfavorable action." *See Tides*, 644 F.3d at 814; *see also* 29 C.F.R. § 1980.104(e)(2)(iv).

Accordingly, Erhart states a prima facie case against BofI for whistleblower retaliation under Sarbanes–Oxley. He pleads sufficient facts that allow the Court "to draw the reasonable inference that [BofI] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678. Thus, the Court will not dismiss this claim.

## 2. Dodd–Frank Whistleblower Retaliation

BofI also moves to dismiss Erhart's whistleblower retaliation claim brought under the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). "Like Sarbanes–Oxley, [Dodd–Frank] was passed in the wake of a financial scandal—the subprime mortgage bubble and subsequent market collapse of 2008." *Somers v. Digital Realty Tr. Inc.*, 850 F.3d 1045, 1048 (9th Cir. 2017). Dodd–Frank "provided new incentives and employment protections for whistleblowers by adding Section 21F to the Securities Exchange Act of 1934." *Id.* The Act defines a "whistleblower" as "any individual who provides . . . information relating to a violation of the Securities laws to the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6). To protect whistleblowers from retaliation, Section 21F provides:

> No employer may discharge . . . or in any other manner discriminate against, a whistleblower in the terms and conditions of employment . . . because of any lawful act done by the whistleblower:
>
> > (i) in providing information to the [SEC] in accordance with this section; [or]
> > . . .
> > (iii) in making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 . . . .

*Id.* § 78u-6(h)(1)(A). Accordingly, in addition to protecting reports made to the SEC, Dodd–Frank's anti-retaliation provision incorporates protection for those disclosures made under Sarbanes–Oxley's analogous provision. *Id.*; *see also* 17 C.F.R. § 240.21F-2 (interpreting 15 U.S.C. § 78u-6(a)(6)).

Despite that Dodd–Frank incorporates Sarbanes–Oxley disclosures, there is a split of authority as to whether Dodd–Frank protects Sarbanes–Oxley disclosures that are not made directly to the SEC. *Compare Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 621 (5th Cir. 2013) (holding Dodd–Frank protects only

disclosures made to the SEC), *with Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 155 (2d Cir. 2015) (applying *Chevron* deference to the SEC's contrary interpretation of Dodd–Frank's anti-retaliation provision in 17 C.F.R. § 240.21F-2). In 2017, the Ninth Circuit adopted the broader interpretation of Dodd–Frank's anti-retaliation provision. *Somers*, 850 F.3d. at 1050, *cert. granted*, 137 S. Ct. 2300 (2017). Consequently, in this circuit, Dodd–Frank incorporates protection for Sarbanes–Oxley disclosures that are not made directly to the SEC. *See id.* at 1047, 1050–51.

Here, the Court has already determined Erhart sufficiently alleges that he engaged in protected activity under Sarbanes–Oxley. Because Dodd–Frank also prohibits BofI from retaliating against Erhart for engaging in this purported conduct, he has stated a plausible claim for whistleblower retaliation under Dodd–Frank as well. *See Somers*, 850 F.3d at 1045.[4] The Court therefore denies BofI's request to dismiss Erhart's second claim for retaliation under Dodd–Frank.

### 3.   Violation of the Confidentiality of Medical Information Act

In his fourth claim, Erhart alleges BofI violated California's Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56–56.37, when SVP Tolla informed coworkers that Erhart's whistleblowing allegations were not credible because of his "psychiatric medical leave." (FAC ¶¶ 73, 106–11.) BofI argues this claim is subject to dismissal because Erhart does not allege BofI disclosed "medical information" within the meaning of the CMIA. (Mot. 19:3–8.)

The CMIA "is intended to protect the confidentiality of individually identifiable medical information obtained from a patient by a health care provider,

---

[4] The Court recognizes the possibility that even under the narrower interpretation of Dodd–Frank, Erhart may have a claim for retaliation based on his "two whistleblower tips" submitted directly to the SEC. (*See* FAC ¶ 31.) To proceed on this basis, Erhart would need to demonstrate that he possessed "a reasonable belief that the information [he] was providing relate[d] to a possible securities law violation (or, where applicable, to a possible violation of the provisions set forth in 18 U.S.C. § 1514A(a)) that ha[d] occurred, [was] ongoing, or [was] about to occur." *See* 17 C.F.R. § 240.21F-2. However, in light of Erhart stating a claim under the broader interpretation of Dodd–Frank adopted by the Ninth Circuit in *Somers*, the Court need not further explore the viability of this theory at the motion to dismiss phase.

while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." *Brown v. Mortensen*, 51 Cal. 4th 1052, 1070 (2011) (citing *Loder v. City of Glendale*, 14 Cal. 4th 846, 859 (1997); *Heller v. Norcal Mutual Ins. Co.*, 8 Cal. 4th 30, 38 (1994)). To further this purpose, the CMIA contains a series of provisions regarding the use and disclosure of medical information by employers. *See* Cal. Civ. Code §§ 56.20–56.245. One of these provisions, California Civil Code § 56.20(c), provides that "[n]o employer shall use, disclose, or knowingly permit its employees or agents to use or disclose medical information which the employer possesses pertaining to its employees" unless the employee first signs an appropriate authorization or one of several statutory exceptions applies.

Relevant to this prohibition, the CMIA defines "medical information" as "any individually identifiable information, *in electronic or physical form*, in possession of or derived *from a provider of health care*, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j) (emphasis added). Further, a "patient" is defined as "any natural person . . . who received health care services from a provider of healthcare and to whom medical information pertains." *Id.* § 56.05(k).

To illustrate, an employer violated the CMIA when it misused information contained in two psychiatrists' written evaluations regarding an employee's alcohol consumption and anger toward a colleague. *Pettus v. Cole*, 49 Cal. App. 4th 402, 451–52 (1996). Although the CMIA permitted the employer to use the employee's medical information "for determining [the employee's] eligibility for paid and unpaid leave from work for medical reasons," its use of this information to also ultimately terminate the employee violated the CMIA. *Id.* at 452.

Here, the Court agrees that Erhart has not stated a plausible claim under the CMIA. Erhart alleges he "called off sick" and informed BofI "he was seeking an

appointment with his physician to discuss a medical leave of absence." (FAC ¶ 63.) He also alleges he submitted "paperwork" for his leave of absence. (*Id.* ¶ 72.) There is no allegation, however, that Erhart "received health care services from a provider of healthcare." *See* Cal. Civ. Code § 56.05(k). There is similarly no specific allegation that BofI received any "medical information" regarding Ehart under the CMIA—e.g., medical records, a medical certification, or other information in "electronic or physical form . . . derived from a provider of health care." *See id.* § 56.05(j). Without factual allegations establishing that BofI received "medical information" under the CMIA, Erhart fails to state a claim that BofI improperly used or disclosed this information. *See id.* § 56.20(c).

Accordingly, Erhart's fourth claim for violation of the CMIA is subject to dismissal. That said, because it is possible that BofI received and somehow improperly disclosed Erhart's medical information, the Court will grant Erhart leave to amend this claim. *See* Fed. R. Civ. P. 15(a); *see also, e.g.*, *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

### 4. Breach of the Implied Covenant of Good Faith and Fair Dealing

Erhart's seventh claim asserts that BofI breached the implied covenant of good faith and fair dealing by terminating him without good cause. (FAC ¶ 133.) BofI moves to dismiss this claim on the basis that Erhart has not sufficiently alleged that an agreement existed between the parties that would allow him to pursue an implied covenant claim. (Mot. 19:12–28.)

"The law implies in every contract a covenant of good faith and fair dealing." *Koehrer v. Superior Court*, 181 Cal. App. 3d 1155, 1169 (1986). "[T]he obligations imposed by the implied covenant of good faith and fair dealing are not those set out in the terms of the contract itself, but rather are obligations imposed by law governing the manner in which the contractual obligations must be discharged—fairly and in good faith." *Inter-Mark USA, Inc. v. Intuit, Inc.*, No. C-

07-04178 JCS, 2008 WL 552482, at *7 (N.D. Cal. Feb. 27, 2008) (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 573 (1973)). Specifically, this implied covenant ensures that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *See Brown v. Superior Court*, 34 Cal. 2d 559, 564 (1949). It serves only "to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *See Carma Developers Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992). Consequently, "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract," and the covenant cannot contradict the contract's express terms. *See id.* at 373–74 (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 690 (1988)).

In the employment context, these limitations on the implied covenant of good faith and fair dealing mean that the covenant "cannot supply limitations on termination rights to which the parties have not actually agreed." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 342 (2000). "[California] Labor Code section 2922 establishes the presumption that an employer may terminate its employees at will, for any or no reason. A fortiori, the employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment." *Id.* at 350. "Precisely because employment at will allows the employer freedom to terminate the relationship as it chooses, the employer does not frustrate the employee's contractual rights [in violation of the covenant of good faith and fair dealing] merely by doing so." *See id.* (emphasis omitted).

Here, Erhart claims the parties agreed "that [he] would be able to perform the duties of an internal auditor in accordance with federal and state regulations and commonly understood business practices, without fear of losing his job, being threatened physically and otherwise, and without having his performance

evaluation downgraded and bonus reduced because he spoke up about unlawful and improper practices at the Bank." (FAC ¶ 130.) Yet, Erhart does not actually allege that the parties' agreement altered Erhart's at-will employment by providing he could be terminated only for good cause. (*See id.*)

The Court finds that Erhart's First Amended Complaint lacks sufficient factual allegations to state a plausible claim for breach of the implied covenant of good faith and fair dealing. Under California Labor Code § 2922, Erhart's employment with BofI was presumed to be at-will. Erhart does not plead sufficient facts to overcome this presumption.[5] And because he does not defeat this presumption, BofI had the right to terminate Erhart for any or no reason. *See Guz*, 24 Cal. 4th at 350. Thus, the Bank could not have violated the covenant of good faith and fair dealing arising out of the parties' purported agreement by terminating him without good cause. *See* Cal. Lab. Code § 2922; *Guz*, 24 Cal. 4th at 349–50 (providing the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement"). This conclusion does not mean that Erhart's alleged termination was lawful under California state law. Rather, it means Erhart will need to look beyond California state contract law to attempt to obtain redress for BofI's alleged conduct.

Accordingly, Erhart's claim for breach of the implied covenant of good faith and fair dealing is not plausible. The Court will therefore grant BofI's motion to

---

[5] In addition to not alleging an express contract that overcomes the presumption of at-will employment, Erhart does not demonstrate an implied contract modifying BofI's termination rights existed. An employee who cannot identify an express contract limiting the employer's termination rights may be able to rely upon an implied agreement to this effect. *Guz*, 24 Cal. 4th at 336. California courts apply a series of factors to determine whether this type of implied contract exists. *See Shue v. Optimer Pharm., Inc.*, No. 16–cv–02566–BEN, 2017 WL 3316259, at *7 (S.D. Cal. Aug. 1, 2017) (listing factors). Erhart does not detail any factual allegations about BofI's employment policies or procedures or the norms within the financial industry that support an inference that BofI's termination rights were limited by an implied contract. He also does not allege BofI made him any representations or assurances of continued employment—his whistleblower retaliation allegations indicate the opposite is true. Thus, Erhart cannot rely on an implied contract theory to support his claim.

dismiss Erhart's seventh cause of action with leave to amend. *See* Fed. R. Civ. P. 15(a); *Cafasso*, 637 F.3d at 1058.

### 5. Intentional Infliction of Emotional Distress

Erhart's eighth claim seeks relief for intentional infliction of emotional distress. (FAC ¶ 135–38.) BofI argues this claim is barred by the exclusive remedy provisions of California's Workers' Compensation Act. (Mot. 20:5–27.)

"California's Workers' Compensation Act provides an employee's exclusive remedy against his or her employer for injuries arising out of and in the course of employment." *Wright v. State*, 233 Cal. App. 4th 1218, 1229 (2015) (citation omitted); *accord* Cal. Lab. Code § 3602(a). Therefore, under this exclusive remedy rule, the workers' compensation scheme generally preempts claims based on physical or emotional injuries sustained in the course of employment. *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 161 (2014). Claims for intentional infliction of emotional distress are not excluded. *Id.* These claims "fall[ ] within the exclusive province of workers' compensation" so long as the conduct "occurred 'at the worksite, in the normal course of the employer-employee relationship.'" *Id.* at 162 (quoting *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 902 (2008)); *see also Langevin v. Fed. Exp. Corp.*, No. CV 14-08105 MMM FFMX, 2015 WL 1006367, at *8 (C.D. Cal. Mar. 6, 2015) ("Under California law, workers' compensation provides the exclusive remedy for an intentional infliction of emotional distress claim that is based solely on alleged personnel activity.").

The exclusive remedy rule is not absolute, however, for several reasons. First, the rule does not prohibit a claim where the employer's conduct "contravenes fundamental public policy." *Miklosy*, 44 Cal. 4th at 902. Although this exception appears broad, the California Supreme Court has clarified that it "is aimed at permitting a *Tameny* action to proceed despite the workers' compensation exclusive remedy rule." *Id.* at 902–03. A *Tameny* action is a common law tort claim for wrongful discharge in violation of public policy recognized in *Tameny v. Atlantic*

*Richfield Co.*, 27 Cal. 3d 167 (1980). Thus, the "public policy" exception to the exclusive remedy rule allows the employee to allege a *Tameny* action, but it does not allow the employee to also assert a distinct claim for intentional infliction of emotional distress. *Miklosy*, 44 Cal. 4th at 903; *Yau*, 229 Cal. App. 4th at 161–62.

Another exception to the exclusive remedy rule is if the employer's conduct "exceeds the risks inherent in the employment relationship." *Miklosy*, 44 Cal. 4th at 903 (quoting *Livitsanos v. Superior Court*, 2 Cal. 4th 744, 754 (1992)). Stated differently, for the exclusive remedy rule to bar a plaintiff's claim, the employer's conduct must be within the normal risks of the employment relationship. *E.g.*, *Shoemaker v. Myers*, 52 Cal. 3d 1, 18 (1990). "There is no bright line test in determining what behavior is part of the employment relationship or reasonably encompassed within the compensation bargain." *Onelum v. Best Buy Stores L.P.*, 948 F. Supp. 2d 1048, 1055 (C.D. Cal. 2013) (quoting *Calero v. Unisys Corp.*, 271 F. Supp. 2d 1172, 1181 (N.D. Cal. 2003)). "Rather, the critical issue is whether the alleged acts, bereft of their motivation, 'can ever be viewed as a normal aspect of the employer relationship.'" *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, 24 Cal. 4th 800, 822 (2001) (quoting *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 718 (1994)).[6]

Further, the California Supreme Court has held whistleblower retaliation is a risk inherent in the employment relationship. *Shoemaker*, 52 Cal. 3d at 25; *Miklosy*, 44 Cal. 4th at 903. In *Shoemaker*, the whistleblower's supervisors "threatened, intimidated and harassed him on account of his complaints." 52 Cal. 3d at 8. He was later "interrogated" and ultimately terminated. *Id.* One of the defendants made

---

[6] The exclusive remedy rule also cannot be used to bar a federal statute's private right of action that "is unaffected by the availability of remedies under state workers' compensation law." *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 646–47 (1990). Erhart's federal whistleblower retaliation claims fit this exception. *See id.* Similarly, claims based on state statutes where the state legislature has provided "an additional remedy to those already granted under other provisions of the law" are not barred. *See Shoemaker*, 52 Cal. 3d at 22. Erhart's third claim under California Labor Code § 1102.5 for whistleblower retaliation falls under this exception. *See id.*

a statement "to the effect that he knew the termination would not be upheld, but 'he just wanted to cause [the plaintiff] as much grief as possible." *Id.* at 25. The court held that "[t]he kinds of conduct at issue (e.g., discipline or criticism) are a normal part of the employment relationship. Even if such conduct may be characterized as intentional, unfair or outrageous, it is nevertheless covered by the by workers' compensation exclusivity provisions." *Id.* Therefore, the court affirmed the appellate court's dismissal of the plaintiff's intentional infliction of emotional distress claim, which was distinct from his *Tameny* and statutory whistleblower retaliation claims. *Id.* at 26; *see also Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 151–53, 161–62 (1987) (upholding dismissal of intentional infliction of emotional distress claim as barred by the workers' compensation scheme where the employee alleged he was falsely accused of misconduct, subjected to a "kangaroo" disciplinary proceeding, demoted, assigned "humiliating and menial duties," and forced to retire).

In this case, the Court finds Erhart's claim for intentional infliction of emotional distress does not escape the reach of the exclusive remedy rule. First, the exception for conduct that contravenes fundamental public policy is inapplicable. As explained above, that exception is designed to allow a *Tameny* action for wrongful discharge in violation of public policy. *Miklosy*, 44 Cal. 4th at 903; *Yau*, 229 Cal. App. 4th at 161–62. Erhart alleges a *Tameny* action against BofI as his fifth claim, which is not challenged in BofI's motion. (*See* FAC ¶¶ 112–24.) Although the public policy exception allows Erhart's fifth claim to proceed in spite of the exclusive remedy rule, it does not save his claim for intentional infliction of emotional distress.

In addition, in light of the California Supreme Court cases mentioned above, Erhart does not plead conduct that exceeds the risks inherent in the employment relationship. Erhart alleges that "he was officially fired on June 9, 2015." (FAC ¶ 72.) Thus, the alleged threats, harassment, and other retaliatory acts he suffered

before and up to this point occurred during the course of his employment. BofI's alleged retaliatory conduct "may be characterized as intentional, unfair or outrageous," but "it is nevertheless covered by the by the workers' compensation exclusivity provisions." *See Shoemaker*, 52 Cal. 3d at 25; *see also Miklosy*, 44 Cal. 4th at 903 ("As to the exception for conduct that 'exceeds the risks inherent in the employment relationship,' it might seem at first blush to apply here—based on the argument that whistleblower retaliation is not a risk inherent in the employment relationship—but we rejected this same argument in [*Shoemaker*].").  Hence, BofI's alleged conduct does not exceed the risks inherent in the employment relationship.[7]

Accordingly, Erhart's intentional infliction of emotional distress claim lacks plausibility because it is barred by the exclusive remedy rule under California's Workers' Compensation Act. The Court will dismiss this claim with leave to amend. *See* Fed. R. Civ. P. 15(a); *Cafasso*, 637 F.3d at 1058.

### 6. Defamation

Erhart's ninth cause of action seeks relief for defamation. (FAC ¶¶ 139–57.) BofI moves to dismiss, arguing that Erhart fails to state his claim with the required specificity. (Mot. 22:17–24.)

Defamation "is an invasion of the interest in reputation" and "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Ringler Assocs., Inc. v. Maryland Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (2000) (citing Cal. Civ. Code

---

[7] Some of Erhart's allegations mention defamatory statements, including statements purportedly made after BofI terminated him. (FAC ¶ 74b.) BofI's alleged statements "after [Erhart] was terminated . . . can, by no stretch, be deemed to have occurred in the course and scope of [his] employment." *See Davaris v. Cubaleski*, 12 Cal. App. 4th 1583, 1591 (1993). Further, statements made during the employment relationship that "have no other purpose than to damage [Erhart]'s reputation are neither a 'normal part of the employment relationship' nor a risk of employment within the exclusivity provision of the Workers' Compensation Act." *See id.* (quoting *Howland v. Balma*, 143 Cal. App. 3d 899, 905 (1983)). But the proper cause of action to seek redress for these alleged statements is defamation. *See id.* at 1591–92; *Howland*, 143 Cal. App. 3d at 904–05. Because Erhart pleads a defamation claim, the Court addresses BofI's alleged statements within the contours of that claim.

§§ 45, 46). "It is an essential element of defamation that the publication be of a false statement of fact rather than opinion." *Id.* at 1181 (emphasis omitted). "The dispositive question for the court is whether a reasonable factfinder could conclude that the published statements imply a provably false factual assertion." *Moyer v. Amador Valley J. Union High Sch. Dist.*, 225 Cal. App. 3d 720, 724 (1990). Courts analyze this issue using a "'totality of circumstances' test—a review of the meaning of the language in context and its susceptibility to being proved true or false." *See id.* at 125.

"Under California law, the defamatory statement must be specifically identified, and the plaintiff must plead the substance of the statement. Even under the liberal federal pleading standards, general allegations of the defamatory statements that do not identify the substance of what was said are insufficient." *Norsat Int'l v. B.I.P. Corp.*, No. 12–cv–674–WQH, 2013 WL 5530771, at *5 (S.D. Cal. Oct. 3, 2013) (quoting *Scott v. Solano Cty. Health & Soc. Servs. Dep't*, 459 F. Supp. 2d 959, 973 (E.D. Cal. 2006)). Nevertheless, "[l]ess particularity is required when it appears that [the] defendant has superior knowledge of the facts, so long as the pleading gives notice of the issues sufficient to enable preparation of a defense." *See Okun v. Superior Court*, 29 Cal. 3d 442, 458 (1981).

Further, the plaintiff must allege the statement was published. *See Ringler Assocs.*, 80 Cal. App. 4th at 1179. Publication is defined as "a [written or oral] communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." *Id.*; *see also* Restatement (Second) of Torts § 577. "Publication need not be to the public or a large group; communication to a single individual is sufficient." *Ringler Assocs.*, 80 Cal. App. 4th at 1179.

Liability may also be based on self-publication of the defamatory statement. "Generally, when a plaintiff voluntarily discloses the contents of a [defamatory] communication to others, the originator of the defamatory statement is not liable for

the consequent damage." *See Reese v. Barton Healthcare Sys.*, 693 F. Supp. 2d 1170, 1189 (E.D. Cal. 2010). Under the self-publication exception, a defendant may be liable for a plaintiff's foreseeable self-publication where: "[1] the person defamed [is] operating under a strong compulsion to republish the defamatory statement; and [2] the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed." *See id.* (alterations in original) (quoting *McKinney v. County of Santa Clara*, 110 Cal. App. 3d 787, 796 (1980)).

BofI's primary contention is that "Erhart fails to allege the substance of the allegedly defamatory statement(s), the identity of the person(s) who allegedly made the statement(s), the identity of any person(s) who heard or received the statement, or even when the statement(s) was made." (*See* Mot. 22:17–20.) The Court finds that this argument runs counter to the pleadings.

Erhart specifically alleges that in March 2015, SVP Tolla told BofI employees that Erhart was responsible for a negative article about BofI published on the Seeking Alpha website, and SVP Tolla had previously implied the same by calling Erhart "Seeking Alpha" in February 2015. (FAC ¶ 71.) Erhart similarly alleges that BofI's agents and employees, including SVP Tolla and CEO Garrabrants, have widely published claims that Erhart "colluded and/or collaborated with 'short sellers' of BofI's stock." (*Id.* ¶ 74B.) These allegations support a claim for defamation. BofI's alleged statement that Erhart caused the publication of a negative article about his employer is "a provably false factual assertion." *See Moyer*, 225 Cal. App. 3d at 724. While BofI attempts to argue that Erhart is required to explain the defamatory nature of this statement, (*see* Reply 11:21–23, ECF No. 37), the evident implication is that Erhart acted unprofessionally by liaising with the Seeking Alpha website to disclose negative information about his employer. Such an implication "has a natural tendency to injure" someone employed as an internal auditor—a profession that requires

integrity and confidentiality. *See Ringler Assocs.*, 80 Cal. App. 4th at 1179. Further, BofI's alleged statement that Erhart "colluded and/or collaborated with 'short sellers' of BofI's stock," (FAC ¶ 74B), is also provably false and raises the same concern about Erhart's adherence to professional standards.

As to the publication requirement, Erhart alleges that BofI's statement that he was responsible for a negative article was made to third-parties. (FAC ¶ 71.) Erhart also alleges BofI was aware that he would be under significant pressure to disclose the contents of the alleged defamatory statements described in his pleading to various other third-parties, including prospective employers. (*Id.* ¶ 148.) Given the nature of the financial industry and the requirements of the auditing profession, Erhart plausibly alleges that he felt compelled to disclose and explain the circumstances of BofI's statements to prospective employers. *Cf. Webber v. Nike USA, Inc.*, No. 12–cv–00974–BEN, 2012 WL 4845549, at \*7 (S.D. Cal. Oct. 9, 2012) (denying a motion to dismiss where the plaintiff alleged prospective employers would learn of the reason for his termination and that he was therefore compelled to explain the reason to potential employers). Under this strong compulsion to disclose, Erhart contends that he in fact did republish the alleged defamatory statements to third persons. (*See* FAC ¶ 148.)

Accordingly, accepting Erhart's allegations as true, the Court finds that he pleads sufficient facts to state a claim for defamation. Thus, the Court will not dismiss Erhart's ninth cause of action.

## III.   MOTION TO STRIKE

### A.   Legal Standard

Rule 12(f) of the Federal Rules of Civil Procedure provides that a court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins*

*Co.*, 697 F.2d 880, 885 (9th Cir. 1983). "When considering a motion to strike, the court 'must view the pleading in a light most favorable to the pleading party.'" *U.S. ex rel. Pecanic v. Sumitomo Elec. Interconnect Prod., Inc.*, No. 12-cv-0602-L(NLS), 2013 WL 774177, at *9 (S.D. Cal. Feb. 28, 2013) (citing *In re 2TheMart.com, Inc.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000)).

"Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003). "[The] motion . . . should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation. If there is any doubt . . . the court should deny the motion." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted). Thus, allegations that provide background information, historical material, "or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant." *In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010).

**B.**   **Analysis**

In addition to moving to dismiss six of Erhart's claims, BofI requests the Court strike numerous allegations from his First Amended Complaint. (Mot. 23:1–25:17.) BofI groups these allegations into three categories. (*Id.*) The Court will consider each category in turn.

**1.**   **Allegations Regarding Believed Wrongdoing**

The first category is a selection of Erhart's allegations in which he describes the perceived wrongdoing he discovered at BofI. (*See* Mot. 23:1–21.) BofI claims these allegations are immaterial because Erhart fails to allege he reported the alleged conduct to the government or other appropriate recipient. (*Id.* 23:15–21.) Thus, BofI requests the Court strike all of these allegations. (*Id.*)

BofI's request is meritless. Erhart does in fact allege he reported the perceived wrongdoing at issue. He claims he "reported each of these matters to

appropriate government agencies as a whistleblower in April 2015." (FAC ¶ 45.) Moreover, even if the First Amended Complaint lacked this specific allegation, the Court would still deny BofI's request. The allegations BofI seeks to strike provide support for not only Erhart's federal whistleblower retaliation claims, but also his amalgam of state law causes of action. Hence, the Bank fails to demonstrate these allegations "could have no possible bearing on the subject of the litigation." *See Platte Anchor Bolt*, 352 F. Supp. at 1057. BofI also does not establish these allegations are "unduly prejudicial." *See In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d at 773; *cf. Pecanic*, 2013 WL 774177, at *10 (S.D. Cal. Feb. 28, 2013) (striking allegations regarding catastrophic commercial airplane crash as unduly prejudicial where there was no claim that the defendants' products were used in the aircraft). Therefore, striking these allegations under Rule 12(f) is not appropriate.

### 2. Allegations Regarding Exhaustion of Administrative Remedies

The second category of allegations BofI seeks to expunge overlaps with the first. (*See* Mot. 25:2–8.) This time, BofI requests the Court strike a selection of Erhart's factual allegations regarding his discovery of wrongdoing because the Bank claims Erhart failed to exhaust his administrative remedies under Sarbanes–Oxley. (*Id.* 24:1–8.) Although Erhart alleges he did indeed exhaust his administrative remedies, (FAC ¶ 8), BofI invites the Court to take judicial notice of Erhart's administrative complaint filed with the Department of Labor and determine which of his present allegations were not included in his administrative filing, (Mot. 25:2–8).

The Court declines BofI's invitation to carve up Erhart's amended pleading based on what he included in his administrative complaint. The Bank's motion overlooks the fact that Erhart is not simply bringing a claim under Sarbanes–Oxley. He has nine other claims. Although Sarbanes–Oxley may require Erhart to exhaust his administrative remedies before bringing a whistleblower retaliation claim,

Dodd–Frank does not. *Compare* 18 U.S.C. § 1514A(b)(2)(D), *with* 15 U.S.C. § 78u-6(h)(1)(B)(i); *see also Somers*, 119 F. Supp. 3d at 1095. The same is true for Erhart's whistleblower retaliation claim under California Labor Code § 1102.5. *See* Cal. Lab. Code § 98.7(g); *Satyadi v. W. Contra Costa Healthcare Dist.*, 232 Cal. App. 4th 1022, 1033 (2014). Consequently, even if Erhart failed to fully exhaust his administrative remedies under Sarbanes–Oxley, the allegations BofI seeks to remove from his pleading are appropriately included to support Erhart's other claims. In other words, BofI once again fails to demonstrate these allegations "could have no possible bearing on the subject of the litigation." *See Platte Anchor Bolt*, 352 F. Supp. at 1057. Thus, the Court will not strike them.

### 3. Allegations Regarding Confidential Information

Last, BofI targets twenty-six paragraphs of allegations where it claims Erhart—by including these allegations in his pleading—"has violated the privacy, confidentiality and attorney-client privilege rights of BofI's employees, clients, and business counterparties." (Mot. 25:13–15.) The Bank asks the Court to strike these allegations from Erhart's pleading as impertinent. (*Id.* 25:9–17.)

The Court will not do so for two reasons. First, given that many of Erhart's allegations were reported in *The New York Times*, his pleading has existed in the public record for months, and the Court has discussed his allegations in its orders, "the cat is out of the bag." *See SmithKline Beecham Corp. v. Pentech Pharm., Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (Posner, J.). It would be a waste of judicial resources to now analyze twenty-six paragraphs of allegations to determine if they should be stricken because Erhart did indeed violate some privilege or right of privacy. *See Neilson*, 290 F. Supp. 2d at 1152 ("Motions to strike are generally regarded with disfavor[.]").

In addition, this Court has already determined Erhart was "permitted to disclose BofI's information in his complaint if doing so was 'reasonably necessary' to pursue his retaliation claim." (ECF No. 40.) *See Cafasso*, 637 F.3d at 1062; *see*

*also Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1039 (C.D. Cal. 2012) (noting in a False Claims Act case that the publication of confidential documents in the relator's complaint "was not wrongful, even in light of nondisclosure agreements, given 'the strong public policy in favor of protecting whistleblowers who report fraud against the government'"); *cf. Wadler v. Bio–Rad Labs., Inc.*, 212 F. Supp. 3d 829, 849 (N.D. Cal. 2016) (concluding former general counsel was permitted to rely on privileged communications and confidential information that was "reasonably necessary" to his claims and defenses in his whistleblower retaliation action). This determination cannot be made in the context of a Rule 12(f) motion to strike. Thus, when Erhart's amended pleading is construed in his favor, BofI has not shown these allegations "clearly could have no possible bearing on the subject of the litigation." *See Platte Anchor Bolt*, 352 F. Supp. 2d at 1057. Accordingly, the Court will not strike the final category of allegations identified by BofI. *See id.* at 1057 ("If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion.").

In sum, because striking any of the three categories of allegations identified by BofI is not warranted, the Court is unpersuaded by the Bank's motion to strike.

## IV.   **CONCLUSION**

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** BofI's motion to dismiss and strike allegations from Erhart's First Amended Complaint (ECF No. 35). Specifically, the Court denies BofI's request to dismiss Erhart's claims for whistleblower retaliation under Sarbanes–Oxley, whistleblower retaliation under Dodd–Frank, and defamation. The Court, however, grants BofI's motion to dismiss Erhart's claims for violation of California's Confidentiality of Medical Information Act, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. The Court dismisses these claims with leave to amend. In addition, the Court denies BofI's motion to strike

allegations from Erhart's pleading. If Erhart chooses to file a Second Amended Complaint, he must do so no later than **September 29, 2017**.

   **IT IS SO ORDERED.**


DATED: September 11, 2017

**Hon. Cynthia Bashant**
**United States District Judge**