**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHARLES MATTHEW ERHART, | Case No. 15-cv-02287-BAS-NLS |
| Plaintiff, | *consolidated with* 15-cv-02353-BAS-NLS |
| v. | **ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL (ECF No. 386)** |
| BOFI FEDERAL BANK, | |
| Defendant. | |
| And Consolidated Case | |

Plaintiff Charles Matthew Erhart worked for Defendant BofI Federal Bank as an internal bank auditor. When Erhart discovered conduct that he believed broke the law, Erhart reported the conduct to his boss and eventually the Bank's regulators. BofI terminated him.

In the aftermath, BofI and Erhart told competing tales of what happened. BofI claimed Erhart abandoned his job and wanted to "bring down the bank." Erhart, in turn, portrayed himself as an internal auditor in a turbulent corporate environment. Time and time again, Erhart battled against pressure from senior management as he discovered wrongful conduct. But when events were hitting a flashpoint, Erhart's supervisor abruptly

quit instead of escalating the concerns to the Bank's Audit Committee. Erhart then contacted the Bank's regulators to report his findings before being later terminated.

After years of litigation, the parties' colliding stories came to a head in a three-week trial. To say the jury was called upon to make classic credibility determinations is an understatement. Erhart's word was pitted against various current and former BofI employees, including the upper echelons of management. He prevailed. The jury unanimously found BofI violated whistleblower protections and defamed Erhart, awarding him $1.5 million.

Now before the Court is BofI's Renewed Motion for Judgment as a Matter of Law or a New Trial. The Bank attacks the sufficiency of the evidence for the jury's verdict and asks for judgment in its favor. BofI alternatively asks the Court to order a new trial or remit the damages. Neither request is persuasive. Hence, for the following reasons, the Court denies BofI's motion.

## BACKGROUND

### I.   Procedural History

In October 2015, Erhart filed this action claiming BofI retaliated against him for reporting wrongdoing to his supervisors and the Government. His initial complaint included ten claims and described over a dozen instances of believed wrongdoing at the Bank. BofI responded with a countersuit against Erhart, claiming he breached an employee confidentiality agreement and violated his duty of loyalty to the Bank.

After protracted motion practice and discovery, the case neared trial in 2020. The COVID-19 pandemic and scheduling accommodations added two more years, leading to the Court setting a three-week jury trial for 2022.

Along the winding way, the Court made more rulings than can be fairly summarized here. Two bear further mention. First, at the summary judgment phase, the Court grappled with the core of Erhart's lawsuit: his whistleblower retaliation and wrongful termination claims. (Summ. J. Order, ECF No. 192.) These claims required Erhart to show he reasonably believed BofI broke the law. (*Id.* 19:6–21:2; 53:1–54:8, 64:3–5.) He claimed

wide-ranging conduct did so, including BofI providing a misleading response to an SEC investment fraud subpoena, BofI making untimely payments to employees' 401(k) plans, and BofI making unauthorized risky loans. (*Id.* 10:20–28.) Some of these factual predicates did not survive summary judgment, but many others remained for trial. (*Id.* 88:21–89:28; *see also* ECF No. 200.)

Second, at the motion in limine phase, the Court found Erhart failed to provide any estimate of his calculable damages throughout discovery. (Order on BofI's Mot. in Limine No. 5, ECF No. 244.) Those damages included his "claims for future wages and earnings, lost employment benefits, bonuses, overtime, vacation benefits, medical expenses, and back pay." (*Id.*) The Court also found he could not avoid the automatic sanction under Rule 37(c)(1). This ruling meant Erhart could seek only "emotional distress damages, reputational damages, and punitive damages" at trial. (*Id.*)

## II.   Trial[1]

Ten claims reached the jury. Erhart brought four counts for (1) violation of Sarbanes-Oxley's anti-retaliation provision, (2) violation of California Labor Code section 1102.5—the state's general whistleblower statute, (3) wrongful termination in violation of public policy, and (4) defamation. (Jury Verdict 1:1–6:4, ECF No. 314.) BofI brought six counterclaims for (1) breach of contract, (2) conversion, (3) breach of the duty of loyalty, (4) negligence, (5) violation of California Penal Code section 502, and (6) violation of the Computer Fraud and Abuse Act.[2] (*Id.* 6:5–7:18.)

---

[1] The Trial Transcript is organized into fifteen volumes, which the Court cites to using the leading numeral in the pincite—e.g., 3-760:13 cites to Volume 3, Page 760, Line 13. The volumes' electronic case filing numbers are included below.

| Vol 1 (No. 289) | Vol. 2 (285) | Vol. 3 (286) | Vol. 4 (290) | Vol. 5 (292) |
| Vol. 6 (No. 294) | Vol. 7 (296) | Vol. 8 (298) | Vol. 9 (300) | Vol. 10 (303) |
| Vol. 11 (No. 308) | Vol. 12 (310) | Vol. 13 (312) | Vol. 14 (315) | Vol. 15 (321) |

[2] Two other claims reached trial—but not the jury. First, considering the limitation on Erhart's recoverable damages, the Court found there was insufficient evidence for his Dodd-Frank Act anti-retaliation claim. (Trial Tr. 10-2790:3 to 15.) Second, the Court put to rest BofI's amorphous fraud and concealment claim after hearing no supporting evidence. (*Id.* 10-2790:16 to 10-2791:6.)

*Erhart's Perspective*.  From start to finish, the jury heard conflicting narratives about what happened during Erhart's tenure at the Bank, including the reasons for his termination.  Indeed, a considerable portion of Erhart's case was presented through BofI's current or former employees, putting credibility determinations front and center.  (Trial Tr. 1-266:10 to 3-760:13.)

Then, for several days of trial, Erhart told his perspective.  The jury learned Erhart grew up in Kansas, studied finance at the University of Kansas, graduated with a 4.0 GPA, and then worked as an examiner for FINRA—the Financial Industry Regulatory Authority—for three and a half years.  (Trial Tr. 3-761:10 to 3-766:19.)  He then joined BofI as an internal auditor in September 2013.  (*Id.* 3-769:16 to 3-773:6.)  Although some of his experience at FINRA translated well to this new role, there was still "a huge learning curve."  (*Id.* 3-769:17 to 3-770:15.)  Erhart was then twenty-seven years old.  (*Id.* 3-773:11 to 12.)

Another key figure was Jonathan Ball, Erhart's direct supervisor.  (Trial Tr. 3-770:20 to 22.)  Erhart received most of his on-the-job education from Ball.  (*Id.* 3-774:15 to 16.)  Ball had previously been the head of internal audit at a bank that failed and shared his experiences with Erhart.  (*Id.* 6-1734:20 to 6-1735:3.)  When Erhart began to discover issues during his work, he repeatedly raised them to Ball and sought Ball's experienced guidance, who was responsive to Erhart's concerns.  (*E.g.*, *id.* 3-785:14 to 3-786:5, 3-848:7 to 14.)  Some senior members of management were not so supportive, however.  In one instance, Erhart was asked to remove a negative finding from an audit report out of concern that it "could be discoverable in a class-action lawsuit" against the Bank.  (*Id.* 3-819:2 to 3-820:21.)  Further, after Erhart put his concerns in writing, he received a less favorable performance evaluation, with management suggesting he rely less on email and "take a more proactive approach" by "getting out and meeting with data owners and business unit managers."  (*Id.* 2-454:22 to 2-457:5, Trial Ex. 25.)  In another instance, the Senior Vice President of Audit and Compliance walked by Erhart, "and in passing, he said out loud, if

Matt continues to turn over rocks, he's going to find a snake and get bit." (Trial Tr. 3-880:20 to 3-881:25.)

Then, as concerns piled up in the audit department, Ball made it clear to Erhart "that he was going to go to the [Bank's] Audit Committee" with the issues. (Trial Tr. 5-1447:14 to 16; *see also, e.g., id.* 3-847:10 to 12; 3-868:1 to 15; 3-890:2 to 10.) Congress enacted Sarbanes-Oxley "[t]o safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation." *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014). Among other things, Sarbanes-Oxley mandates that the publicly-traded holding company for the Bank maintain an audit committee where "[e]ach member of the audit committee" is a member of the board of directors and "shall otherwise be independent." 15 U.S.C. § 78j-1(m). Plus, there must be procedures for employees to raise "concerns regarding questionable accounting or auditing matters" to the audit committee. *Id.* (*See also, e.g.*, Trial Tr. 1-292:1 to 1-293:2 (testifying about the composition and structure of BofI's Audit Committee).)

Events hit a flashpoint around February and March of 2015. BofI's principal regulator—the Office of the Comptroller of the Currency ("OCC")—was conducting a "full-scope examination" of the Bank, with on-site examiners. (Trial Tr. 2-507:4 to 2-509:4.) Erhart was concerned that the Bank was withholding information from the OCC. (*E.g., id.* 3-812:16 to 3-813:17, 3-852:7 to 10; 3-855:23 to 25.) His supervisor, Ball, "was the point person with the OCC" for audit functions at the Bank. (*Id.* 2-508:7 to 10.) Yet, on March 5, 2015, during the examination, Ball "walked out" on his job with no notice to Erhart. (*Id.* 3-865:16 to 3-866:2.)

During the morning of the next day, which was a Friday, Erhart contacted the OCC to report his concerns, and a telephonic meeting was scheduled for the following Monday. (Trial Tr. 3-892:5 to 20.) Erhart "spent a big portion of [his] weekend combining all the issues, most of—a lot of them which were initially intended for the Audit Committee, into a document and provided a written document that was 10 to 15 pages, approximately, in length to the OCC via email." (*Id.* 3-892:21 to 3-893:3.) He then met with the OCC and

had a follow-up meeting in person, where he brought his company-issued laptop computer. (*Id.* 3-895:12 to 3-896:21.)

<u>Termination Letter</u>.  The jury learned that around this same time, BofI was trying to summarily fire Erhart and recover his company-issued laptop, purportedly because he "was being dishonest" and not at work "for a critical meeting."  (Trial Tr. 2-544:13 to 25 ("I also said if he, you know, is sitting at home playing video games, that I felt like he should be terminated on the spot."); *see also id.* 2-595:8 to 10 (failing to recall if there was any "mention that Mr. Erhart had done anything dishonest").)  This on-the-spot termination clashed with BofI's attendance policy, which was to terminate employees if they had three days of unexplained absences—not just a single morning.  (*Id.* 3-725:14 to 3-727:25.)  And BofI was trying to terminate Erhart after it opened locked cabinets at his workstation and discovered an unfavorable memorandum about perceived wrongdoing involving the Bank's Chief Executive Officer ("CEO").  (*Id.* 2-465:11 to 2-468:7.)

After preparing a termination letter, BofI attempted to deliver it and obtain Erhart's laptop, but the Bank was unsuccessful.  (Trial Tr. 2-545:1 to 18, Trial Ex. 1156.)   The Bank's CEO, Greg Garrabrants, also became involved in the effort to recover the laptop, which was atypical.  (*Id.* 2-600:24 to 2-603:9.)  Nor was it normal for BofI to dispatch its head of information technology "to go out to collect company property" from an employee. (*Id.* 2-599:4 to 6; *see also* 2-545:11 to 15.)

<u>Termination</u>.  Before BofI could deliver its termination letter, Erhart requested medical leave.  (Trial Tr. 2-549:5 to 2-551:4; 2-554:3 to 11.)  BofI followed the law and processed Erhart's leave request under the Family and Medical Leave Act and California's Family Rights Act.  (*Id.* 3-715:13 to 16.)  BofI then sent Erhart a leave eligibility letter, which also requested the return of any "BofI laptop . . . as soon as possible."  (*Id.* 3-718:6 to 3-719:2.)  This request to return a laptop was not put in every medical leave letter.  (*Id.* 3-719:19 to 21.)  And BofI's Chief Performance Officer, who was responsible for human resources functions, testified that before Erhart, she had never collected a laptop from an employee who was out on medical leave.  (*Id.* 2-588:22 to 25; 2-589:5 to 11; 2-603:15 to

18.)  Erhart returned the laptop within a few days of receiving this leave notice.  (*E.g.*, 3-719:7 to 11; 4-1044:2 to 11.)

After accepting Erhart's medical certification, BofI informed him his twelve-week leave commenced as of March 6, 2015.  (Trial Tr. 3-719 to 3-721:14, Trial Ex. 1175.)  Normally, the BofI employee who coordinated medical leave would then reach out to an employee like Erhart before he was slated to come back from leave.  (Trial Tr. 2-593:1 to 8.)  BofI did not do so or tell Erhart his leave expired.  (*Id.* 3-724:10 to 23.)  Instead, on June 9, 2015, the Bank sent a letter informing Erhart that he was being terminated for failing to report to work for more than three consecutive days—the same attendance policy referenced above.  (*Id.* 3-725:14 to 3-726:2, Trial Ex. 1178.)

<u>Defamation</u>.  As for Erhart's defamation claim, this claim centered on statements made by BofI's CEO, Greg Garrabrants, during a transcribed call with investors and analysts.  (Trial Tr. 7-1978:23 to 7-1979:10.)  CEO Garrabrants called Erhart "an inexperienced, underperforming, junior audit team member."  (Trial Ex. 29 at 1, ECF No. 386-12.)  He similarly said Erhart "did not understand the Bank's management reporting systems" and was a "poor performer."  (*Id.* at 2.)  Garrabrants further said Erhart's emails "were often incoherent and they did not elicit responses because of their incoherence."  (*Id.* at 3.)

Previously, however, the jury had heard from Erhart's supervisor, Ball, about Erhart's competency.  Ball told Erhart on more than one occasion that he was doing a good job; the written quality of Erhart's audits was generally better than other auditors in the department; Ball never put Erhart on a performance improvement plan; there was no reason to put Erhart on such a plan; and Ball never told Erhart he was in danger of losing his job.  (Trial Tr. 6-1735:4 to 6-1737:3.)  And the jury saw more than enough of Erhart's work emails throughout the trial to determine whether they were "often incoherent" and "did not elicit responses because of their incoherence."  (*E.g.*, Trial Ex. 97.)

<u>BofI's Counter-Narrative</u>.  The Bank presented its own narrative through various witnesses and lengthy cross-examination of Erhart.   The Bank elicited testimony

addressing Erhart's believed wrongdoing, suggesting that nothing nefarious transpired during his tenure.  (*E.g.*, Trial Tr. 2-505:20 to 2-506:7, 6-1772:14 to 6-1773:15.)  CEO Garrabrants claimed the Bank "knew [Erhart] was wrong about all these things."  (*Id.* 7-1991:3.)  He contended that "Erhart deviated from his audit scope and pushed himself into areas in which he did not have the appropriate expertise, he jumped to conclusions, [and] those conclusions could have been corrected if he had better communication skills and simply got up and talked to the people that would have had that information."  (*Id.* 7-1991:9 to 14.)  Further, Ball unexpectedly walked out of his job during the middle of the OCC's on-site examination because of burnout and back pain, not because of the problems raised by Erhart that needed to be addressed by the Audit Committee.  (*Id.* 13-3356:21 to 24; *see also id.* 6-1759:8 to 24.)

In addition, according to BofI, Erhart was terminated because he did not return after his medical leave, and his communications to his supervisor, senior management, and regulators about believed wrongdoing had nothing to do with it.  (*See* Trial Tr. 3-725:2 to 3-726:14.)  The Bank also cast doubt on Erhart's medical leave, revealing he visited the zoo with his father and girlfriend on the same day his leave commenced and never took recommended medication.  (*Id.* 4-1187:18 to 23, 6-1608:23 to 6-1609:2.)  Finally, the Bank sought to impugn Erhart's credibility through a variety of evidence, including by introducing testimony that Erhart said "he hated being at the [expletive] bank" and wanted to bring down the Bank.  (*Id.* 9-2440:12 to 9-2455:19.)

<u>Verdict</u>.  After more than a full day of deliberations, the jury reached a unanimous verdict.  (Trial Tr. 13-3433:6, 14-3502:8.)  BofI's claims fell flat; the jury rejected all six of them.  (Jury Verdict 6–7.)  As for Erhart's claims, the jury first found BofI violated Sarbanes-Oxley's anti-retaliation provision and checked two out of the three options for specifying the conduct Erhart "reasonably believe[d] was a violation of law."  (*Id.* 1.)  The jury rejected BofI's affirmative defense "that it would have taken the same personnel action in the absence of Mr. Erhart's protected activity."  (*Id.* 2.)

Next, the jury found BofI violated California Labor Code section 1102.5.  (Jury Verdict 2.)  For this claim, the jury checked all nine options for specifying the conduct Erhart "reasonably believe[d] was a violation of state, local or federal law or regulation." (*Id.* 3.)  The jury again rejected BofI's affirmative defense.  (*Id.*)  And to wrap up the retaliation claims, the jury found BofI wrongfully terminated Erhart in violation of public policy, again rejecting the Bank's affirmative defense.  (*Id.* 3–4.)  In line with the Court's damages ruling mentioned above, the jury assessed Erhart's "emotional distress or harm to his reputation" for these claims.  (*Id.* 4.)  The jury awarded him $1 million.  (*Id.*)

In addition, the jury found Erhart proved BofI defamed him.  (Jury Verdict 4.)  Of the four possible defamatory statements specified by the Court, the jury checked one: the statement that "Mr. Erhart was incompetent at his job."  (*Id.* 4–5.)  The jury rejected BofI's claim that this statement was "substantially true" and awarded $500,000 in damages for emotional distress and reputational harm.[3]  (*Id.* 5.)   BofI now renews its request for judgment as a matter of law on Erhart's claims and alternatively seeks a new trial.

## RENEWED JUDGMENT AS A MATTER OF LAW

### I.  Legal Standard

A motion under Rule 50(b) for judgment as a matter of law is not a standalone motion, but rather is "a renewed Rule 50(a) motion."  *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  If the court has either denied or deferred its ruling on the Rule 50(a) motion, and a jury returned a verdict against the moving party, that party may renew the motion under Rule 50(b).  *Id.*; *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007).  In ruling on a Rule 50(b) motion, the court may allow judgment on the verdict, order a new trial, or reverse the jury and direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b).

---

[3]  The jury also found BofI's conduct warranted punitive damages under state law but deadlocked on the amount to award.  (Jury Verdict 6.)  The Court held a limited, one-week retrial on the punitive damages issue, and a second jury found punitive damages were not appropriate.  (ECF No. 370.)

Because it is a renewed motion, a post-verdict motion under Rule 50(b) must be based on the same grounds asserted when the party moved under Rule 50(a) during pre-deliberation. *E.E.O.C.*, 581 F.3d at 961.  A party may not "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003); *see also Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion]." (alterations in original)).

Judgment as a matter of law under Rule 50(b) is appropriate "only if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).   When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000); *see also Winarto*, 274 F.3d at 1283 (providing the court "must accept the jury's credibility findings consistent with the verdict.").

The Ninth Circuit has made clear that a court "cannot disturb the jury's verdict if it is supported by substantial evidence." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999).  Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (internal quotation marks omitted).  "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Reeves*, 530 U.S. at 151.

## II.   Analysis

### A.   Retaliation Claims

BofI argues the verdict on Erhart's three whistleblower retaliation claims cannot stand as a matter of law for several reasons. (Mot. 4:2–22:3.)  The Court first considers

- 10 -

BofI's attack on the retaliation evidence because this issue concerns all three claims. The Court next turns to BofI's challenge to the protected activity component of Erhart's Sarbanes-Oxley claim. Last, the Court addresses BofI's arguments regarding the sufficiency of evidence for the damages awarded on these claims.

### 1. Evidence of Retaliation

BofI contends there is insufficient evidence to support the jury's determination that BofI retaliated against Erhart for reporting believed wrongdoing to his supervisor and the Bank's principal regulator. (Mot. 9:20–12:15.) The Bank likewise contends the jury's rejection of its affirmative defense to Erhart's retaliation claims cannot stand.[4] (*Id.* 12:16–14:13.)

Erhart's first three successful claims required that he show BofI retaliated against him in violation of the law. There are some nuances, but if the Bank terminated Erhart for engaging in protected activity, then this termination would satisfy the retaliation requirement for each claim. (Jury Instructions Nos. 14, 17, 18; ECF No. 319.) *See* 18 U.S.C. § 1514A(a) (prohibiting various retaliatory conduct, including a "discharge"); Cal. Lab. Code § 1102.5(b) (providing an employer "shall not retaliate against an employee"); *Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167, 178–79 (1980) (explaining California's cause of action for wrongful discharge in violation of public policy). "Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *See, e.g.*, *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003); *accord Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1061–62 (2005) (state law).

BofI's Rule 50(b) challenge is not persuasive. The Bank claims it was "uncontroverted" at trial that BofI terminated Erhart "for job abandonment," and therefore

---

[4] BofI preserved these related challenges by making a motion to dismiss the retaliation claims after the close of Erhart's case, where it raised arguments concerning the June 9 termination letter and the Bank's claimed basis for ending Erhart's employment. (Trial Tr. 8-2300:14 to 8-2301:17.) *See E.E.O.C.*, 581 F.3d at 961.

"there was no evidence" that this termination "resulted from any reporting of alleged wrongdoing." (Mot. 10:16–19, 12:12–13.)  This framing of the evidence is not only one-dimensional, but it also overlooks the jury's credibility determinations.

As summarized above, there was substantial evidence for the jury to conclude that Erhart's termination was motivated by his protected activity.  Viewing the evidence in Erhart's favor, he received a lower performance evaluation after he put concerns in writing.  Erhart reported believed wrongdoing to his supervisor repeatedly.  A senior executive told him that if he "continue[d] to turn over rocks, he [was] going to find a snake and get bit."  Then, when Erhart did not report to work the day after his boss "walked out" unexpectedly, the Bank opened locked cabinets at his workstation and discovered an unfavorable memorandum about perceived wrongdoing involving its CEO.  On the same day, the Bank attempted to terminate Erhart as he was contacting its principal regulator.  BofI's CEO became involved in the effort to recover Erhart's company-issued laptop, which was atypical.  The termination letter was rescinded only after Erhart requested medical leave.  Even still, the Bank insisted on the return of the laptop, which was again unusual.  The Bank was aware Erhart was communicating with the OCC.  And then the Bank later terminated him without reaching out about his medical leave, which was once again abnormal, and BofI apparently did so while applying the same attendance policy it bypassed when trying to fire Erhart the first time.

Given this showing, there was ample evidence for the jury to conclude BofI terminated Erhart in retaliation for his protected activity.  Indeed, BofI's suggestion that the jury had to credit its stated reason for firing Erhart ignores the law. (Instruction No. 5 ("You may believe everything a witness says, or part of it, or none of it.").)  *See, e.g.*, *Newton v. Equilon Enters., LLC*, 411 F. Supp. 3d 856, 868 (N.D. Cal. 2019) ("However, it is the jury's purview to decide what the evidence means, whether it is credible, and how to weigh it.").  The jury was empowered to not only make credibility determinations, but also consider circumstantial evidence, including BofI's knowledge that Erhart engaged in protected activity, the proximity in time between the protected activity and the retaliatory

employment decision, and the pattern of conduct consistent with retaliatory intent.  *See Coszalter*, 320 F.3d at 978 (explaining whether adverse employment action is retaliatory depends on "surrounding circumstances"); *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (noting retaliatory intent "may be established by an inference derived from circumstantial evidence"); *see also Flores v. City of Westminster*, 873 F.3d 739, 750 (9th Cir. 2017) (explaining that there is no bright-line rule about the timing of retaliation, and "[d]epending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation" (alteration in original)).

BofI's related challenge meets the same fate.  As an affirmative defense to each retaliation claim, BofI needed to show, "by clear and convincing evidence," that it would have terminated Erhart "for legitimate, independent reasons, even if Mr. Erhart had not engaged in the protected activity."  (Instruction No. 21.)  BofI contends the jury's decision to reject this defense cannot stand in light of the evidence.  (Mot. 12:16–13:3.)  This argument faces an uphill battle considering the heightened burden of proof for the defense. "When a party has the burden of proving any . . . defense by clear and convincing evidence, it means that the party must present evidence that leaves [the factfinder] with a firm belief or conviction that it is highly probable that the factual contentions of the . . . defense are true."  (Instruction No. 46.)  Considering the evidence at trial and the credibility determinations that are consistent with the verdict, the Court does not hesitate to conclude this Rule 50(b) challenge is unpersuasive.  *See Winarto*, 274 F.3d at 1283 (explaining the court can overturn the jury "only if, under the governing law, there can be but one reasonable conclusion as to the verdict"); *see also Reeves*, 530 U.S. at 151 (providing the court "must disregard all evidence favorable to the moving party that the jury is not required to believe").

Ultimately, BofI's motion "rests not on a lack of substantial evidence, but on [its] own interpretation of that evidence."  *See Newton*, 411 F. Supp. 3d at 868.  The Court denies the Rule 50(b) request based on the evidence of retaliation and the Bank's affirmative defense to the retaliation claims.

## 2. Sarbanes-Oxley Protected Activity

The Bank renews its request for judgment as a matter of law on Erhart's Sarbanes-Oxley claim based on the protected activity element.[5] (Mot. 4:2–9:19.) BofI argues no reasonable jury could conclude Erhart reasonably believed BofI was violating any of the laws encompassed by Sarbanes-Oxley's anti-retaliation provision, 18 U.S.C. § 1514A. (*Id.*)

The Court has already spilled a lot of ink on this topic. (Summ. J. Order 18:23–49:10; Second Dismissal Order 13:6–18:2, ECF No. 44; First Dismissal Order 18:1–27:2, ECF No. 22.) In a nutshell, Erhart needed to show he "reasonably believe[d]" the conduct he reported violated one of the laws enumerated in § 1514A. 18 U.S.C. § 1514A(a). The listed laws are mail fraud, wire fraud, bank fraud, securities fraud, "any rule or regulation of the" SEC, and "any provision of Federal law relating to fraud against shareholders." *Id.*

Erhart did not, however, "have to prove that he reported an actual violation." *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1186–87 (9th Cir. 2019). Further, Erhart was entitled to protection from retaliation if he had a reasonable but mistaken belief that there might have been a violation of one of the laws listed in § 1514A. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1001 (9th Cir. 2009). The "reasonable belief" standard includes both a subjective component and an objective component. *E.g.*, *Wadler*, 916 F.3d at 1187–88, *Van Asdale*, 577 F.3d at 1000. For the subjective component, Erhart needed to show he believed the conduct reported violated one of the categories in § 1514A. *Van Asdale*, 577 F.3d at 1000. "The objective reasonableness component . . . 'is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'" *Wadler*, 916 F.3d at 1188 (quoting *Sylvester v. Parexel Int'l LLC*, No. 07-123, 2011 WL 2517148, at *12 (Dep't of Labor May 25, 2011) (en banc)). The Ninth Circuit describes this "reasonable belief"

---

[5] BofI preserved this challenge by moving to dismiss the Sarbanes-Oxley claim based on insufficient evidence before the Court submitted the case to the jury. (Trial Tr. 11-2911:8 to 11-2993:25.) *See E.E.O.C.*, 581 F.3d at 961.

standard "as a 'minimal threshold requirement.'"   *Wadler*, 916 F.3d at 1187 (quoting *Van Asdale*, 577 F.3d at 1001).

The Court crafted a jury instruction that reflected these standards.  (Instruction No. 14.)  Further, the Court endeavored to incorporate the Ninth Circuit's guidance from *Wadler*, 916 F.3d 1176, which addressed jury instructions on this element.  Hence, with the parties' assistance, the Court created Instruction No. 15.  (Tr. 11-2945:20 to 11-2949:12; *see also* Pretrial Conference on Jury Instructions 21:7–25:17, ECF No. 271.)  This instruction made it clear to the jury that "[o]nly the following violations of law alleged in this case qualify for a SOX violation: violation of a rule or regulation of the SEC; or violation of a federal law relating to fraud against shareholders."   (Instruction No. 15.)  The Court then defined the relevant SEC rule, the Internal Controls Rule, as well as shareholder fraud for the jury.  The Court then asked the jury:

> If you found that Mr. Erhart proved Bofl violated SOX, what conduct by Bofl did Mr. Erhart reasonably believe was a violation of law?  (You must check at least one; check all that you find apply.)
>
> ____   Bofl recorded telephone calls
> __X__   Bofl had a high deposit concentration risk
> __X__   Bofl provided risky loans to criminals and/or politically exposed individuals

(Jury Verdict 2.)[6]

---

[6] On the second item, "high deposit concentration risk," there is a procedural wrinkle.  BofI moved to summarily adjudicate this issue with respect to Erhart's California state law retaliation claims, but it neglected to do so for his Sarbanes-Oxley Claim.  (Summ. J. Order 49 n. 15, 57:4–59:13.)  On the state claims, the Court granted BofI's request, reasoning Erhart did not show how a factfinder could conclude this conduct violated certain SEC rules, including the Internal Controls Rule.  (*Id.* 58:20–59:1.)  "As for potential shareholder fraud," the Court reasoned Erhart's summary judgment opposition did "not even mention the elements of this theory," and he thus did "not meet his burden to show he disclosed an objectively reasonable belief of this type of violation."  (*Id.* 59:1–4.)  This ruling meant the deposit concentration risk issue made it to trial only for the Sarbanes-Oxley claim.

The Court denied BofI's motion in limine follow-up, explaining that the motion could not "be used as a disguise" for the summary judgment motion it did not make.  (ECF No. 240 (collecting cases).)  Then, after hearing the evidence on this issue, the Court denied BofI's Rule 50(a) challenge.  (Trial Tr. 11-

The Court again construes the evidence in Erhart's favor to resolve BofI's Rule 50(b) challenge. As to the first item checked on the verdict form, the jury learned that Erhart was assigned to an audit that involved studying the Bank's "deposit concentration risk." (Trial Tr. 3-832:15 to 3-834:25.) This risk concerns whether too many of the Bank's deposits are controlled by a small number of customers—meaning, if some of those customers withdrew their funds, there could be a run on the Bank. (*Id.* 3-385:17 to 21.) Erhart understood that bank runs had historically caused banks to fail like during the Great Depression; the trial predated the well-publicized bank failures that occurred in March 2023. (*Id.* 3-834:14 to 23.) And the Bank's business unit identified this concern as a "key risk." (*Id.* 3-832:15 to 20, 3-834:3 to 23.)

The Bank assigned an additional employee to assist Erhart and generate a report on this issue. (Trial Tr. 3-835:1 to 9.) Upon reviewing the report, Erhart discovered that four BofI customers controlled about 25% of the Bank's deposits and nine customers controlled about 40% of the Bank's deposits. (*Id.* 3-835:17 to 21.) Erhart then reviewed several publicly traded banks' SEC filings and discovered "there were banks that reported concentrations that were way lower than what the Bank appeared to have." (*Id.* 3-836:12 to 13.) Erhart raised this issue in writing to the Bank's Chief Risk Officer, who acknowledged it was a risk, but did not adequately address Erhart's concerns. (*Id.* 3-840:4 to 7; Trial Ex. 98, ECF No. 395-14.) Erhart then later raised this issue to the OCC because it was "a major risk to the Bank that needs to be disclosed to" its investors, and he believed the "Bank violated various federal laws for their publicly traded stock in that they did not disclose these risks to investors in their SEC filing." (Trial Tr. 3-849:5.)

On the second item, the jury heard that Erhart was assigned to the Loan Originations Audit. (Trial Tr. 3-869:9.) Erhart discovered "some very large dollar amount loans" made by BofI had "very high interest rates" but were overcollateralized, which did not make

---

2911:8 to 11-2993:25.) The Court did so because "there was additional evidence that was elicited during the trial that was not put forward during the motion for summary judgment." (*Id.* 11-2920:6 to 8.)

sense "on its face." (*Id.* 3-869:9 to 23.)  Upon investigation, Erhart learned many of these loans were made to criminals or so-called politically exposed persons (PEPs), and he reported this discovery to Ball.  (*Id.* 3-869:24 to 3-871:20.)  Erhart shared with the jury why he believed various customers fit this profile, which ranged from foreign politicians to individuals charged or convicted of investment fraud and other schemes.  (*Id.* 4-1025:20 to 4-1034:8.)

Erhart was additionally concerned because if the Bank had been aware its customers fit one of these categories, then one would expect to see that risk reflected in the loan files.  (Trial Tr. 3-871:17 to 23.)  Yet, the loan files Erhart sampled did not have "any indication" that the loans had been flagged as being made to higher-risk customers.  (*Id.* 3-872:16 to 19.)  Erhart also reviewed a written Bank policy that prohibited lending to PEPs, which made Erhart believe the Bank was doling out these loans without following its own procedure.  (*Id.* 3-873:13 to 21.)  Beyond notifying Ball of this issue, Erhart provided a spreadsheet of these loans to the OCC and a copy of the written policy.  (*Id.* 8-374:24 to 8-375:18.)

Finally, it bears repeating something obvious:  the jury learned Erhart is not a lawyer.  He was a junior bank auditor.  Erhart was not the general counsel to a major laboratory equipment company.  *Cf. Wadler*, 916 F.3d at 1181.  Nor was he an in-house intellectual property attorney who had worked for a Chicago law firm.  *Cf. Van Asdale*, 577 F.3d at 991.  If courts, including this one, are going to subject employees like Erhart to the same standard as attorneys—or demand the same expertise gleaned from presiding over billion-dollar securities lawsuits—then Sarbanes-Oxley's anti-retaliation provision will be gutted.  *See Lawson*, 571 U.S. at 435 (explaining Congress was particularly concerned that corporate and accounting firm employees were discouraged from reporting corporate misconduct).  Sarbanes-Oxley protects all covered employees, not just those with the privilege of a law degree.  18 U.S.C. § 1514A(a).

To that end, the jury found Erhart satisfied the reasonable belief standard, and it had sufficient evidence to do so.  BofI had a wealth of opportunities to pick apart Erhart's story

and challenge his beliefs.  The jury still found them credible and reasonable.  It is not appropriate to "disturb the jury's verdict," particularly in light of the individualized reasonable belief standard.  *See Lambert*, 180 F.3d at 1012; *see also Wadler*, 916 F.3d at 1187 (describing the reasonable belief standard as a "minimal threshold requirement"); *Van Asdale*, 577 F.3d at 1001 (noting even a mistaken belief that is reasonable is enough for protected activity).  The Court thus denies the Rule 50(b) motion on this ground.

### 3.    Damages

The Bank next argues there was insufficient evidence that Erhart suffered emotional distress or reputational harm to support his retaliation claims.  (Mot. 14:14–19:17.)  BofI preserved its challenge to the sufficiency of evidence for the emotional distress damages, but whether the Bank did so for reputational harm is a close call.[7]  The Court addresses both items to avoid any doubt.  BofI also argues Erhart's damages are excessive, but the Court addresses that point under the new trial motion below.

In BofI's view, the evidence of Erhart's emotional distress was insufficient because he had "only four doctor visits," he was largely worried about additional, post-firing retaliation "that never materialized," and the Court was wrong to allow Erhart to tell the jury that the Bank sued not only Erhart for breach of its confidentiality agreement, but also sued both his mother and girlfriend in separate proceedings, causing additional distress.  (Mot. 14:17–19:17.)  This challenge misses the mark for two reasons.

First, BofI's motion buries the lead when it comes to confronting the Ninth Circuit's law on emotional distress damages.  (*Compare* Mot 14:17–19:17 (relying on a district court decision, *Sharkey v. J.P. Morgan Chase & Co.*, No. 10cv3824 (DLC), 2018 WL 1229831

---

[7]  In response to Erhart's objection on this threshold issue, BofI directs the Court to its Notice of Motion, which "identifies when and where BofI moved for judgment during trial as to each ground raised in its renewed Motion."  (Reply 1 n.1.)  Having followed the lead, BofI cites to an exchange where it moved "to dismiss all claims of emotional distress on the grounds that the plaintiff has not presented evidence from which a jury could reasonably conclude that he suffered stress as a result of retaliatory conduct."  (Notice of Mot. 2 n.4 (citing Trial Tr. 8-2304:4 to 10).)  BofI was surely intending to dispose of all remaining potential damages for Erhart's retaliation claims, but its counsel did not mention reputational harm in the brief oral motion.  (*See* Trial Tr. 8-2304:4 to 10.)

(S.D.N.Y. Mar. 5, 2018), for a Rule 50(b) challenge, *with id.* at 20:5–6 (acknowledging, when moving to reduce the damages under Rule 59, that "emotional distress damages awards need not be supported by 'some kind of "objective evidence" in this circuit'").) The Ninth Circuit rule is not favorable to the Bank's position:

> While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in . . . the Ninth Circuit, or the Supreme Court. *See Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985) (upholding emotional damages based solely on testimony); *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) (noting that emotional damages may be awarded on testimony alone or appropriate inference from circumstances); *Carey v. Piphus,* 435 U.S. 247, 264 n. 20 (1978) (noting that emotional distress damages are "essentially subjective" and may be proven by reference to injured party's conduct and observations by others).

*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003) (rejecting appellants' argument "that emotional distress damages must be supported by substantial evidence"). And, as Erhart correctly points out, the Sarbanes-Oxley case BofI relies upon is applying the law in one of those "other circuits"—the Second Circuit—where emotional distress damages are "unavailable absent physical manifestations of that distress, or corroborating testimony or independent medical evidence." *Sharkey*, 2018 WL 1229831, at *11 (quoting *Annis v. Cnty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998)).

Second, when the Court applies the Ninth Circuit's standard, the outcome is clear-cut. Erhart testified that he suffered symptoms because of the actions the Bank took against him. (Trial Tr. 4-1114:16 to 18.) He "had severe anxiety for a very long time," and there were instances where it was hard for him to breathe, with "sleepless nights" and episodes where he became "so sick to [his] stomach that [he] threw up." (*Id.* 4-1115:4 to 8.) This testimony alone defeats BofI's challenge. "[C]ompensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994). Consequently, the jury had sufficient evidence to award emotional distress damages. The Bank picks out

other portions of Erhart's testimony to support its view of the evidence, but that is exactly what the Rule 50(b) standard prohibits the Court from doing here.  *See Reeves*, 530 U.S. at 151.

As for reputational damages, the Bank does not offer any additional arguments that are specific to this type of damages.  (*See* Mot 14:17–19:17.)  The Court goes no further. *Cf. Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (providing issues need to be "argued specifically and distinctly" and a mere "assertion of an issue" is not enough to preserve it); *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019) (holding that a "passing reference" to an issue "[w]ithout meaningful briefing" waives it).  Hence, the Court denies BofI's Rule 50(b) request based on sufficiency of the evidence for Erhart's damages on his three retaliation claims.

### B.    Defamation

BofI also seeks judgment in its favor on Erhart's defamation claim for two reasons. First, BofI contends there was no evidence of emotional distress or reputational harm for the defamatory statement the jury identified in its verdict.  (Mot. 22:4–23:24.)  Second, BofI argues there was no evidence that the Bank made an actionable defamatory statement. (*Id.* 23:25–25:22.)

Unlike the other Rule 50(b) challenges discussed above, BofI does not provide a record cite for where it moved pre-verdict to raise its first challenge to the defamation claim.  (*See* Notice of Mot. 3:6–8.)  The closest request the Court recalls is the one identified in *supra* note 7, where BofI moved "to dismiss all claims of emotional distress . . . as a result of retaliatory conduct," but this motion did not mention defamation or the statement at issue.  (*See* Trial Tr. 8-2304:4 to 10.)  The Court consequently finds this first challenge was not preserved.  *See Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007) ("A renewed motion for judgment as a matter of law must be preceded by a motion made at trial that sets forth the specific grounds raised in the renewed motion.").

Regardless, this first challenge is hollow.  It was not much of a leap for the jury to find that Erhart being called incompetent at his job by the CEO of a publicly traded

company in a transcribed investor call caused him reputational harm.   Indeed, Erhart testified that the allegations the Bank made against him "in the investor call" have affected his ability to advance in his career "[t]o this day."  (Trial Tr. 10-2799:2 to 6.)  And Erhart has not had the kind of career that he expected, including him having to take a low-level compliance role at one point and then doing only part-time work that he was "lucky enough to get through former colleagues" at FINRA.  (*Id.* 4-1124:22 to 4-1125:16.)

BofI's second Rule 50(b) challenge to the defamation claims faces similar headwinds.  The Bank's Notice of Motion cites the following excerpt to support that it preserved this challenge: counsel argued "that the statements about Erhart being incompetent [at his] job [were] a statement of opinion, not one of fact.  And that [part of the defamation claim] should go out on that additional, separate ground."  (Trial Tr. 11-3002:17 to 20.)   The Court appreciates just how many issues counsel was juggling throughout trial, but this pre-verdict argument did not preserve many of the contentions raised in BofI's Rule 50(b) motion.  Those points include BofI's argument that Erhart "conceded that he did not have the competence to investigate many issues he later reported"—i.e., the argument that the CEO's statement about Erhart's competency was not defamatory because it was shown to be true. (Mot. 24:9–22; *see also id.* 24:23–25 (arguing another statement made in the investor call was "undeniably true").)  So, too, did the Bank fail to preserve its contention that "the evidence was uncontroverted that Garrabrants and BofI used reasonable care to determine the truth or falsity of the statement." (Mot. 25:16–18.)   The Court thus does not further consider these arguments, which also concern questions of fact for the jury. *See Wallace*, 479 F.3d at 631.

The one argument BofI did preserve is its contention that the comments about Erhart's competency were statements of opinion, not fact.  (Mot. 24:25–15.)  BofI cites to a state law case, *Gould v. Maryland Sound Industries, Inc.*, 31 Cal. App. 4th 1137, 1154 (1995), for the proposition that statements about an employee's level of job performance "are non-actionable opinion."  (Mot. 24:25–25:2.)  Erhart aptly defuses this argument. (Opp'n 23:11–24:4.)  As he highlights, *Gould* does not stand for such an open-ended

- 21 -

proposition.  Instead, there, the court explained that a statement by a supervisor accusing an employee of "poor performance" was "clearly a statement of opinion," but only because the statement did "not suggest any lack of honesty, integrity or *competency*."  *Gould*, 31 Cal. App. 4th at 1154 (emphasis added).  The jury found Garrabrants did the opposite—he said Erhart was incompetent at his job.  And the jury had sufficient evidence to reach this conclusion.  (Trial Ex. 29 at 1.)  Thus, the Court denies BofI's Rule 50(b) challenge with respect to Erhart's defamation claim, and the Court denies the renewed motion for judgment as a matter of law in its entirety.

## II.   New Trial

### A.   Legal Standard

Rule 59 allows a court to grant a new trial.  Fed. R. Civ. P. 59(a).  Rule 59 does not enumerate specific grounds for a new trial, but the court is bound to grant a new trial for "grounds that have been historically recognized."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003)).  Historically, those grounds include "claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"  *Id.* at 729 (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  A court may also grant a motion for a new trial where the verdict "is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

In considering a Rule 59 motion, the court "is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court can weigh the evidence and assess the credibility of the witnesses."  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).  However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed."  *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987).

### B.      Analysis

BofI seeks a new trial on several grounds.  First, for each of the claims discussed above, BofI weaves in the argument that the jury's conclusion was against "the clear weight of the evidence."  (*E.g.*, Mot. 9:17–19.)  Second, BofI argues Erhart's damages were excessive, warranting a new trial or a remittitur.  (*Id.* 19:18–22:3, 23:20–24.)  Finally, the Court confronts BofI's argument that there was a miscarriage of justice based on an evidentiary ruling, even though this issue is relegated to a lengthy footnote.  (Mot. 16 n.9.)

#### 1.      Weight of Evidence

The Court discussed the evidence for Erhart's claims under Rule 50(b) above, but now switches its lens to the Rule 59 standard, which allows the Court to independently assess the evidence and witnesses.  *See Experience Hendrix*, 762 F.3d at 842.  Having presided over the trial and again reviewed the evidence to adjudicate BofI's renewed request for judgment as a matter of law, the Court is unpersuaded "that the verdict is against the weight of the evidence."  *See Molski*, 481 F.3d at 729.  Given the credibility issues at the heart of the case, the Court also lacks the belief that the jury erred, let alone a "definite and firm conviction that a mistake has been committed."  *See Landes*, 833 F.3d at 1372.  Consequently, the Court finds a new trial is not appropriate on this first ground.

#### 2.      Excessive Damages

The Court turns to whether a new trial is appropriate based on Erhart's damages.  The Court already determined there was sufficient evidence for the jury to award Erhart damages for his retaliation and defamation claims.  That said, the Court may order a new trial if the amount awarded is "grossly excessive or monstrous."  *See Zhang*, 339 F.3d at 1041.

Erhart recovered damages under federal and state law.  As explored above, the Ninth Circuit does not require emotional distress damages to be supported by objective evidence.  *See Passantino*, 212 F.3d at 513; *Zhang*, 339 F.3d at 1040.  Similarly, under California law, "there is no fixed or absolute standard by which to compute the monetary value of emotional distress," and a "jury is entrusted with vast discretion in determining

- 23 -

the amount of damages to be awarded." *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1602 (2012). "It is the members of the jury who . . . are in the best position to assess the degree of the harm suffered and to fix a monetary amount as just compensation therefor." *Agarwal v. Johnson*, 25 Cal. 3d 932, 953 (1979), *disapproved of on other grounds by White v. Ultramar, Inc.*, 21 Cal. 4th 563 (1999)). A jury's determination will not be overturned unless the damages are incorrect as a matter of law or are the product of "passion, prejudice, or corruption." *Plotnik*, 208 Cal. App. 4th at 1602.

The Court first considers the damages for Erhart's retaliation claims. With the parties' support, the Court combined the verdict form's damages interrogatory for these claims out of concern "that having a damages section at the end of each cause of action could lead to double counting for what is essentially one harm." (Verdict Form Status Conference Tr. 23:1–2, ECF No. 261.) Therefore, the jury answered a single question for all three claims, awarding Erhart $1 million for his emotional distress and reputational harm. (Jury Verdict 4.)

This recovery, combined with the $500,000 defamation award, was but a fraction of what Erhart requested in his closing argument. (*See* Trial Tr. 13-3420:23 to 25 (arguing "the right numbers are this: $5 million for emotional distress, and $7 million for the destruction of his reputation").) The testimony indicated Erhart suffered years' worth of emotional distress from the Bank's actions, including anxiety, sleepless nights, and periods of difficulty breathing. And, contrary to the Bank's argument, the $1 million verdict on the retaliation claims is not "so excessive that it reflects clear passion and prejudice." (*See* Mot. 21:7–8.) Further, the Bank again relies on Second Circuit authority to assail Erhart's retaliation damages, but this reliance is misplaced. (*See id.* 20:22–22:3.) Overall, the Court is unconvinced that the jury's award for Erhart's retaliation claims is "grossly excessive or monstrous." *See Zhang*, 339 F.3d at 1041; *see also, e.g.*, *Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078, 1102 (D. Mont. 2019) (denying request for new trial or remittitur based on jury's award of "$500,000 for mental and emotional humiliation" while rejecting the

1  defendant's similar argument that emotional distress damages need objective supporting
2  evidence).

3          Turning to the damages for the defamation claim, BofI argues "$500,000 for
4  defamation damages is so grossly excessive that it simply reflects the jury's passion and
5  prejudice against BofI, which cannot stand.  At the very least, the Court should reduce
6  Erhart's recovery to no more than $1."  (Mot. 23:20–24 (citations omitted).)  This curt
7  argument is likewise unconvincing.  Erhart's professional reputation was impugned by the
8  CEO of a publicly traded company in a transcribed investor call, and Erhart testified those
9  defamatory comments continue to affect his career to this day.  The jury's award of
10  $500,000 is not excessive, and BofI does not show it was the product of "passion, prejudice,
11  or corruption."  *See Plotnik*, 208 Cal. App. 4th at 1602.

12      **3.      Miscarriage of Justice**

13          Last, BofI contends the admission of evidence about the Bank suing Erhart's mother
14  and girlfriend was so prejudicial that "permitting the verdict to stand would result in a
15  miscarriage of justice."  (Mot. 16 n.9.)  Some additional background is necessary.  Before
16  meeting with the OCC, Erhart used his girlfriend's laptop to compile his fifteen-page
17  "Notes for Whistleblower Discussion."  (Trial Tr. 5-1312:13 to 5-1313:9.)  Around the
18  same time, Erhart emailed his mother several documents related to his allegations of
19  wrongdoing for safekeeping.  (*Id.* 4-1056:15 to 4-1057:23.)  The Bank later sued not only
20  Erhart, but also his girlfriend and mother in separate proceedings to supposedly recover its
21  confidential information. (*Id.* 4-1115:15 to 17; 4-1116:11 to 15.)  These additional lawsuits
22  caused Erhart to feel awful and at blame for his mother's and girlfriend's predicaments.
23  (*Id.* 4-1118:3 to 7; *see also id.* 4-1115:15 to 20.)

24          The Bank wanted to keep this evidence out on relevance and Rule 403 grounds.
25  (Trial Tr. 4-1116:6 to 15; *see also id.* 5-1492:1 to 5-1497:3 (discussing this issue outside
26  the presence of the jury afterwards).)  The relevance objection was not well taken, however,
27  for at least two reasons.  First, as to Erhart's claims, the evidence addressed the "overall
28  picture," which was relevant to whether the Bank had a retaliatory intent when it terminated

1   him.  (*Id.* 5-194:1 to 19.)  *See Coszalter*, 320 F.3d at 978 (providing retaliatory intent "is a

2   question of fact that must be decided in the light of the . . . the surrounding circumstances").

3   Although this conduct occurred after BofI terminated Erhart, the jury could consider

4   whether the Bank's actions showed there was something afoot beyond Erhart being "just a

5   guy who walked off the job or abandoned his post and that was the end of it."  (Trial Tr. 5-

6   1494:11 to 13.)  Second, the evidence was plainly relevant to BofI's claim against Erhart

7   for breach of an employee confidentiality agreement based on him sharing the Bank's

8   information or documents.  Erhart was entitled to introduce the full story of what happened

9   to those documents, including to argue the Bank's claim was not genuine.  (Trial Tr. 5-

10  1494:20 to 5-1495:1 (reasoning Erhart "should be able to tell his story of what happened"

11  regarding the documents "and how this information ended up [t]here and how the Bank got

12  it back . . . that all goes to the issue of the Bank's damages.").)  Finally, excluding this

13  relevant evidence under Rule 403 was not justified.  (*Id.* 5-1495:2.)

14  　　　　Having now set the stage, BofI fails to demonstrate a new trial is warranted based

15  on the jury hearing this evidence.  "An error creates a miscarriage of justice if it 'seriously

16  impaired the fairness, integrity, or public reputation of judicial proceedings.'"  *Tan Lam v.*

17  *City of Los Banos*, 976 F.3d 986, 1006 (9th Cir. 2020) (quoting *C.B. v. City of Sonora*, 769

18  F.3d 1005, 1019 (9th Cir. 2014) (en banc)).  Initially, BofI does not show the Court erred

19  in its evidentiary determinations.  Further, to address the Bank's concerns that Erhart might

20  recover for emotional distress suffered by his mother or girlfriend, the Court gave a special

21  instruction to the jury.  (Instruction No. 42 ("Neither side may recover damages for any

22  injury suffered by any other party.  For example, Mr. Erhart may not recover damages for

23  any injury suffered by his girlfriend or his mother."); *see also* Instruction No. 38 ("You

24  must not include in any damages award any amount to punish or make an example of the

25  other side.  You must award only the damages that fairly compensate the injured party for

26  his or its loss.").)  BofI highlighted this special instruction to the jury and argued it

27  extensively during the Bank's closing argument.  (Trial Tr. 12-3245:12 to 12-3251:3.)  In

28  this case, "as in all cases," the jury is "presumed to follow the court's instructions."  *CSX*

*Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam).  Hence, BofI both fails to demonstrate the Court erred and that a miscarriage of justice occurred.  The Court consequently denies its request for a new trial on this final ground, which resolves the Bank's motion.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant BofI Federal Bank's Renewed Motion for Judgment as a Matter of Law or a New Trial.  (ECF No. 386.)

**IT IS SO ORDERED.**

**DATED: September 28, 2023**

Hon. Cynthia Bashant
United States District Judge

15cv2287